# 14-4662-cv

IN THE

# 𝕌𝕟𝕚𝕥𝕖𝕕 𝕊𝕥𝕒𝕥𝕖𝕤 ℂ𝕠𝕦𝕣𝕥 𝕠𝕗 𝔸𝕡𝕡𝕖𝕒𝕝𝕤

## FOR THE SECOND CIRCUIT

➤➤◄◄

MELISSA LULLO, JASON HALSTEAD, TAYLOR HALSTEAD, HEATHER HALSTEAD,

*Plaintiffs,*

*and*

JOHN RESTIVO, DENNIS HALSTEAD,

*Plaintiffs-Appellees,*

*(Caption Continued on the Reverse)*

*On Appeal from the United States District Court
for the Eastern District of New York (Central Islip)*

## BRIEF AND SPECIAL APPENDIX
## FOR DEFENDANT-APPELLANT

PETER J. TOMAO
600 Old Country Road, Suite 328
Garden City, New York 11530
516-877-7015

*and*

LANGONE & ASSOCIATES, PLLC
600 Old County Road, Suite 328
Garden City, New York 11530
516-795-2000

*Attorneys for Defendant-Appellant*

*v.*

NASSAU COUNTY, ROBERT DEMPSEY, in his individual capacity, FRANK SIRIANNI, in his individual capacity, MILTON GRUBER, in his individual capacity, HARRY WALTMAN, ALBERT MARTINO, in his individual capacity, CHARLIE FRAAS, in his individual capacity, THOMAS ALLEN, in his individual capacity, RICHARD BRUSA, in his individual capacity, VINCENT DONNELLY, in his individual capacity, MICHAEL CONNAUGHTON, in his individual capacity, WAYNE BIRDSALL, in his individual capacity, WILLIAM DIEHL, in his individual capacity, JACK SHARKEY, in his individual capacity, DANIEL PERRINO, in his individual capacity, ANTHONY KOZIER, in his individual capacity, DETECTIVE SERGEANT CAMPBELL, SHIELD 48, in his individual capacity, ROBERT EDWARDS, SEAN SPILLANE, in his individual capacity, DOE, OFFICERS AND DETECTIVES 1-10, in their individual capacities, RICHARD ROE, SUPERVISORS 1-10, in their individual capacities,

*Defendants-Appellees,*

*and*

CAROLANN HESSEMANN, as executrix of the Estate of JOSEPH VOLPE also known as JOSEPH VOLPE,

*Defendant-Appellant.*

# TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT........................................................1

JURISDICTION..........................................................................1

STATEMENT OF THE CASE AND PROCEDURAL
HISTORY.................................................................................2

QUESTIONS PRESENTED AND SUMMARY OF
ARGUMENT.............................................................................6

STATEMENT OF FACTS............................................................12

    Crime Scene.......................................................................12
    Autopsy.............................................................................12
    Pre-Arrest Criminal Investigation........................................13
    Continuing Post-Arrests' Investigation..................................22
    State Court Trials and Direct Appeals...................................26
    Newly Discovered Evidence..................................................28


POINT I    THE DISTRICT COURT SET ASIDE THE FIRST
JURY'S VERDICT BASED ON A MISINTERPRETATION OF
*BOYD V. CITY OF NEW YORK,* 336 F.3D 72 (2ND Cir 2003).............51

POINT II  THE DISTRICT COURT DENIED VOLPE A FAIR
SECOND TRIAL WHEN IT REFUSED TO ADMIT KOGUT'S
AND RESTIVO AND HOLSTEAD'S ADMISSIONS TO
ESTABLISH BOTH PROBABLE CAUSE TO PROSECUTE
AND LACK OF MALICE BY THE POLICE...................................60

POINT III    PMRB ANALYSIS IS NOT RELIABLE TO A
"SCIENTIFIC CERTAINTY;" PLAINTIFFS' EXPERTS
VIOLATED THE COURT'S ORDER BY TELLING THE JURY
THAT IT..................................................................................65

<u>POINT IV</u>   THE COURT'S PRECLUSION OF THE
TESTIMONY OF DEFENDANTS' EXPERT, DR. JOSEPH
 KADANE, WAS PREJUDICIAL ERROR .....................................76

<u>POINT V</u>   VOLPE WAS DEPRIVED OF A FAIR TRIAL DUE
TO AN ACTUAL CONFLICT OF INTEREST CAUSED BY THE
DEFENSE COUNSEL'S MULTIPLE REPRESENTATION OF ALL
DEFENDANTS...............................................…..............................80

<u>POINT VI</u>    PLAINTIFFS' POLICE PRACTICES EXPERT
MISLED THE JURY REGARDING THE APPLICABILITY
OF *BRADY* AND USURPED THE JURYS' ROLE AS THE
EXCLUSIVE FINDER OF FACTS...... ..........................................87

<u>POINT VII</u>   THE DISTRICT COURT ERRONEOUSLY
 POSITED A CONFLICT BETWEEN N.Y. GEN. OBLIG.
LAW § 15-108 AND 42 U.S.C. § 1983 AND IGNORED THE
GENERAL PROHIBITION AGAINST DOUBLE
RECOVERY.............................…....................................................94

<u>POINT VIII</u>  THE DAMAGES AWARDED WERE
EXCESSIVE................….................................................................99

<u>CONCLUSION</u> .......................................................................103

*Amore v. Navarro*, 624 F.3d 522) (2nd Cir. 2010)...............................55
*Amorigianos v. Ntl. R.R. Passenger Corp.,* 303 F.3d 256
(2nd Cir. 2002)....................................................................87
*Austin v. U.S.,* 509 U.S. 602 (1993).......................................55
*Baba Ali v. State of New York,* 24 Misc.3d 591 (Ct. of Claims 2009)....97
*Baker v. Gerould* 2005 WL 2406003, (W.D.N.Y. 2005)........................84
*Banks v. Yokemick,* 177 F. Supp.2d 239 (S.D.N.Y. 2001)...................95
*Barkley v. United Homes, LLC,* 848 F. Supp.2d 248 (E.D.N.Y. 2012)...98
*Barnes v. Graham*, 2009 WL 1424116 (S.D.N.Y. May 20, 2009)..........90
*Bender v. City of New York,* 78 F.3d 787 (2nd Cir. 1996).....................97
*Bernstein v. Piermont*, 2013 WL 571840 (S.D.N.Y Oct. 21, 2013)........84
*Boyd v. City of New York,* 336 F.3d 72 (2nd Cir. 2003)....................5, 51
*Bruton v. United States,* 391 U.S. 123 (1968).................................. 51
*California v. Trombetta*, 476 U.S. 479 (1984).................................89
*Carter v. State of New York*, 139 Misc.2d 423
(Ct. of Claims 1988)..........................................................96, 97
*Cobb v. Pozi*, 363 F.3d 89 (2nd Cir. 2004).................................51, 60
*Cinema Five, Ltd. V. Cinerama, Inc.,* 528 F.2d 1384 (2nd Cir. 1976......81
*Colon  v. New York,* 60 N.Y.2d 78 (1983)..........................................56
*Dagnello v. Long Island R.R. Co.,* 289 F.2d 797 (2nd Cir. 1961)............99
*Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993)........*Passim*
*Dunton v. Suffolk County,* 729 F.2d 903 (2nd Cir. 1984) .....................80
*Ephedra Prods. Liab. Litig.*, 393 F. Supp. 2d 181 (S.D.N.Y. 2005).......68
*General Electric Co. v. Joiner,* 522 U.S. 136 (1997).....................65, 76
*Giard v. Durby*, 360 F. Supp. 2d 229 (D.Mass.2005)..........................79
*Gonzalez v. New York,* 2009 N.Y. Misc. LEXIS 6570 (Ct. of Claims
2009)...................................................................................97
*Gordon v. Norman,* 788 F.2d 1194 (6th Cir. 1986)..............................86
*Giles v. Maryland*, 386 U.S. 66 (1967)............................................89
*Gonzalez v. State,* 26 Misc.3d 1212(a) (Ct. Claims 2009)..................101
*Gristwood v. State,* 119 A.D.3d 1414 (4th Dep't 2014)......................101
*Haley v. City of Boston,* 657 F.3d 39 (1st Cir. 2011)...........................87
*Halpern v. Rosenbloom,* 459 F. Supp. 1346 (S.D.N.Y. 1978)...............98
*Haynes v. City of New York,* 29 A.D.3d 521 (2nd Dep't 2006)............100
*Hoffman v. McNamara,* 688 F. Supp. 830 (D. Conn. 1998)..................95

*House v. Bell,* 547 U.S. 518 (2006)................................................58

*Illinois v. Fisher*, 540 U.S. 544 (2003)..........................................89

*Indu Craft, Inc. v. Bank of Baroda,* 47 F.3d 490 (2nd Cir. 1995)...........97

*Ismail v. Cohen,* 899 F.2d 183 (2nd Cir. 1990).................................102

*Jenkins v. City of New York,* 478 F.3d 76(2nd Cir. 2007)....................53

*Johnson v. City of New York,* 2011 WL 2693234 (S.D.N.Y. 2011).......100

*Kent v. Thomas*, 464 F. App'x 23 (2nd Cir. 2012)..............................64

*Kogut v. County of Nassau, et al,* 789 F.3d 36(2nd Cir. 2015).......5,52,65

*Kumho Tire, Co v. Carmichael*, 525 U.S. 137 (1999).........................67

*Kyles v. Whitley*, 514 U.S. 419 (1995)...........................................87

*Lightfoot v. Union Carbide Corp.,* 901 F. Supp. 166 (S.D.N.Y. 1995...100

*Lore v. City of of Syracuse,* 670 F.3d 127 (2nd Cir. 2012)...............65, 76

*Lowth v. Town of Cheektowaga,* 82 F.3d 563 (2nd Cir. 1996)................ 64

*Mason v. Oklahoma Turnpike Auth.*, 115 F.3d 1442
(10th Cir. 1997).......................................................................95

*Mason v. City of New York, 949 F. Supp 1068,* (S.D.N.Y.)..................95

*Memphis Community School Dist. V. Stachura,* 477 U.S. 299
(1987)....................................................................................95

*Mercado v. City of New York*, 2010 WL 3910594 (S.D.N.Y Sept. 30.
2010)......................................................................................84

*Nimely v. City of New York*, 414 F.3d 381 (2nd Cir. 2005)...................93

*Ortiz v. State*, No. 96390 (Ct. Claims 2000)..................................101

*Patterson v. Balsacorp.* 440 F.3d 104 (2nd Cir. 2006)........................86

*People v. Cintron*, 199 A.D.2d 526 (2nd Dep't 1993)..........................53

*People v. Halstead,* 180 A.D.2d 818 (2nd Dep't 1992) ........................ 28

*People v. Kogut,* 176 A.D.2d 757 (2nd Dep't 1991).......................... 27

*People v. LaBounty,* 127 A.D.2d 989 (4th Dept. 1987)........................89

*People v. Nelson*, 79 AD2d 171 (4th Dep't 1981)...............................53

*People v. Pacheco*, 38 A.D.3d 686 (2nd Dept. 2007)...........................89

*People v. Restivo,* 209 A.D.2d 448 (2nd Dep't 1994)........................... 28

*People v. Reome*, 15 N.Y.3d 188 (2010)..........................................56

*Peterson v. County of Nassau*, 995 F. Supp. 305 (E.D.N.Y.
1998).....................................................................................100

*Phansalkar v. Anderson Weinroth & Co.,* 344 F.3d 184
(2nd Cir. 2003).........................................................................94

*Pinsky v. Duncan,* 79 F.3d 306 (2nd Cir. 1996)................................64

*Raedle v. Credit Agricole Indosuez,* 670 F.3d 411 (2nd Cir. 2012).........59

*Ramierez v. New York City OTB,* 112 F.3d 38 (2nd Cir. 1997)..............99

*Rezulin Products Liability Litigation,* 309 F. Supp.2d 531 (S.D.N.Y. 2004)......................................................................................91

*Ricciuti v. NYC Transit Auth.,* 796 F. Supp. 84 (S.D.N.Y. 1992)..........84

*Scarbrough v. Myles,* 245 F.3d 1299 (11th Cir. 2001).............................55

*Sital v. City of New York,* 60 A.D.3d 465 (1st Dep't 2009)..................100

*Smith v. City of N.Y.,* 388 F. Supp.2d 179 (E.D.N.Y. 2005)...............64

*Smith v. Artus,* 2009 U.S. Dist. Lexis 50264 (W.D.N.Y. June 16, 2009)......................................................................................90

*Stampf v. Long Island R.R.,* 761 F.3d 192 (2nd Cir. 2014)..................99

*Stansbury v. Wertman,* 721 F.3d 84 (2nd Cir. 2013)..........................53

*State Farm Mut. Ins. Co. v. Campbell,* 538 U.S. 408 (2003)...............99

*Townes v. City of New York,* 176 F.3d 138 (2nd Cir. 1999)..................54

*United States v. Coppa* 267 F.3d 132 (2d Cir. 2001)........................ 89

*United States v. Agurs,* 427 U.S. 97 (1974)......................................88

*United States v. Bagley,* 473 U.S. 667 (1985)..................................89

*United States v. Bilzerian,* 926 F.2d 1285 (2nd Cir. 1991)..................88

*United States v. Duncan,* 42 F.3d 97 (2nd Cir. 1994)........................91

*United States v. Hunley,* 2010 WL 3527542 (W.D.N.Y. Sept. 7, 2010)......................................................................................90

*United States v. Mejia,* 545 F.3d 179 (2nd Cir. 2008)........................91

*United States v. Parcel of Property,* 337 F.3d 225 (2nd Cir.2003)..........54

*United States v. Schwartz,* 283 F.3d 76 (2nd Cir. 2002).....................84

*United States v. Williams,* 506 F.3d 151 (2nd Circuit 2007)..........67, 68

*United States v. Zucker,* 161U.S. 475 (1896)..................................55

*Walder v. U.S.,* 374 U.S. 62 (1954)..............................................57

*Valez v. City of New York,* 730 F.3d 128 (2nd Cir. 2013)............... 51, 60

*Zarcone v. Perry,* 78 A.D.2d 70, 79 (2nd Dep't 1980).........................97

*Zerega Ave. Realty Corp. v. Horbeck Offshore Transp., LLC,* 571 F.3d 206 (2nd Cir. 2009)..................................................92

## STATUTES

42 U.S.C. §1983...............................................................1,3, 94

28 U.S.C. §1291 .....................................................................1

C.P.L. § 60.22.......................................................................55

Court of Claims Act § 8-b...........................................................94

N.Y. Gen. Oblig. Law § 15-108 ............................................*Passim*

# PERIODICALS

Collins, Barbara W, "*The Effects of Temperature on Postmortem Morphology of Human Hair,*" Master's Thesis, June 1996.................71

Domzalski, Alison, "*The Effects of Environmental Exposure On Human Scalp Hair Root Morphology*" ...................................70

Jeffrey, Kathryn J., Abernathy, Kate A., Tutin, Caroline E.G., Bruford, Michael W., "*Biological and Environmental Degradation of Gorilla Hair & Microsatellite Amplification Success*" Biological J, of the Linnean Society, 2007 ...................................77

Kadane, Joseph B., "*Postmortum Root Banding of Hairs,*" April 19, 2010................................................................76

Kadane, Joseph B., "*Postmortum Root Banding of Hairs: a skeptical review,*" Law, Probability and Risk (2015) 14(3): 213-228 (Oxford University Press – April 1, 2015); Online Publication: doi:10.1093/lpr/mgv002........................................................76

Linch, Charles A., Prahlow, Joseph A., "*Postmortem Microscopic Changes Observed at the Human Hair Head*" *Proximal End,* J. Forensic Science 2001..........................................72

Risinger, D. Michael, Saks, Michael J., Thompson, William C., Rosenthal, Robert, "*Observer Effects in Forensic Science: Hidden Problems of Expectation and Suggestion,*" 90 Cal L. Rev. 1 (2002).......67

UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT
-----------------------------------------------------------------------X
JOHN RESTIVO and DENNIS HALSTEAD,
                    *Plaintiffs-Appellees,*


                    -v-


CAROLANN HESSEMANN, as Executrix of the
 Estate of Joseph Volpe,
                              *Defendant-Appellant.*
-----------------------------------------------------------------------X

## PRELIMINARY STATEMENT

Carolann Hessemann, as Executrix of the Estate of Joseph Volpe, a deceased Nassau County Police Detective, appeals from a final judgment entered in the United States District court, Eastern District of New York (Seybert, J.), upon a jury verdict finding the late Detective Joseph Volpe violated the constitutional rights of John Restivo and Dennis Halstead, and awarding each plaintiff $18 million dollars in compensatory damages (and $5 million in legal fees).[1]

## JURISDICTION

The action was commenced in the District court pursuant to 42 U.S.C. § 1983. This Court's jurisdiction is invoked pursuant to 28 U.S.C.

---

[1] On January 3, 2011, Det. Volpe passed away (T-II 745). March 25, 2011, Carol Hessemann, as Executrix of Volpe's Estate, was substituted for the late Det. Volpe.

§ 1291. Final judgment was entered in the District court on November 17, 2014. A timely notice of appeal was filed on December 17, 2014 (A 1-3).[2]

## STATEMENT OF THE CASE
## AND PROCEDURAL HISTORY

On December 5, 1984, the body of 16-year-old Theresa Fusco was found naked in a wooded area of Lynbrook, New York. She was raped and strangled. She was last seen leaving her job at Hot Skates, the local roller rink, at about 9:47 p.m., on November 10, 1984. Virtually every detective in the Homicide Unit of the Nassau County Police Department worked on the case. Detective Volpe was the lead detective; his supervisor was Lt. Shaun Spillane.

In early 1985, the police received information that plaintiffs John Restivo, Dennis Halstead and John Kogut murdered Ms. Fusco. Kogut subsequently confessed and implicated Halstead and Restivo in the rape/murder. Restivo and Halstead also made incriminating statements to the police and to others. The plaintiffs' admissions were ostensibly corroborated by Ms. Fusco's hairs having been found in Restivo's van. In

---

[2] "A" followed by numbers refers to the Appendix; "SA" refers to the annexed Special Appendix; "T-I" refers to the first trial transcript; and "T-II" refers to the second trial transcript.

1986, Kogut, Restivo, and Halstead were tried and convicted of the rape and murder.[3] Each was sentenced to 33 years to life in prison. Their convictions were affirmed on appeal.

Almost 18 years after their convictions, DNA technology excluded Kogut, Restivo, and Halstead as the source(s) of semen that was found inside Ms. Fusco's body.[4] Based on this newly discovered evidence, plaintiffs' convictions were vacated. Kogut was retried and acquitted, after which, on December 21, 2005, the indictment was dismissed as to all three men in the interest of justice.[5]

Restivo, Halstead, and Kogut subsequently brought separate 42 U.S.C. §1983 actions claiming that they were wrongfully convicted due to pervasive police misconduct.[6] They brought duplicative actions in the New York State Court of Claims, where each settled for $2.2 million.

---

[3] Kogut was tried separately and convicted by a different jury.

[5] The People retried Kogut based on his confession. Nassau County Judge Victor Ort dismissed the case after finding that "the questioned hairs were [not] left in the van on or about November 10th of 1984, and absent those hairs, there is no corroboration, whatsoever, for [Kogut's] confession concerning the count of rape" under New York State Law.

[6] Restivo and Halstead filed a joint complaint (06 CV 6720). Kogut filed a separate complaint (06 CV 6695). The cases were initially

Among the parade of officers named as defendants in the federal civil rights complaint were Det. Joseph Volpe, Det. Charles Fraas and Supervisor Lt. Shaun Spillane.[7] Plaintiffs alleged that the police officers acted in concert with each other (and others) to fabricate evidence by planting Fusco's hairs in Restivo's van, and by suppressing exculpatory evidence (i.e., jeans and a rope) recovered from a car that was stolen close to where Ms. Fusco was last seen on the night she was murdered.

Plaintiffs sought compensatory damages for pain and suffering and for loss of liberty based on wrongful imprisonment. The defendants denied that they had engaged in any unlawful conduct and maintained that they acted in good faith.

The case was tried twice. The first trial ended in a jury verdict exonerating all the defendants. A motion for a new trial was granted on July 22, 2013, on the grounds that the jury should not have been permitted to use Kogut's confessions to demonstrate that the police had probable cause to arrest Restivo and Halstead, since Kogut's confession

---

consolidated and then unconsolidated after the district court granted Restivo and Halstead a new trial (Dist. Ct. ECF # 100).

[7] Detectives Robert Dempsey, Frank Sirianni, Thomas Allen and Wayne Birdsall were also named defendants.

was not admissible at Restivo and Halstead's state court criminal trial. Misinterpreting *Boyd v. City of New York*, 336 F.3d 72, 74 (2nd Cir. 2003), the district court held that only evidence that was "admissible" at Restivo and Halstead's *state court criminal trial* could be considered by the jury in the § 1983 civil rights trial. The purported error was prejudicial because, "Kogut's confession was arguably one of the central pieces of evidence" in the defendants' case (SA. __). (The District court denied Volpe permission to file an interlocutory appeal. *See* Dist. Ct. ECF # 116.)

Employing like reasoning, Kogut argued the jury should not have heard statements made by Restivo and Halstead implicating him in the murder. Kogut's motion was denied because his (voluntary) confession "play[ed] a . . . pivotal and troubling, role in this case" (SA 15, A. 264). (In *Kogut v. County of Nassau, et al,* 789 F.3d 36, 44 (2nd Cir. 2015), this Court affirmed Judge Seybert's order, noting the "devastating detail" of Kogut's confession implicating Restivo and Halstead in the murder.) [8]

At the second trial, after three days of deliberations, the jury found Det. Fraas not liable, but found Det. Volpe liable. A separate

---

[8] The District court denied Volpe permission to file an interlocutory appeal. *See* Dist. Ct. ECF # 116.

damages trial was held on April 11, 2014. The jury awarded Restivo and Halstead each $18 million (plus approximately $4 million in legal fees). This appeal ensued.

## QUESTIONS PRESENTED AND SUMMARY OF ARGUMENT

I.      Whether the District court erred in granting plaintiffs a new trial based on the jury being allowed to use Kogut's confession in determining whether the police had probable cause to arrest and prosecute plaintiffs?

Contrary to the District court's holding, Volpe was entitled to have the jury consider Kogut's confessions on the crucial issue of probable cause to arrest and prosecute Restivo and Halstead. In *Kogut v. County of Nassau, supra,* this Court upheld the District court's denial of Kogut's motion for a new trial, not because of the "devastating detail" and "troubling" aspects of Kogut's confession, but because,

> We . . . do not interpret *Boyd* to mean that only evidence that was in fact admitted at the criminal trial may be considered in a subsequent civil trial on the issue of probable cause to prosecute. Prosecutors are not required to offer into evidence every shred of evidence they have as to guilt; and if they have sufficient admissible evidence, *Boyd* does not preclude the admission of additional evidence in the later civil suit. *Id.* 789 F.3d at 45.

*Kogut* establishes that the District court erred when it granted Restivo and Halstead a new trial. The verdict at Trial II should be vacated and the Verdict at Trial I should be reinstated. Point I.

II.     Whether Volpe was denied a fair, second trial due to the District court's preclusion of both Kogut's confessions and Restivo's admissions made to both civilians and law enforcement personnel?

In addition to Kogut's confessions, both Restivo and Halstead made several self-inculpatory statements to the police and to civilians. However, at the second trial Volpe was neither allowed to use Kogut's confessions nor Restivo's admissions either as evidence in chief or to impeach Restivo and Halstead's self-serving testimonies. This evidence was admissible both to establish the existence of "probable cause" and the absence of "malice" by the police in allegedly suppressing purportedly exculpatory evidence. These admissions were also admissible to rebut plaintiffs' trial claims of "actual innocence." Point II.

III.    (A) Whether Post-Mortem Root Banding is sufficiently reliable to be admissible under *Daubert*? And (B) Whether plaintiffs' expert witness violated the District court's ruling limiting the expert's opinion to a "reasonable belief," and not to a "reasonable degree of

scientific certainty," when the expert told the jury that he believed his opinion met the standard of "scientific certainty"?

Two hairs (denoted "Q-8") from Theresa Fusco's body were found inside Restivo's van after the police impounded and searched it on March 26, 1985. At the federal civil rights trial, plaintiffs argued that the police planted Fusco's hairs inside the van. Plaintiffs alleged that decomposition of the hairs established that they were placed in the van after death because such decomposition only occurs, if at all, several hours (if not days) after death, and the medical examiner testified that Ms. Fusco's body was placed in the weeds where it was found within a an hour after her death.

A *Daubert* hearing was conducted to determine whether the hair root decomposition analysis, known as Post Mortem Root Banding ("PMRB"), was a generally accepted scientific technique. Although the court ruled it was not, it still allowed plaintiffs' expert witness to opine to a "reasonable probability" – not to a "reasonable degree of scientific certainty" – that the hairs were placed inside the van sometime after the murder. However, at the trial, plaintiffs' experts eviscerated the court's compromise ruling by telling the jury that it was "impossible" for

the hairs to have been inside the van at the time of Ms. Fusco's death, and by telling the jury that PMRB analysis was reliable to a "scientific certainty." Point III.

IV.    Whether the district court erred in precluding Volpe from calling a statistician to demonstrate, by statistical analysis, that PMRB analysis was not scientifically reliable?

Dr. Joseph Kadane, PhD, would have testified that, based on the small population sets used in the cadaver experiments, it is statistically spurious to conclude, to a scientific certainty, that PMRB can never occur in hair removed from the scalp of a living person or a person who had just died. His testimony would have been based on a statistical analysis of the data contained in the cadaver studies that plaintiffs' experts relied on in arriving at their opinions. We submit that Det. Volpe had a right to present statistical evidence to the jury to discredit the alleged scientific reliability of PMRB analysis. Point IV.

V.    Whether Volpe was denied a fair trial due to an actual conflict of interest at both the first and second trials?

Nassau County hired the law firm of Freeman, Nooter & Ginsberg ("FN&G") to represent *all* defendants at both trials. Only after the

second trial, did the district court disqualify FN&G when it was revealed that Nassau County intended (since rescinded) not to indemnify defendants if the jury found any defendant liable. However, the evidence was indisputable that Det. Volpe did not have the opportunity to plant the hairs found inside Restivo's van. Det. Volpe was interrogating Halstead at the time the van was impounded. Det. Charles Fraas (a hair fiber expert) and Police Officer Wayne Birdsall (a serologist) searched the van at the direction of a supervisor. P.O. Birdsall found the hairs and gave them to Det. Fraas who placed them in an evidence locker in the crime lab. There was no evidence that Det. Volpe placed the hairs inside the van, or that he had access to Det. Fraas' evidence locker. Indeed, plaintiffs' counsel foresaw this dilemma and argued to the (second) jury that Det. Fraas acted in concert with Det. Volpe in planting the hairs. Incongruously, the jury found Det. Fraas *not* liable but found Det. Volpe liable.

A conflict-free lawyer would have argued that if anyone planted the hairs, it was Det. Fraas and/or P.O. Birdsall who did so without Volpe's involvement. However, that would have required defense counsel to sacrifice his other client, codefendant Det. Fraas. Clearly,

defense counsel's failure to save Det. Volpe was due to conflicting interests and a lack of a single-minded devotion to the interests of Det. Volpe. Point V.

VI.   Whether plaintiffs purported "police practices" expert misled the jury on the meaning of *Brady* and usurped the jury's role as fact finder on the issues of probable cause and malicious prosecution?

Russell Fischer misstated the law in effect in 1985 governing a prosecutor's duty to "learn" of available exculpatory evidence. Furthermore, he mischaracterized commonly used statements in an affidavit as having technical legal meaning. He also opined on the ultimate issue of whether a rope and jeans recovered from John French's stolen car constituted *Brady* material.[9] Point VI.

VII.   Whether the District court erred by disallowing a set off by $2.2 million each plaintiff received from their duplicative settlements with the State of New York for "loss of liberty, including physical injury or physical illness;" the duplicative federal damages awards were for "physical injuries, pain and suffering, severe mental anguish, emotional distress, [and] loss of income"? (A. 134 ¶ 125) (Amended Complaint).

_____

[9] The admissibility of "police practice" experts in a "wrongful conviction" case is a case of first impression in this Court.

VIII. Whether the $18 million damages awarded to each plaintiff "shocks the conscience" and should be substantially reduced?

## STATEMENT OF FACTS

<u>The Crime Scene</u>

On December 5, 1984, Theresa Fusco's naked and brutalized body was discovered by two teenage boys by the railroad tracks near Park Place and Rocklyn Avenue in Lynbrook. The body was in hidden in bushes, covered with debris and wooden pallets, in a secluded area known by local teenagers as "the Fort" (T-I 5012-14). On December 13, 1984, during a renewed search of the area, the police found a gold unicorn-type charm Ms. Fusco was wearing on the day she was murdered (T-I 2483).

<u>The Autopsy</u>

An autopsy was performed on December 6, 1984; the cause of death was ligature strangulation. Dr. Tara Bloom of the Nassau County Medical examiner's Office opined that Ms. Fusco's body was likely placed (where it was found) about one hour after she was killed, i.e., before rigor mortis had set in (T-I 5109-10; T-II 700-03). The body was

covered in weeds and twigs and her hair was covered in leaves (T-I 5117; T-II 707).

At Trial II, Dr. Bloom opined that Ms. Fusco was most likely strangled with a short rope (or other piece of twisted cloth [T-II 718]) less than six feet long and about one inch thick. The marks on her neck indicated that the rope was wrapped around the back of her neck just once but crisscrossed twice in the front of the neck where the pressure was applied. The two ends of the rope were probably twisted like a cork screw to strangle her (T-II 720-22, 725).

Ms. Fusco had also suffered severe blows to her face prior to her death (T-II 713). Based on the extensive facial injuries, blood visible to the naked eye would most likely have been on the rope (T-II 722).

The Pre-Arrest Criminal Investigation

Virtually every detective in the homicide unit for some time worked on the Fusco murder investigation (T-II 661). 400-500 potential witnesses were interviewed; and 16,000 pages of police reports were generated (T-I 1577, 2560, T-II 661, 1903-04).

<u>Harold Smyle</u>

The first break in the case came on January 20, 1985, when Harold Smyle told his friend Ilene Tosner that he knew who murdered Theresa Fusco. Ms. Tosner told her mother, who was friends with Theresa Fusco's mother. While Smyle denied making this statement at the first civil rights trial (T-I 5375), plaintiffs at the second trial stipulated that Smyle did provide information to the police that plaintiffs were involved in the crime (T-II 2583-84).

On March 5, 1985, Smyle told Det. Volpe that he and Restivo were friends; Smyle's wife was related to Restivo's girlfriend Joann (T-I 5365, T-II 1605). About one month before Ms. Fusco's body was discovered on December 5, 1984, Restivo and Smyle were driving by a local hangout known as "The Fort" in Smyle's car when Restivo mentioned that he knew Ms. Fusco had been "strangled" and who did it: "I know who killed her. . . . I can't tell you who did it." A few blocks later, as they were driving past a cemetery, Restivo said, "They will probably find the [Kelly] Morrissey girl in the cemetery" (A. 380).[10] On March 27, 1985,

_____

[10] Kelly Morrissey was a teen who went missing around the same time as Fusco, and has never been found. The district court precluded the defense from introducing evidence that Morrissey had keys to

Smyle reaffirmed his statements in the presence of Det. Volpe, Det. Sirianni and Det. Perino (A. 385-90; T-I 5405).

Restivo Interview

Based on Smyle's lead, Det. Volpe and Det. Dempsey interviewed plaintiff John Restivo on March 5-6, 1985. Restivo told the detectives that one day in November or December 1984, he and plaintiff Dennis Halstead were drinking alcohol in Halstead's apartment when Halstead suddenly started acting strange and admitted that he had raped and murdered a young woman. Halstead "started talking about a broad (girl); that he was either by a cemetery, in a cemetery or across from a cemetery. He [Halstead] tried to fuck her, then he had to fuck her up, but when he said that he didn't tell me how he fucked her up. He then told me that he strangled her and killed her. When Dennis told me this, I went into the bathroom to clear, and I came out and left" (A. 378).

Restivo admitted telling Smyle that Kelly Morrissey's body would probably be found in the cemetery. Restivo saw Ms. Morrissey in Halstead's apartment on several occasions shortly before her disappearance. *Id.*

Halstead's apartment and was dating him at the time of her disappearance (T-II 1994-2002).

After speaking with the police, Restivo told Smyle he had a "big mouth" and should "shut up" and stop cooperating with the police (T-I 3757, 5390). (Plaintiffs stipulated that John Restivo had threatened Smyle to keep his mouth shut [T-II 2583-84].)

John Kogut

On March 21, 1985, Det. Volpe and Det. Dempsey interviewed John Kogut (T-I 1315). Kogut admitted knowing Restivo and Halstead but denied knowledge of Ms. Fusco's murder. Kogut knew Kelly Morrissey from high school and knew that Halstead was romantically attracted to her (A. 314-22).

On March 25-26, 1985, Det. Volpe and Det. Dempsey interviewed Kogut again (T-I 1355). They gave him *Miranda* warnings (T-I 1482).[11] Ultimately Kogut confessed. In a seven page confession, he described in detail how he, Restivo and Halstead raped and murdered Ms. Fusco (T-I

---

[11] Kogut testified that he knew his *Miranda* rights from a prior arrest (T-I 1478).

1466).[12] Kogut repeated that confession on videotape to then ADA George Peck, now a judge in Nassau County (T-I 1467).

Kogut and Halstead worked as movers for Restivo's moving company. On the night of the murder, after they had just finished a job in East Rockaway, they rode around in Restivo's van drinking alcohol and smoking marijuana. Restivo drove. Halstead was in the front passenger seat. Kogut sat on a cushion in the back of the van. Between 8:00 to 10:00 p.m. they saw Theresa Fusco walking on Merrick Road near a cemetery. Fusco appeared to be about 15-16 years old, and was wearing a blue denim dungaree jacket, a dark tank top, dark pants and white high top sneakers. Halstead recognized her and told Restivo to pull over; Halstead wanted to ask Fusco if she wanted "to party, meaning maybe smoke or have some beers." Halstead offered to give Fusco a ride home and she accepted. Kogut opened the side door of the van and let her in (A. 315-16).

Ms. Fusco knelt down in the space between Restivo and Halstead. She told them she had been fired from her job that evening. Halstead

---

[12] This was the seventh version of the confession. Volpe had to discard the earlier ones because Kogut kept arguing with the words he used (T-I-1656).

asked her if she wanted to party to forget about it. As they approached a cemetery, Halstead asked Ms. Fusco if she wanted to "do the right thing?"' Ms. Fusco became angered and told Restivo, "'Stop the fucking van and let me out!'" Halstead jumped out of his seat and grabbed her. Ms. Fusco screamed to leave her alone and let her out. Kogut joined in groping her, and she slapped him in the face. Kogut punched her in the face; he said: "With this I freaked out; I got crazy, and I punched her with my left fist on the right side of her face. She falls out of Dennis' grip to the floor of the van." Kogut punched Fusco again in the face rendering her semi-unconscious (A. 317).

Kogut then jumped on top of her. Halstead removed her pants and underwear while Kogut tore off her blouse and bra. Kogut told Ms. Fusco to stop screaming and crying while Halstead was raping her. By then Restivo had parked in the cemetery and told Halstead that he, too, "wanted a piece." After Halstead was done, Restivo got on top of Fusco. By the time Restivo was finished, Fusco was almost unconscious; Kogut described her as "fainting" (A. 317).

Kogut then placed a quilted moving blanket on the ground next to the van. Restivo and Halstead carried Ms. Fusco out of the van and

placed her face up on the blanket. Kogut noticed a gold chain around her neck "with what looked like a double heart on it with a piece broken off of it."[13] Kogut ripped the chain off her neck and took other jewelry she had and placed the items in his pocket (A. 317-18).

Ms. Fusco began crying again and said she was going "to tell" on them, at which point plaintiffs decided they had to kill her or she would have them arrested. Kogut "got on top of her, put [his] knees on her shoulders and covered her mouth. My back was to John and Dennis and one of them threw me a rope. One of them said, 'Do what you gotta do.'" Meanwhile, Halstead sadistically told Ms. Fusco, "'You have to die.'" Kogut took a rope from inside the van and "wrapped it double around her neck, then I twisted it like a cork screw. I twisted it for a few minutes until her body went limp, and I felt she was dead." In the video recording of his confession, Kogut made a "corkscrew" motion with his hands (T-I 1506).

---

[13] The half-heart charm was given to her by her best friend Lisa Kaplan who wore the other half around her neck (T-I-670; T-II 2282).

Kogut then rolled Ms. Fusco's lifeless body in the blanket, lifted it over his shoulder and placed it in the van with the rope.[14] Restivo then drove out of the cemetery to find a place to hide the body. Meanwhile, Ms. Fusco's clothing and her purse were placed in a plastic bag and secreted underneath the front passenger seat of the van. Restivo said he would dispose of her belongings.

Kogut described the purse as maroon a strap (A. 319). (Ms. Fusco's mother had told the police that her daughter was carrying a maroon pocketbook on the day of her disappearance.)

They drove to "The Fort," a hideout Restivo knew as a youth. Restivo and Halstead carried the body from the van and into a secluded wooded area. Restivo "was carrying her by her head and walking backwards and Dennis had her feet." They removed the body from the blanket and left her face down in the dirt. They covered Ms. Fusco with leaves and wooden pallets. As they were walking out of the woods, Kogut threw the jewelry in the woods.[15] They brought the blanket back

---

[14] Kogut was obviously physically strong, being both a furniture mover and a landscaper by trade (T-I 1488).

[15] Det. Thomas Allen discovered a ring and a unicorn charm near where Fusco's body was found in the woods (T-I 2542, T-II. 2579).

to the van. Kogut declined a ride home, saying he wanted to walk to his friend Brian Skellington's house (A. 322).[16]

## Brian Skellington

Brian Skellington corroborated Kogut's confession. Skellington lived in a basement apartment in Lynbrook. On May 5, 1986, Skellington told the police that on the morning of Sunday, November 11, 1984, Kogut came to his house exhausted. Kogut said he had gotten high with Restivo and Halstead in Restivo's van the night before, and that they were with a girl. When Skellington asked who she was, Kogut said, "You don't want to know." Kogut had scratches on his arms and blood on his shirt. Skellington was angry that Kogut brought blood and dirt into the house and loaned Kogut a shirt (T-I 1287-89, 1707, 2331-32).

---

[16] After sitting in jail a few days, Kogut renounced his confession, saying it was coerced due to 24 hours of interrogation and beatings. However, his video-taped confession showed no signs of exhaustion, cuts or bruises, or any other indicia of coercion. *See* A. 433. Both the *nisi prius* and the Appellate Division found Kogut's confession voluntary.

On March 27, 1985, Det. Volpe and Det. Perrino re-interviewed Smyle. Along with reiterating what he had previously told the police, Smyle added:

> I also wish to state that yesterday, after learning the news that Kogut had got arrested, I wanted to call Joann, John Restivo's girlfriend, and I wanted to tell Joann that if the police come to the house, I wanted her to be aware of what was going on. . . . . *She asked me if the body was found in a moving blanket.* I told her I didn't know (A. 385) (emphasis added).

Continuing, Post-Arrest Investigation

Restivo and Halstead were incarcerated from the time of their arrests on June 20, 1985, until the time of their release on June 11, 2003 (T-II 548, 3494). Meanwhile, the investigation continued.

Michael Backman

On April 3, 1985, Det. Sirianni and Det. Connaughton interviewed Michael J. Bachman, who was also Kogut's friend. Bachman told the police that Kogut made collect calls to him from the Nassau County Jail and said that he was "toasted" on the night of the murder and that Restivo and Halstead committed the crime with him (A. 323).

## Halstead's Intercepted Admission

On April 6, 1985, pursuant to an eavesdropping order, the police overheard a conversation between Halstead and his sister Linda in which Halstead said that he knew he was going to be arrested for the Fusco murder (T-II 1097). When Linda asked, "Were you with him?" Halstead said, "Yeah" (TI-4091; T-II 1100).

## Kenneth P. Cockerel

Kenneth P. Cockerel worked for Restivo; they were once good friends. Restivo was the godfather to Cockerel's daughter (T-II 1625-26).

On April 19, 1985, Det. Volpe and Det. Allen interviewed Cockerel (T-I 2495). Cockerel told them that in March, 1985, a few days after Kogut was arrested for the Fusco rape/murder, Cockerel overheard Restivo tell Kenneth's brother Michael Cockerel: "I got my piece of ass but I didn't choke her" (T-I 2497). Restivo and Michael stopped talking when Kenneth entered the room (T-I 3073-76; 3261, 3488, 3499; A. 394).

Kenneth gave a second statement to Det. Volpe and Det. Sirianni on June 10, 1985, the day he testified in the grand jury. In this statement, he said he overheard Restivo mention the name "Theresa" and say "I was there, but I didn't choke the bitch" (T-I 2506).

## David Rapp

Det. Volpe and Det. Allen interviewed David Rapp on May 9, 1994. Rapp and Restivo were friends. Rapp told the police that Restivo became nervous after Kogut's arrest. Restivo said that he and Halstead were near where the murder occurred and "'shouldn't be seen together'" (A. 298).

## Carl Pozzini

Det. Volpe interviewed Carl Pozzini on June 10, 1985. He, too, was Restivo's friend. One day after Kogut was arrested, Rapp mentioned to Pozzini and Restivo that Kogut was in deep trouble. Restivo's response was "that he [Restivo] was wasted or dusted on Angel Dust and didn't remember too much. He admitted that he was involved but claimed that he tried to stop it. Restivo told them that he was really scared and didn't want his girlfriend, Joann, to find out" (A. 395).

## Brian O'Hanlon

On September 12, 1985, Brian O'Hanlon was interviewed by Det. R. Lane and Det. H. Waltman. One week after Halstead was arrested, he called O'Hanlon from the Nassau County Jail and said that he, Restivo and Kogut picked up Fusco by Hot Skates; that he (Halstead)

smacked her, and removed her pants and raped her (T-I-1059).[17] Halstead said they drove into a cemetery where Kogut killed her by wrapping a rope around her neck (A. 332).[18]

### Steven Dorfman

On April 2, 1986 (and again on June 25, 1986), Steven Dorfman was interviewed by Det. Volpe and Det. Connaughton. Dorfman was a pretrial detainee with Restivo at the Nassau County Jail. Restivo told Dorfman that Restivo, Halstead and Kogut were together when Ms. Fusco got into the van and Halstead wanted to have sex with her. After she resisted, they raped and murdered her. Restivo said that Kogut raped her first, followed by Halstead, and then Restivo. Kogut strangled her with a scarf. Restivo told Dorfman that Halstead and Kogut had also murdered another girl who disappeared around the same time (A. 327).

### Patrick Proctor

On May 12, 1986, Patrick Proctor (in the presence of his attorney) was interviewed by ADA Fred Klein, Det. Volpe, and Det. Connaughton.

---

[17] Confirming Kogut's confession that Halstead had removed her pants.

[18] Confirming Kogut's confession that the murder occurred at the cemetery and that Kogut strangled Fusco with a rope.

Proctor was an inmate with Kogut at the Nassau County Jail when Kogut admitted that he, Restivo and Halstead had raped and murdered Fusco. Word in the jail was that Halstead was going to take a plea. Kogut said Halstead had better not, because if he did, Kogut would tell the police how Halstead murdered another girl and buried her body upstate near where Halstead used to hunt. Kogut said that if they had more time, they would have buried Ms. Fusco upstate like they did the other girl. (A. 329).

Samuel Newsome

On October 22, 1986, Samuel Newsome was interviewed by the police (names unknown). He was confined at the Nassau County Jail with Dennis Halstead. He said that in January, 1986, Halstead initially said he was innocent, but then admitted that he raped and murdered Fusco with Restivo and Kogut while high on alcohol and cocaine (A. 400).

## State Court Trials and Direct Appeals[19]

In April, 1986, Kogut was tried under Nassau County Indictment No. 61029. The evidence offered against him was his confessions, his admission to Brian Skellington, and the two hairs recovered from Restivo's van that were Fusco's. Kogut was convicted; on May 28, 1986, he was sentenced as a second felony offender to 33-1/3 years to life in prison. His conviction was affirmed on appeal. *People v. Kogut,* 176 A.D.2d 757 (2nd Dep't 1991) (holding, *inter alia,* "[t]he totality of the circumstances indicate that [Kogut's] statements were voluntarily made"), *lv. denied,* 79 N.Y.2d 859 (1992).

In January, 1987, Halstead and Restivo were tried together under Nassau County Indictment No. 61322. The evidence against Halstead included his incriminating tape-recorded statements to his sister; and statements he made to his friends, Brian Skellington and Brian O'Hanlon, as well as to Samuel Newsome, a fellow inmate at the Nassau County Jail.

---

[19] Taken from "Respondent's Briefs" submitted to the Appellate Division, Second Department. The briefs will be made available at the Court's request.

The evidence against Restivo consisted of his confession to fellow inmate Steven Dorfman, several incriminating remarks to friends (listed above), an attempt to establish a false alibi with Michael and Dawn Cockerel, and Fusco's hairs found in his van.

Halstead and Restivo were both convicted; and on February 6, 1987, and on February 24, 1987, respectively, each was sentenced to 33-1/3 years to life in prison. Their convictions were affirmed on appeal. *People v. Halstead,* 180 A.D.2d 818 (2nd Dep't 1992) (holding, *inter alia,* that Halstead's confession to Newsome was not given in violation of Halstead's right to counsel), *lv. denied* 80 N.Y.2d 904 (1992); *People v. Restivo,* 209 A.D.2d 448 (2nd Dep't 1994), *lv. denied,* 88 N.Y.2d 1024 (1996).

The Newly Discovered Evidence

In this § 1983 litigation, Restivo and Halstead claim that (a) they are actually innocent; (b) Det. Volpe knowingly and intentionally suppressed *Brady* material (i.e., the rope and jeans recovered from John French's stolen car); and (c) Det. Volpe maliciously prosecuted the plaintiffs by fabricating evidence (i.e., by planting Fusco's hairs in Restivo's van) in order to convict them. Their claims are meritless.

(a) DNA Did Not Exonerate Restivo and Halstead; It Just
Excluded Them as being the Donor(s) of the Sperm Found Inside
Fusco's Body.

At the time of the criminal trial, DNA testing was unavailable.

However, subsequent DNA technology established that the sperm found

inside Ms. Fusco's body was not from any of the plaintiffs (T-II 426-28,

432). Ms. Fusco may have had intercourse as long as12 hours prior to

the time she was murdered (T-II 436-43). At the time of her death, Ms.

Fusco had a boyfriend she worked with at Hot Skates who was African

American (T-I 597-98, T-II 2284; 2299-2300).

While Ms. Fusco's mother, Connie Napoli, believed her daughter

was a virgin, she conceded that her daughter might not have told her if

she was sexually active (T-I  652; T-II 2283-84).

Contrary to Restivo and Halstead's claim, the absence of their

sperm in Ms. Fusco's body is not proof of their actual innocence. First of

all, it is plausible that "plaintiffs" did not ejaculate inside the crying

and screaming girl during the violent attack. Second, the "plaintiffs"

might have used condoms. There was evidence that Halstead "like[d]

young girls," had a 16-or-17-year-old girlfriend when he was 28 years

old, and may have been dating teenager Kelly Morrissey at the time of

her disappearance (T-II 2045).[20] Condoms would have been a standard item in their wallets to avoid impregnating their fertile young sex partners, for fear of the legal [statutory rape] and/or familial [angry fathers] repercussions for their exploitations. Of course, had they used condoms when they raped Ms. Fusco, they would not have left their semen in her body.

(b) <u>There Was No Evidence of Any Purposeful *Brady* Violation</u>

Restivo and Halstead proffer rank speculation in arguing that Det. Volpe purposefully withheld exculpatory information, to wit: the jeans and rope found in a stolen car recovered about one mile from where Ms. Fusco went missing. However, not only is there no basis to conclude that this evidence was exculpatory, there was no evidence that it was in fact withheld.

To begin, it must be noted that the police file in this case comprised of dozens of bankers boxes. Many documents were lost from 1984 over the past twenty years. But several documents relating to the stolen car were in a box with crime scene photos, including a detailed report prepared by Det. Volpe dated November 11, 1984, in which he

---

[20] The court noted, "Nobody knows where Kelly Morrissey is" (T-II 2048).

described in minute detail his investigation into the stolen car (T-II 1046, 1289-90, 1795-99).

On the same day Ms. Fusco went missing, a car (owned by John French) was stolen about a mile away (T-I 877). French found it vandalized in a lot on November 18, 1984 (T-I 885; T-II 2038-40). When the car was recovered, Lori Gabberty, John's sister, found a rope in the car and a pair of jeans behind the front seat (T-I- 890; 934; 950). She brought the jeans to the Lynbrook Police (T-II 2052). The Lynbrook Police, who function independently of Nassau County Police, subsequently discarded the jeans. Plaintiffs claim the jeans were exculpatory because they were "striped jeans" similar to the type of jeans Ms. Fusco was wearing on the day of her murder.

First of all, the jeans found in the car did not match the description of Fusco's jeans. Ms. Gabberty testified that the jeans she found were not striped; rather, the jeans had stitching that made them look like they were striped (T-I 946-48; T-II 2042, 2072, 2074). "The stitching went down the leg, and that's what I referred to as the stripe," she said (T-II 2075). John French himself did not recall if the jeans were striped (T-II 2218).

Ms. Gabberty remembered bringing the jeans to the Lynbrook police station and giving them to the front desk (T-I 936; T-II 2077). She had no idea that they could be connected to a murder investigation (T-II 2078) – because they were not!

Second, striped jeans were in fashion at the time of the murder. Young girls all around the neighborhood were wearing them (T-I 614).

Nor was there evidence that the rope found was used in a murder. The medical examiner testified that the rope used to commit the murder would have had blood on it (T-II 722). A photo of the rope reveals that it had no blood on it (A. 375). In addition, the rope was long enough to tie down a bed (T-I 923); however, the medical examiner testified the rope used in the murder was most likely less than six feet in length (T-II 720-22, 725).

Plaintiffs' police procedures expert, Russell Fischer, conceded Det. Volpe thoroughly investigated the French car lead (T-I-918; T-II 1795-96). The lead came months before Kogut confessed and Restivo and Halstead were arrested. Det. Volpe stated in his report that "The jeans at this time showed no apparent significance to the Fusco missing person report" (T-II 1289-90).

Det. Fraas similarly testified, "I remember being puzzled as to what the significance of that car was, and I believe it was eliminated as being part of this homicide" (T-I 1946-47; T-II 2140-41).

Furthermore, Mr. Fischer concurred with Det. Volpe's determination that a woman named Debbie Smith – who claimed to have seen French's car near where the murder occurred – was not reliable due to her apparent mental illness, as testified by Smith's former boyfriend (T-II 1889). Fischer said, "I would have done, quite honestly exactly what the Nassau County Police Department did. They responded to her calls. They interviewed her. They took a statement from her. They did some very affirmative types of investigative steps, which is what I would have done" (T-II 1890; *see*, T-I 4505).[21] Fischer

---

[21] <u>James Pearson</u> was Debbie Smith's boyfriend in November 1984. He testified that Debbie had mental problems that caused her to be placed in psychiatric hospitals at least a couple of time each year (T-II 2332). As difficult as it was to be in a relationship with her, he remained her close friend for many years (T-II 2333). Debbie was with Pearson at a dance on November 17, 1984; not long after, Pearson learned that Debbie had told the police that on the evening of November 17th, she heard a girl scream by the rail road tracks and heard guys talking. Debbie said Pearson was with her when she heard those noises; Pearson said it simply was not true, and he told that to the police (T-II. 2340-41). Debbie would make up elaborate false stories when she was in her manic phase (T-II 2343).

noted that each time the detectives spoke with Ms. Smith, she changed the timeframe when she said she heard the scream (T-I 4505).

Nevertheless, Halstead and Restivo claim that the jeans and rope in French's stolen car were somehow exculpatory; and that Det. Volpe was obligated to apprise the prosecutor of those items, which he allegedly failed to do. However, the evidence was in equipoise as to whether Volpe disclosed this information to the prosecutors. Det. Volpe made extensive notes of his interview with John French and Ms. Gabberty which were in the file (T-II 1863). Det. Volpe had the car taken into police custody for forensic examination (TI-900; T-II 1871-72). Photos were taken of the car (T-I 905; T-II 1891). The crime scene log lists the French vehicle and various photographs that were taken of it (T-II 1892).

Furthermore, Restivo's state trial criminal defense attorney, Theodore W. Robinson, had "no independent recollection" what evidence he received. He could not even recall the voluntary disclosure that was turned over to him (T-I 1204; T-II 1306-08). Nevertheless, Robinson claimed that he would have remembered a rope and striped jeans being found in a stolen car near where the murder occurred (T-II 1294-96).

The voluntary disclosure form invited defense counsel to go to the D.A.'s office to view photographs taken by law enforcement (T-I 4154, 4168, 4205). The photographs included the rope found in French's car (T-I 4209). Former ADA Fred Klein confirmed that in each case he handled he would inform defense counsel that "we have photographs. If you want to take a look at them, give me a call and come into the office and we will show you all of them. I didn't pick and choose what I turned over" (T-II 1392, 1395). The disclosure indicated that a hair comparison analysis would be forthcoming (T-II 1394). The Fusco homicide files contained 11,000 pages of documents (T-II 1407). However, attorney Robinson never asked to see the DA's files or photographs or any particular evidence in the file (T-II 2675). Had he done so, he would have seen Det. Volpe's report that was in the file regarding the jeans and the rope.

ADA Fred Klein doubted that Det. Volpe withheld information regarding the jeans and rope recovered from French's car (T-I 4155, T-II 1358-59, 1363). Klein worked on many cases with Det. Volpe and always had complete access to Det. Volpe's files (T-II 1396-97). The police interviewed approximately 100 people. Not every interview

resulted in a police report. All leads were available to the prosecutors, "but they don't necessarily get turned over to me without a request" (T-II 1399).

Klein presented the Restivo/Halstead case to the grand jury (T-1 4198). Approximately 25 witnesses testified (T-II 1381).

Former ADA (now Judge) Edward McCarty was the initial ADA actually assigned to the case (T-II 1457, 1465). He testified that in every homicide case, several supervisory detectives are assigned to make sure the investigation remains on track and that the police complied with the requests made by the DA's office (T-II 1463-64). Judge McCarty did not remember whether he was told about French's stolen car or seeing any notes or reports pertaining to it (T-I 1467-71).

Retired Lt. Shaun Spillane testified that Det. Volpe had determined that the jeans and rope recovered from French's car were not material and closed that avenue of investigation (T-II 667, 684-85).[22] Prosecutors know that homicide detectives do not brief them on

---

[22] Lt. Spillane was Det. Volpe's supervisor during the Theresa Fusco homicide investigation. Prior to becoming head of the Homicide Unit, Spillane spent 12 years as head of the robbery squad, and during seven of those years Det. Volpe had worked under his command. Spillane said that Volpe was an "excellent detective" whom Spillane never had cause

every (unproductive) lead (T-II 677, 681). But prosecutors also know that the detectives' files are always available for inspection. Furthermore, the practice in Nassau County Police was that once the trial begins, the entire file is transferred to the ADA assigned (T-II 678).[23]

(c) The Purported Fabrication of Evidence

As we argue in Point III, *infra*, the purported scientific evidence that the Q-8 hair decomposition occurred several hours or days after the murder (while still on Ms. Fusco's body) was unreliable. In any event, the record is clear that Det. Volpe had no access to the hairs locked in the crime lab; those hairs were in the exclusive custody and control of Det. Charles Fraas, who was found not liable by both juries.

On December 6, 1984, P.O. Birdsall (a serologist) received blood and hair samples from the Fusco autopsy that he kept in a secure locker. On December 11, 1984, he transferred the hairs to codefendant

---

to discipline or reassign (T-I 2655, 2677). Spillane also noted that as the lead detective in the Fusco investigation, Det. Volpe was assisted by sergeants working around the clock and other detectives in the Homicide Unit, all of whom were veteran detectives (T-I 2656).

[23] Over the years, some of the files in this massive case were lost (T-II 1043-46).

Det. Charles Fraas (a hair fiber expert) in a sealed envelope (T-I 1786, I 1841, T-II 1152, 1218-19).

Thereafter, Fraas had exclusive custody and control of the hairs from that point on (T-II 1158-60). He placed them on microscopic slides and in a sealed container (T-II 2135). Fraas had no recollection of Det. Volpe ever coming to the crime lab to talk about or view the hair evidence (T-I 1935, T-II 1161).

On March 26, 1985, Detective Fraas and Officer Birdsall were directed by a supervisor to search Restivo's impounded van at Nassau County police headquarters (T-I 1770, 1871-73). The hairs were on the floor, underneath the front passenger's side seat (T-I 1871; T-II 730-31, T-II 2153-55). Det. Fraas took custody of the hairs at 6:00 p.m. that evening and kept them in the crime lab (T-I 1874; T-II 2156). The hairs were consistent with Ms. Fusco's (T-I 1906).

Det. Volpe was not present when Fraas and Birdsall searched the van (T-I 1824). Volpe did not have access to the crime lab where the evidence was secured. Only authorized personnel could enter the crime lab unescorted. The crime lab was once a jail and had a heavy metal

door at the entrance that was always kept locked and people had to be buzzed into the lab (T-I-1811, 1836, 1931; T-II 1160, 2161-63).

The supervisor's office was next to the entrance. The supervisor had to grant entry into the lab and "escort [visitors] to the area or to the person that they were there to see" (T-I 1835, T-II 2163, 2165):

> Q. If a person like Joseph Volpe had an active homicide and there was a serologist and there was a hair microscopist would he, Volpe, just be buzzed in and be allowed to walk around unescorted?
> A. The procedure at the time was that if he buzzed the gate, [he] would be met by a supervisor [who would] direct him or lead him to whoever it is that he wanted to visit; it was not customary for folks to wander around in the lab, that did not work there (T-II 2165).

No exceptions were made for homicide detectives (T-I 1835). Det. Volpe could not have entered the crime lab without being buzzed in and escorted (T-I 1792).

The lab was shut down and locked at midnight every night (T-II 2162).

Nor did Det. Volpe have access to the medical examiner's files. As he testified at his video deposition:

> Q. Did you plant hairs in this case?
> A. No.

Q. Did you . . . go to the ME's office and take hairs from the ME's office and put them in envelopes?
A. No.

Q. Did you have access to the ME's office?
A. No (T-II-2572).

Plaintiffs' summation conceded there was no evidence – absent

pure speculation – that Det. Volpe had access to the hairs:

How did Volpe get the hairs? All the detectives working in the SIB and the detectives working in homicide knew each other. They were all on a first name basis. . . . Volpe could certainly access the lab, would know what to do, where the hairs were. It would only take a few minutes to switch these hairs (T-II 2741).

Plaintiffs Proclaim Their Innocence

Dennis Halstead was 29 years old when he was convicted of the

murder. He admitted that Theresa Fusco was friends with his younger

sister and that he knew her (T-II 1126-29).

Although Halstead could not remember where he was or what he

was doing during the day time of November 10, 1984, he was sure he

was not with Restivo (T-II 1074-75). He claimed to remember being

home with his family that evening perusing a family photo album (T-II

1076-77).[24] However, on April 6, 1985, Halstead was overheard on a telephone call from the Nassau County Jail telling his sister Linda that he *was* with Restivo at the time of the crime and knew he was going to be arrested for the Fusco murder (T-II 1097). When she asked, "Were you with him?" Halstead answered, "Yeah" (T-II 1100).

Halstead had conceded that he invited teenage girls to his apartment to drink beer and smoke marijuana (T-I 3991-92). At the time he was living with an 18-year-old high school drop-out (T-I 3981).

John Restivo testified that Halstead liked young girls and constantly had young girls in his apartment. Restivo would go to the apartment to drink alcohol and smoke marijuana with them (T-II 1645-46). However, Restivo denied committing the crime. He said that they could not have been in the van on November 10, 1984, because it was up on blocks and inoperable (T-II 1602). Restivo denied being with John Kogut at any time on November 10th (T-II 1603). But he admitted that Halstead, Kogut, Smyle and Michael Cockerel were his close friends

---

[24] Halstead also testified that he was innocent. Halstead was an alcoholic since age 21 (T-I 3908; T-II 1057) and had three DWI convictions (T-II 1058). His addiction was so bad that he sometimes blacked out from drinking (T-II 1122). Drinking gave him an explosive temper that he sometimes could not control (T-II 1123). He had separated from his wife Victoria in 1981 (T-I 3909, T-II 1069).

and occasionally worked for him (T-II 1583, 1628). Ropes used to move furniture were in the van (T-II 1672-73).

Restivo's father was a retired Nassau County Police Officer who was friends with Supervisor Lt. Shaun Spillane (T-I 3731; T-II 1576, 1579).

Restivo denied telling Smyle before Fusco's body was found that she was "strangled," or that he (Restivo) knew who killed her (T-I 3619, T-II 1674). Restivo did not know why Smyle would lie at Restivo's murder trial (T-II 1629). However, Restivo conceded that Smyle might have driven him to the DMV (T-II 1656, 1663), which was consistent with Smyle's testimony that during the ride to the DMV, Restivo told him that Fusco had been strangled and that he (Restivo) knew who did it (T-I 3757, T-II 1676-77).

Restivo also denied telling Michael Cockerel the day after the rape/murder, "I got my dick wet" the night before (T-I 3724, T-II 1670). Restivo's brother Charlie was convicted of witness tampering after assaulting Michael Cockerel whom he suspected was cooperating with the police (T-II 1677).

Concetta Napoli, Theresa Fusco's mother, listened to Kogut's confession. She remembered her daughter on occasions saying to people, "I'm gonna tell. I'm gonna tell!" Those were the words Kogut said Theresa said just before they decided to kill her (T-I 617). Ms. Napoli described the jeans Theresa was wearing on the day she went missing as dark blue denim with a stripe two to three inches wide (T-I 576). That style of jeans was in fashion at the time (T-I 614).

Defense Case

Regina Fuhrmann was 14 years old in 1984; she lived in Lynbrook, and knew Theresa Fusco (T-I 4979, T-II 2121). She knew Halstead and had been in his apartment on several occasions (T-1 4980). In 1984, Halstead was dating 17-year-old Gail Cole (T-I 4982, T-II 2123-24). They would drink alcohol and smoke marijuana in his apartment (T-I 4981; T-II 2124). Each time Ms. Fuhrmann was inside Halstead's apartment, young girls were present drinking alcohol and smoking marijuana (T-II 2125). Halstead would attract young girls by giving them keys to his apartment (T-I 4984, T-II 2126-27). Ms. Fuhrmann stopped going to Halstead's apartment because what she saw made her feel "creepy" (T-II 2127). She dared not tell her parents

that she was hanging out with her teenage girlfriends in an adult man's apartment (T-II 2128).

Lisa Johnson was Theresa Fusco's best friend; they lived around the block from each other (T-I 651; T-II 2296-97). On the day Theresa went missing, she was wearing striped jeans (T-I 674). Striped jeans were a fad in 1984 and many teenage girls wore them (T-II 2303-04). Ms. Johnson provided the police with a half heart necklace and told them she had given the matching necklace to Theresa (T-I 669-670). Ms. Johnson identified April Halstead and Theresa in a photograph taken at a party (T-I 690).

Michael Cockerel was suffering from advanced lung cancer, COPD and kidney disease at the time of the second trial and needed oxygen to testify (T-II 2385). The Restivos were like family to him until he told the police what he knew (T-I-3129; T-II 2390-91). Cockerel remembered sanding floors at Restivo's house on the afternoon of Saturday, November 10, 1984 (T-I 3131; T-II 2397). Restivo picked him up around 9:00 a.m. in a maroon colored Chevrolet station wagon. They rented floor sanding equipment from Leo's tool rental, stopped at 7-Eleven, and then went to Restivo's house in Bellmore (T-II 2398-99). Restivo and the

Lampasona brothers helped him (T-II 2400). They drank beer in the morning while working; and later Restivo's girlfriend Joann brought them lunch (T-II 2401). Cockerel had dinner of Cornish game hens at Restivo's house (T-I 3132). After dinner, at around 7:00 p.m., Cockerel loaded the rental equipment into the station wagon and drove home (T-II 2402-03).

The next day, Sunday, Cockerel spoke with Restivo on the telephone (T-I 3370; T-II 2406). Restivo sounded like he had a hangover. Restivo told Cockerel that he had been out drinking the night before "and got his dick wet," which Cockerel knew meant that Restivo had sexual intercourse (T-I3371; T-II 2407).

One day (before December 5, 1984, when Ms. Fusco's body was found), Cockerel and Restivo were in Restivo's van going to pick up a washing machine or drier at Restivo's house when Restivo said that the authorities would probably find Fusco's body at the Lynbrook Cemetery (T-I 3225). When Cockerel asked Restivo how he knew that, Restivo said the cemetery was close to Hot Skates and it would be easy to dispose of the body there (T-I 3236; T-II 2408-09).

On March 15, 1985 Nassau police first interviewed Cockerel (T-I 3186; T-II 2410-11, 2452). He did not want to cooperate because he was afraid of the Restivo family: "I know Charlie the brother and John [Restivo] and his family. If you go against them, you'll have a problem" (T-II 2411-12).

A defense investigator named Rick Arden later interviewed Cockerel at Restivo's mother's house. Cockerel was invited by Restivo but did not know a private investigator was going to be there (T-I 3242; T-II 2412-13). Many of Restivo's family members were present, including Restivo's uncle who was a retired FBI agent, and a polygraphist (T-I 3243; T-II 2413). Investigator Arden wanted Cockerel to falsely tell the police that he stayed at Restivo's house the entire evening on November 10, 1984 (T-II 2415). When Cockerel asked Restivo if he was involved in the Fusco murder, Restivo blurted out, it "[d]idn't matter who did it. She was a black person lover" (T-I 3243; T-II 2430). [25] (Restivo admitted making that statement (T-I 3655).) Restivo did not deny that he murdered Ms. Fusco (T-II 2432).

---

[25] Restivo used the "N" word but Judge Seybert precluded the witness from telling that to the jury (T-I 3114).

Arden prepared a false statement that Cockerel signed that said that Cockerel and Restivo were at Restivo's parents' house on the evening of November 10th (T-I 3390).

Arden wanted Cockerel to have his wife Dawn lie, too, and say that Restivo was at their house in Wantagh on November 10 after 11:00 p.m. (T-I 3390-92; T-II 2422).

The Restivos' were so concerned about Cockerel cooperating that they had a lawyer call the police station to prevent Cockerel from being interviewed by the police. Cockerel told the police he did not want a lawyer (T-1 3214; T-II 2425).

On cross-examination, Cockerel admitted that he lied when he told the grand jury that he was at Restivo's house until 10 p.m. on November 10th (T-II 2465-66). He lied because he was afraid of the Restivos (T-II 2467). That same fear caused him to tell his brother to say whatever was necessary at the grand jury to get out of being a witness because, "Being around the police and the Restivo family all intimidated me" (T-II 2476). Cockerel knew his brother was also being pressured by the Restivos to make up a story (T-II 2504-05).

When Cockerel told Charles Restivo that he would not meet with Restivo's lawyers, Charles became angry and assaulted Cockerel for refusing to lie to the police (T-I 3172). Cockerel had Charlie Restivo arrested for assault and witness tampering (T-I 3172; T-II 2420). Cockerel decided to cooperate with the authorities after that incident (T-II 2420-21).

The Video Deposition of Joseph Volpe

Det. Volpe died prior to the first trial. He was deposed by plaintiffs' counsel, but died before he had an opportunity to tell his side of the story.

Volpe followed customary police practices during the Fusco murder investigation. It was his customary practice to turn over his entire file to the prosecutor (T-II 2546-48). In this case, his file was at the DA's office "almost daily sometimes. So all of my notes, that I'm sure you have, with reference to [French's] car and my crime scene photos and my lab reports were all reviewed by the District Attorney before he went forward on May of 1985" to the grand jury (T-II 2564).

Det. Volpe knew the prosecutor had to disclose exculpatory information to the defense, but that was not his responsibility (T-II 2564-65).

Det. Volpe denied planting Fusco's hairs in Restivo's van (T-II 2565-66):

> Q. Did you . . . go to the ME's office and take hairs from the ME's office and put them in envelopes?
> A. No.
> Q. Did you have access to the ME's office?
> A. No (T-II 2572).

Responding to plaintiffs' counsel claim that in an affidavit Det. Volpe said that hairs similar to Fusco's hairs were found inside Restivo's van even before Det. Fraas had examined them, Det. Volpe said, "To the best of my recollection, when I did this affidavit, I recall being aware of a similarity of hairs" (T-II 2567). He said a supervisor may have told him that (T-II 2568). He was certain a person in authority told him that because otherwise he would not have included that in his affidavit (T-II 2569, 2571-72).

Det. Volpe said that not only did he not go inside the van, he was not even permitted to go inside it because, "It's a crime scene" (T-II 2573; see, T-II 2569).

Furthermore, in his March 26, 1985 affidavit for an eavesdropping warrant, Det. Volpe said that possible human blood was found inside the van because, "I was just a messenger from what I had heard from the lab [i.e.,] that it looked like it was blood" (T-II 2573).

He believed Det. Fraas made the identification and told him that it was Fusco's hairs inside the van (T-II 2573). Det. Fraas had initially suspected that they were Fusco's hairs by a visual hair comparison with the hairs in the Crime Lab (T-II 2574).

POINT I

## THE DISTRICT COURT SET ASIDE THE FIRST JURY'S VERDICT BASED ON A MISINTERPRETATION OF *BOYD V. CITY OF NEW YORK*[26]

After the first trial, Restivo and Halstead moved to set aside the defense verdict on the grounds, *inter alia,* that it was improper for the court to have allowed Kogut's confessions into evidence because they were inadmissible at Restivo and Halstead's state criminal trials (*see Bruton v. United States,* 391 U.S. 123 [1968]). Plaintiffs relied on language in *Boyd v. City of New York*, 336 F.3d 72, 75-76 (2d Cir. 2003), that, "probable cause to commence proceedings means the belief that the prosecution would succeed *based on admissible evidence*" (emphasis supplied). Misconstruing the phrase "admissible evidence" to mean "admitted *into evidence,"* the district court granted the motion because:

> Kogut's confession . . . was not admissible in Halstead and Restivo's criminal proceedings. Accordingly, the jury never should have considered the Kogut confession in determining whether Defendants had probable cause in connection with Halstead and Restivo's case (SA 14, A. 263)*.*
> . . . .
>
> Here, one of the facts and circumstances known to Defendants was that Kogut had provided a confession, but

---

[26] The standard of review on this preserved issue of law is *de novo. See Valez v. City of New York,* 730 F.3d 128, 134 (2nd Cir. 2013); *Cobb v. Pozi,* 363 F.3d 89, 112 (2nd Cir. 2004).

this "evidence" would not have any bearing on whether the prosecution against Halstead and Restivo would or could succeed (SA. 15, A. 264).

Accordingly, on August 16, 2012, the district court limited the evidence defendants could use at the second trial to establish both probable cause to prosecute and absence of malice to that which was BOTH: (1) included in their responses to Restvio's and Halstead's contention interrogatories and (2) *admissible in the underlying criminal proceedings*" (A. 204; Dist. Ct. ECF # 353).[27]

In *Kogut v. Nassau County,* 789 F.3d 36 (2nd Cir. 2015), this Court rejected the district court's conclusion that *Boyd* limited evidence admissible in the federal civil rights trial exclusively to evidence *actually admitted* at the state court criminal trial. Kogut had argued on appeal that "he was prejudiced by the joint trial, at which evidence was admitted that he contends would have been inadmissible at a trial of his claims alone;" i.e., "statements attributed to Restivo and Halstead was [sic] not admissible against him at his criminal trials, and that the

---

[27] At the conclusion of the second trial, defense counsel moved for a mistrial based on the court's refusal to allow Kogut's confessions and Restivo's statements into evidence: "It is our position that we can't get a fair trial without that and, therefore, we request, retroactively, a mistrial because of your ruling" (T-II 2701 – motion denied).

district court therefore erred . . . in denying his post-trial Rule 59 motion for a new trial." *Id.* at. This Court rejected that argument:

> We also do not interpret *Boyd* to mean that only evidence that was in fact admitted at the criminal trial may be considered in a subsequent civil trial on the issue of probable cause to prosecute. Prosecutors are not required to offer into evidence every shred of evidence they have as to guilt; and if they have sufficient admissible evidence, Boyd does not preclude the admission of additional evidence in the later civil suit. *Id.* 46.

*Kogut* establishes that the district court erred by granting Restivo and Halstead a new trial based on *Boyd*.

Initially, a distinction must be drawn between probable cause to arrest and probable cause to convict. To establish probable cause to arrest, the "evidence need not be admissible at trial in order to support a finding of probable cause." *Stansbury v. Wertman*, 721 F.3d 84, 91 (2nd Cir. 2013) (holding that "although not able to be used at his [criminal] trial, [a victim's] identification of [the perpetrator] may properly provide a basis for probable cause to arrest him" [quoting, *People v. Nelson*, 79 A.D.2d 171, 174 (4th Dep't 1981), abrogated on other grounds by *People v. Cintron*, 199 A.D.2d 526 (2nd Dep't 1993); *Jenkins v. City of New York*, 478 F.3d 76, 91, n. 16 (2d Cir. 2007) (improperly conducted lineup identifications could establish probable cause in defense of false arrest

claim because "the fruit of the poisonous tree cannot be invoked to support a section 1983 claim"); *United States v. Parcel of Property*, 337 F.3d 225, 236 (2nd Cir.2003) ("there is clear authority in our circuit allowing the use of hearsay to establish probable cause"); *Townes v. City of New York*, 176 F.3d 138, 145 (2nd Cir. 1999) (same).

Probable cause *to convict*, on the other hand, is a term of art used to describe the quantum of evidence necessary to defeat a claim of malicious prosecution. "Probable cause, in the context of malicious prosecution, has also been described as such facts and circumstances as would lead a reasonably prudent person to believe the plaintiff guilty." *Boyd,* 336 F.3d at 76. Importantly, probable cause to convict – in this context – is *not* the same as proof beyond a reasonable doubt. It is the prosecutor's duty to decide whether evidence beyond a reasonable doubt exists to convict.

*Kogut* establishes that, contrary to the district court's ruling, while the evidence establishing probable cause to prosecute must derive from *technically* admissible evidence, it need not have actually been offered or admitted at the criminal trial. For example, the Sixth Amendment's Confrontation Clause does not apply to civil proceedings.

*See United States v. Zucker,* 161 U.S. 475, 480-82 (1896); *Austin v.*

*United States,* 509 U.S. 602, 608 fn. 4 (1993). In these civil proceedings,

whether they were tried together or not, the plaintiffs' statements

qualified as exceptions to the hearsay rule as admissions by party

opponents. *See* F.R.E. § 801(d)(2).

Furthermore, police officers are not tasked with knowing the rules

of evidence or the prosecution's theory of the case. *See Amore v.*

*Navarro*, 624 F.3d 522, 533-534) (2d Cir. 2010) ("The question is not

what a lawyer would learn or intuit from researching case law, but

what a reasonable person in a defendant [police officer's] position

should know about the constitutionality of the conduct"); *Scarbrough v.*

*Myles*, 245 F.3d 1299, 1303 n. 8 (11th Cir. 2001) ("Police officers are not

expected to be lawyers or prosecutors").

Here, Kogut's confessions, along with Restivo and Halstead's

admissions, combined to convince the first jury that Det. Volpe (and the

other defendants) reasonably believed that they had probable cause to

convict the plaintiffs. Kogut confessed twice to the police and implicated

Restivo and Halstead. Kogut's confessions were not only admissible

against himself, they also corroborated Restivo and Halstead's self-

inculpatory admissions. Just as Restivo and Halstead's inculpatory statements were admissible at the trial to demonstrate probable cause to prosecute Kogut, so, too, were Kogut and Restivo's admissions admissible to demonstrate probable cause to prosecute Restivo and Halstead. *Kogut, supra; see also, People v. Reome,* 15 N.Y.3d 188 (2010) (accomplice confessions that corroborate each other can be considered in tandem with other evidence to satisfy C.P.L § 60.22's accomplice corroboration rule).

Furthermore, given the rich factual detail in Kogut's confession, it would have been reasonable for Det. Volpe to assume that Kogut would cooperate and testify against Restivo and Halstead in exchange for a more lenient sentence, in which case Kogut's confession would have been admissible (at least for impeachment purposes) at Restivo and Halstead's trial. *See Colon  v. New York,* 60 N.Y.2d 78, 82 (1983) ("A party may act with probable cause even though mistaken . . . if the party acted reasonably under the circumstances in good faith").

Kogut's detailed confessions explaining the extreme violence employed was also consistent with Ms. Fusco's face having been battered; and his statement that he twisted the rope around Ms. Fusco's

neck like a "corkscrew" was precisely how medical examiner Bloom described the murder (T-II 720-22, 725).

Kogut's confessions, as well as Restivo and Halstead's admissions, were also important for the defense to rebut plaintiffs' claim that the hairs were planted in the van. The severe beating to Ms. Fusco's head and face could easily have caused her hair to be in the van. However, the jury at the second trial was not allowed to hear this evidence.

Kogut's confessions and Restivo and Halstead's admissions also established the further reasonableness of Det. Volpe's belief that the rope and jeans found in John French's car were not *Brady* material.

Even if Kogut, Restivo, and Halstead's admissions were not admissible in defendants' case in chief, they certainly were admissible – in this civil trial – to impeach the self-serving testimonies of Restivo and Halstead, who claimed they were actually innocent of the rape-murder. *See generally, Walder v. United States,* 347 U.S. 62, 65 (1954) (upholding use of inadmissible evidence for impeachment purposes to prevent a party from "affirmatively resort[ing] to perjurious testimony in reliance on the Government's disability to challenge his credibility"); *cf. House v. Bell,* 547 U.S. 518 (2006) (courts must consider all evidence

– old and new, including reliable hearsay – in deciding issue of actual innocence). Without a complete picture of the police investigation, the jury was left with a skewed and unfair portrayal of Restivo and Halstead as victims of a purposeful frame-up by the police.

Only after Kogut had a taste of jail for a few days did he recant his confessions, claiming that he was tortured and beaten for 24 hours. However, a review of his video-taped confession taken by ADA Peck shows Kogut to be calm and collect, without a scratch or a bruise on him. In this regard, note that both the trial court and the Appellate Division found Kogut's confessions voluntary. As the district court aptly noted, "a reasonable view of the evidence is that Plaintiffs were together on the night of November 10, 1984 and that, whether true or not, *Kogut's confession was not the product of coercion*" (SA. 41, A. 290 – emphasis added).

In conclusion, Kogut was guilty of rape and murder. His confessions implicated his accomplices Restivo and Halstead. When added to Restivo and Halstead's own admissions to the police and to others, the combined effect of their confessions and admissions clearly established probable cause both to arrest and to prosecute the plaintiffs.

Hence, the district court abused its discretion in setting aside the first jury's verdict on this basis. This Court ought to vacate the second jury's verdict (of liability) and reinstate the first jury's verdict (of no liability). *See Raedle v. Credit Agricole Indosuez,* 670 F.3d 411, 413 (2nd Cir. 2012) ("We hold that the district court abused its discretion in granting the new trial. Accordingly, we reverse the order of the district court granting the new trial; vacate the judgment entered on the basis of the second verdict; and remanded the case to the district court with instructions to reinstate the first verdict and to enter judgment in defendants' favor in accordance with that verdict").[28]

---

[28] The district court granted Restivo and Halstead a new trial on a separate ground that the Court should not have submitted the issue of qualified immunity – as it pertained to the claim of supervisory liability – to the jury. Plaintiffs dismissed this claim, without prejudice, at the second trial, reserving the right to reinstate this claim against *other defendants* if the verdict in the second trial were set aside or vacated. *See* Dist. Ct. ECF # 209.

THE DISTRICT COURT DENIED VOLPE A FAIR SECOND TRIAL WHEN IT REFUSED TO ADMIT KOGUT'S CONFESSIONS, AND RESTIVO AND HALSTEAD'S ADMISSIONS TO ESTABLISH BOTH PROBABLE CAUSE TO PROSECUTE AND LACK OF MALICE BY THE POLICE[29]

In Point I, we ask this Court to reinstate the first jury verdict. In the event that relief is denied, a new trial should be granted because (for the same reasons as in Point I) Volpe was entitled to have the second jury consider Kogut's confessions and Restivo and Halstead's admissions. This evidence would have resulted in a defense verdict, as it did at the first trial.

At the second trial, the plaintiffs focused heavily on the claim that they were actually (factually) innocent of the rape/murder; plaintiff's counsel opened and closed on this theme:

> You are not going to see innocence on the verdict sheet, but . . . [i]nnocence is critical here because John and Dennis are innocent. They proved their innocence through DNA testing (T-II 2721-22; see also, T-II 328, 366, 428).

---

[29] Because the district court precluded the admission of Kogut and Restivo's admissions based on a misinterpretation of *Boyd v. City of New York*, 336 F.3d 72, 75-76 (2d Cir. 2003), the standard of review is *de novo. See Valez v. City of New York,* 730 F.3d 128, 134 (2nd Cir. 2013); *Cobb v. Pozi,* 363 F.3d 89, 112 (2nd Cir. 2004).

As stated in Point I, Kogut's confessions and Restivo and Halstead's admissions were vitally important to rebut Restivo and Halstead's testimonies that they were actually innocent. For example, both Restivo and Halstead testified that they did not see Kogut on the night of the murder; yet the district court repeatedly prevented defense counsel from confronting them with Kogut's confessions (T-II 1092-95, 1607-10, 1728-29). When defense counsel objected to the court's rulings being one-sided, Judge Seybert blew him off, stating, "that [Kogut's] statement has been ruled inadmissible for this trial and you're stuck with it" (T-II 1728-29; see also, T-II 1092-95). After extensive argument, the court finally relented and allowed one question to Restivo, to wit: whether he knew that *the police* had information that he was with Kogut on the day of the murder; and Restivo said he was aware that the police had that information (T-II 1728-32). But that was a far cry from telling the jury *what Kogut* had told the police, and allowing the jury to see the factually rich (difficult to conjure) detail in Kogut's confessions.

Due to the district court's rulings, the defense was also prevented from offering numerous self-inculpatory statements Restivo and Halstead made to several witnesses, including:

- Brian Skellington's statement to Det. Volpe and Det. Perrino confirming that Kogut was dirty and bloodied when Kogut arrived at his house on Sunday morning and did not want to talk about what happened;

- Michael Backman's statement to Det. Sirianni and Det. Connaughton confirming that Kogut confessed to him;

- Kenneth Cockerel's statement to Det. Volpe and Det. Allen that Restivo confessed, "I got my piece of ass but I didn't choke her;"

- Carl Pozzini's statement to Det. Volpe and Det. Allen that Restivo confessed to him;

- Brian O'Hanlon's statement to Det. Lane and Det. Waltman that Halstead confessed to him and implicated Restivo and Kogut;

- Steven Dorfman's statements to Det. Volpe and Det. Connaughton that Restivo confessed to him and implicated Halstead and Kogut;

- Patrick Proctor's statement, made in the presence of his attorney, and ADA Fred Klein, that Kogut confessed to him;

- Samuel Newsome's statement that Halstead confessed to him.

Because the District court precluded all but the evidence admitted at the state court trial, the defense did not offer these ----statements or call these witnesses to testify at the civil rights trial.

To believe that all these statements made to so many individuals and to so many police officers were fabricated by Det. Volpe and the entire Nassau Police Department Homicide Unit is preposterous. The defense had a right to let the jury know the full extent of the information the police were relying on in presenting this case to the DA for prosecution.

The lopsided presentation of evidence also prevented defense counsel from effectively challenging the testimony of Russell Fischer, plaintiffs' expert witness on Proper Police Practices, who testified that the police questioning of Michael Cockerel was designed to elicit false statements; as defense counsel lamented:

> I think this is extraordinarily dangerous to start doing this and we're not permitted, yet again, to go into all of the other interrogations to try and show, whether the jury believes it or not, that the interrogations were done and that [the police] got the statements and it pointed to guilt and they were convicted. We can't do that because we can't go into Restivo's statement or Kogut's. They're doing it through this and we can't do the rest of it (T-II 1827).

Kogut's confession and Restivo's admissions were also necessary to rebut plaintiffs' claim that while probable cause may have been "present at the time of arrest, evidence . . . later surface[d] which . . . eliminate[d] that probable cause," *Kent v. Thomas*, 464 F. App'x 23, 25 (2d Cir. 2012), namely, its fanciful argument that the rope and jeans found in John French's stolen car.

The statements were also important to rebut plaintiffs' claim of malicious prosecution. *See Kogut, supra; Lowth v. Town of Cheektowaga,* 82 F.3d 563 (2nd Cir. 1996) (holding the subjective intent of the defendant police officer highly relevant to the malice inquiry); *Pinsky v. Duncan,* 79 F.3d 306, 313 (2nd Cir. 1996) (malice "implicates an evil or unlawful *purpose*") (emphasis added); *see also, Smith v. City of N.Y.,* 388 F. Supp.2d 179, 187 (E.D.N.Y. 2005) (holding there was no evidence of malice because the prosecutor "believed D.G.'s allegations and found her to be a credible witness").[30]

---

[30] The district court charged the jury that they had to find that Volpe intentionally deprived plaintiffs of their constitutional rights: "If you find the defendants' acts were merely negligent, then even if you find that the plaintiffs were damaged as a result of those acts, you must return a verdict in favor of the defendants" (T-II 2885).

In sum, the refusal to allow the defense to use Kogut's confessions and Restivo's admissions both as evidence in chief and/or to impeach Restivo and Halstead's self-serving testimonies, and the testimony of plaintiffs' experts, deprived Volpe of a fundamentally fair trial.

POINT III

PMRB ANALYSIS IS NOT RELIABLE TO A "SCIENTIFIC CERTAINTY;" PLAINTIFFS' EXPERTS VIOLATED THE COURT'S ORDER BY TELLING THE JURY THAT IT IS[31]

The district court's decision on this issue is reported as *Kogut v. County of Nassau,* 894 F. Supp.2d 230 (E.D.N.Y. – Seybert, J.).

Plaintiffs experts, Dr. Peter DeForest, Nicholas Petraco, and Max Houck, opined that the hairs marked "Q 8" that were found in Restivo's van were not there at the time Ms. Fusco was murdered. They based their conclusion on signs of hair root decomposition in the two Q-8 hairs found in the van. Hair root decomposition is a phenomenon known as Post Mortem Root Banding ("PMRB") that plaintiffs' experts opined could only occur, if at all (because it doesn't always happen), several hours (if not days) after death (T-II 782-84, 912-913, 967-68). Since the medical examiner testified that Ms. Fusco's body was placed where it

---

[31] The standard of review on this preserved issue is abuse of discretion. *General Electric Co. v. Joiner,* 522 U.S. 136, 138-39 (1997); *Lore v. City of of Syracuse,* 670 F.3d 127, 155 (2nd Cir. 2012).

was found about one hour after her death, the experts concluded that the two Q-8 hairs could not have been in the van when she was murdered, or even shortly thereafter (T-II 700).

Volpe, on the other hand, argued that the PMRB evidence failed to meet the reliability standard of *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993).

PMRB Analysis is Unreliable

After a *Daubert* hearing, the district court held that PMRB is not a scientifically reliable method of analysis:

> [T]he idea that PMRB takes several days to develop (and thus that it could not have developed in the short time Ms. Fusco was alleged to be in Restivo's van) had not been established by scientific standards of proof because: (1) although Plaintiffs' experts' theory that PMRB can never appear in the hair of living person could be tested, it hasn't been;" (2) the claim that PMRB took days to develop was "not firmly grounded in the little academic literature or studies that exist on the topic;" and (3) "there have been at least two cases where PMRB has reportedly been observed much earlier than the experts would think possible" (A. 179).
> . . . .
> In sum, the idea that PMRB needs multiple days to develop cannot withstand the rigors of scientific proof and it goes too far for plaintiffs' experts to testify that their conclusions are sound to a reasonable degree of scientific certainty (A. 186).

*See Daubert*, 509 U.S. at 590 (holding that a proposed hypothesis must be supported by appropriate validation – i.e. grounds based on what is known).

The District court Should Not have Compromised

*Daubert* does not permit courts "to perform the [gatekeeping] function inadequately." *United States v. Williams*, 506 F.3d 151, 161 (2nd Cir. 2007). A trial court's reliability analysis, whatever particular factors it employs, must insure that the methodology or science that an expert utilizes is sufficiently reliable to justify the conclusions reached. *See also Kumho Tire, Co v. Carmichael*, 525 U.S. 137 (1999); D.M. Risinger, M.J. Saks, W.C. Thompson, and R. Rosenthal, *Observer Effects in Forensic Science: Hidden Problems of Expectation and Suggestion*, 90 Cal. L. Rev. 1, 4 (2002).

Here, rather than fulfilling its "gatekeeper function" mandated by Rule 702 and *Daubert,* and preclude the experts from testifying altogether, the district court permitted plaintiffs' experts to "offer their opinions as to PMRB except that they may not testify that their views on the timing of PMRB (or any ultimate opinion that [the] hairs did not come from Fusco on the night she died) are a matter of scientific

certainty" (A. Dec. 34 [citing *In re Ephedra Prods. Liab. Litig.*, 393 F. Supp. 2d 181, 188 [S.D.N.Y. 2005]).

The district court concluded that "although these facts do not add up to scientific proof . . . this is not a case where the gap is too great between science and [plaintiffs' experts'] conclusions" (A. Dec 33-34). In fact, the evidentiary gap between the facts proven and the conclusion presumed was too great to meet 701's reliability threshold.

Fed. R. Evid. 702 provides:

A witness who is qualified as an expert by knowledge, skill experience, training, or education may testify in the form of an opinion or otherwise if:

> (a) the expert's scientific technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and,
>
> (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702 entrusts a trial court "the task of ensuring that an expert's testimony rests both on a reliable foundation and is relevant to the task at hand." *United States v. Williams*, 506 F.3d 151, 160 (2nd

Cir. 2007) (citing *Daubert*). While the proponent of the expert testimony has the burden of establishing by a preponderance of the evidence that the admissibility requirements of Rule 702 are satisfied, the district court is the ultimate "gatekeeper." *Williams*, 506 F.3d at 160, *Daubert*, 509 U.S. at 593 n.10.

The Supreme Court established a four factor test to assist trial courts in determining the reliability of expert scientific testimony:

(1) whether the theory or technique can be or has been tested;

(2) whether the theory or technique has been subjected to peer review and publication;

(3) the known or potential rate of error in the case of a particular scientific technique; and,

(4) whether the theory or technique is generally accepted within the relevant scientific community.

*Daubert*, 509 U.S. at 593-596.

Time of Onset of PMRB Cannot be Accurately Determined

Although the lower court found that the experts' hypothesis as to when PMRB begins to develop after death failed the *Daubert* reliability test (because it was not supported by appropriate validation), the court

still permitted plaintiffs' experts to opine on time of onset based on Rule 702, on the grounds that plaintiffs' experts' "training and experience" as forensic hair examiners [was] a permissible substitute for scientific validation of the hypothesis regarding "timing" (A. 186).

First of all, there is a dearth of scientific research confirming the claim that *postmortem* hair root banding is so unique that it can be distinguished from hair root banding caused by environmental factors. *See* Alison Domzalski, *The Effects of Environmental Exposure on Human Scalp Hair Root Morphology* at 49 (A. 172).

Another unproven premise was that hair root banding cannot occur prior to or shortly after death. *Id.*

Finally, the ability to discern whether the banding on a particular hair was a result of decomposition that began while the hair was attached to the scalp of the corpse, or if caused by environmental factors such as soil or moisture, is a judgment call that can only be made by a trained professional with years of experience in human hairs microscopy. Making this determination is so difficult that studies have demonstrated that even expert hair examiners can make mistakes (or

disagree) on whether banding occurred before or after death, or on attached or detached corpse hair. *Id.*

In fact, plaintiffs' expert Max Houck testified that the existing literature on PMRB, published and unpublished, comprised of just nine articles. And none focused specifically on the "time of onset" of PMRB. The District court properly recognized that these limited test samples were too small to qualify PMRB analysis as being firmly grounded in academic literature or experimentation.

Nevertheless, the district court cited three publications during the *Daubert* hearing to support its ultimate conclusion that the plaintiffs' experts provided "a reasonable basis" for admission of this evidence (A. 190-91). Ironically, the district court had previously rejected these same three publications as "not sound to a reasonable degree of scientific certainty."[32]

---

[32] The court found that E, Barbara Wagner Collins, "The Effect of Temperature on Post Mortem Morphology of Human Hair, Master's Thesis, June 1996) provided an insufficient number of samples for reliable empirical consideration (A. 183); concerning the "gorilla paper" (Pls. Ex. 11, Kathryn J. Jeffrey, Kate A. Abernathy, Caroline E.G. Tutin & Michael W. Bruford, "Biological and Environmental Degradation of Gorilla Hair & Microsatellite Amplification Success," Biological J, of the Linnean Society, 2007, 91, 281-294) the court found first the study involved only three gorillas and second because no one knows how or

The district court's change of mind was based primarily on the opinion of Dr. Peter DeForest. While DeForest was qualified to opine on the properties of hair, he lacked the qualifications and expertise to opine on the decomposition process. DeForest conceded, "that's not my area," when questioned on the causes of decomposition, (*Daubert* Hearing, p. 524). He also admittedly lacked the expertise to venture an opinion on "the rate of speed at which the effects of decomposition appear upon a corpse." In short, Dr. DeForest by his own admission lacked the expertise to reliably claim, and for the jury to rely upon, his opinion that PMRB is solely "an artifact of decomposition," or that it occurs only on decomposing corpses.

In conclusion, *Daubert* was designed to exclude "junk science." *Ephedra*, 393 F. Supp. 2d at 190. Expert evidence can be both powerful and quite misleading because of the difficulty in evaluating it. That is why proffered scientific evidence deemed unreliable must be excluded under FRE 403. As demonstrated herein the district court's failure to

---

why PMRB happens in humans . . . no one knows whether or how the process might work differently in gorillas (A. 181); and that the Linch and Prahlow study (Pls. Ex. 10, Charles A. Linch & Joseph A. Prahlow, "Postmortem Microscopic Changes Observed at the Human Hair Head Proximal End," J. Forensic Science 2001:46(1), 15-20) only looked at 22 cases, a very small sample. *Id.*

apply this overriding principle in constructing the compromise ruling on the admissibility of plaintiff's experts' opinion testimony was reversible error.

<u>Plaintiffs' Experts Eviscerated the Court's *In Re Ephedra* Decision Compromise</u>

In *In Re Ephedra, etc.,* Judge Rakoff permitted the plaintiffs' expert to testify that the drug Ephedra "may" or "might" cause strokes and heart attacks, but not that they knew it did for certain.

However, that is precisely what plaintiffs' experts did in this case.

Max Houck testified over objection that it was "*impossible*" that Fusco's hairs were in the van on the night of November 10th *because PMRB takes four days to develop* and *no further testing was required to confirm this assertion* (T-II 765-66, 780-785, 882, 893).

At sidebar, defense counsel argued that the court had ruled in its *Daubert* decision "that plaintiffs couldn't ask a question which incorporated the ultimate issue in the case" (T II 766); "those questions were not permitted, and the reason is that the only way that the witness . . . could answer that question is to use the issue of timing, which you have ruled cannot be testified to a reasonable degree of scientific certainty" (T II 767); the only way they can say it is not a

possibility is because of timing and the postmortem root banding, that incorporates the ultimate issue (T II 767-768); and the "question incorporates in it a supposition that includes the issue of timing, or else the question would have no impact if it didn't include timing (T. II 772).

The district court overruled defense counsel's objection, stating:

I basically let you handle these issues on cross-examination, and I'm going to allow the question (T II 776).

And so, Nicholas Petraco, similarly opined that "the presence of PMRB in the . . . hairs *established that they could not have come from Theresa Fusco before she died"* (T-II 967-968).

From probability to certainty, the torrent of prejudice created by the district court's failure to properly exercise its gatekeeper function culminated in Mr. Petraco testifying that "*if he were allowed to do so he would state that this opinion was a scientific certainty*" (T-II 977-978).

_____

In conclusion, by allowing plaintiffs' experts to tell the jury that it was *impossible* for the Q-8 hairs to have been in the van at the time of the murder, and by Petraco testifying that if permitted he would have testified that PMRB is reliable to a reasonable degree of scientific certainty, the district court's ill-advised attempt to strike a delicate

balance in admitting questionable scientific evidence was obliterated. By not precluding the PMRB evidence, and then failing to limit the experts' testimony, the district court abdicated its gatekeeper responsibility, eviscerated its prior ruling, and consequently abused its discretion. These errors, individually or together, had devastating impact on the jury that cannot be deemed harmless error. A new trial should be granted.

THE COURT'S PRECLUSION OF THE TESTIMONY OF
DEFENDANTS' EXPERT, DR. JOSEPH KADANE, WAS
PREJUDICIAL ERROR[33]

The prejudice caused by the erroneous admission of the PMRB
evidence was greatly compounded by the district court prohibiting
defendants' from calling Dr. Joseph B. Kadane, PhD, a statistician,
from exposing logical flaws in PMRB analysis. As stated, plaintiffs'
experts opined that PMRB can never occur on the body of a living
person, or on the body of a person who just recently died (i.e., one hour).
In support of that proposition, plaintiffs' experts relied on two studies
that used cadavers and found the presence of PMRB in small
percentage of the cadavers. The defense wanted to call Dr. Kadane to
demonstrate, statistically, the experimental design flaws in those two
experiments.

The court recognized Dr. Kadane as being an accomplished
statistician, but prohibited him from testifying at trial because of his
"passing familiarity with hair microscopy and forensic science" (A. 192).
But Dr. Kahane was not called as an expert in hair fiber analysis;

---

[33] The standard of review on this preserved issue is abuse of discretion.
*General Electric Co. v. Joiner,* 522 U.S. 136, 138-39 (1997); *Lore v. City
of Syracuse,* 670 F.3d 127, 155 (2nd Cir. 2012).

rather, he was called to demonstrate the spurious causal relationships underlying plaintiffs' experts' PMRB analysis.

Statistics, as Dr. Kadane explained, is a correlative science that draws causal inferences from data; no more than a "passing familiarity" with the subject matter (here, hair) is necessary for that purpose. Most jurors are unfamiliar with formal statistical analysis. Dr. Kadane's testimony would have helped the jury in deciding whether the inferences plaintiffs' experts drew from the cadaver experiments were valid, for two reasons:

First, to numerically demonstrate that *postmortem* root banding cannot be distinguished from *antemortem* root banding, which has occurred.

Second, and most critically, to demonstrate that PMRB cannot be used to determine when decomposing hair – pre-or postmortem – was removed from a body. [34]

---

[34] Dr. Kadane subsequently published a peer-review article on the subject. *See* Joseph B. Kadane, "*Postmortum Root Banding of Hairs: a skeptical review,*" Law, Probability and Risk (2015) 14(3): 213-228. Online Publication: doi:10.1093/lpr/mgv002 (Oxford University Press – April 1, 2015); *see also,* A. 436-79.

In a nutshell, Dr. Kadane would have testified that, based on the small population sets used in the cadaver experiments, it is statistically spurious to conclude, to a scientific certainty, that PMRB can never occur in hair removed from the scalp of a living person or a person who has just died. His testimony would have been based on statistics.

Ironically, the district court cited Dr. Kadane's testimony in deciding that just because PMRB had never been seen or heard of by plaintiff's experts in *antemortem* hairs, did not prove that PMRB could not occur on the body of a living person or shortly after death:

> On this point, . . .Kadane's concerns about autopsy bias are well-taken; if forensic scientists are not in a position to find PMRB within a short time of someone's death, they will never do so (A. 185).

We do not deny that Dr. Kadane's inexperience in hair fiber analysis could be a factor for the jury to consider in weighing his credibility and the probity of his testimony. But assuming the relevancy threshold is met (FRE § 401), argument as to the weight of the evidence is not a proper basis for denying admission. Vigorous cross-examination, presentation of contrary evidence, and careful instructions on the burden of proof, are the traditional and appropriate means of attacking shaky but admissible evidence. *Daubert*, 509 U.S. at 596; *see,*

*e.g., Giard v. Durby*, 360 F. Supp. 2d 229 (D.Mass.2005) (admitting expert testimony of chemical engineer to testify as to cause of accident, despite him not being a mechanical engineer). Indeed, the district court recognized this basic rule of law when it allowed plaintiffs' expert witnesses to testify because, "this case is not a case where the Court finds the gap too great between the science and the [plaintiffs' experts'] conclusions."

The lower court having held that plaintiffs' experts' hypothesis that PMRB needs multiple days to develop cannot withstand the rigors of scientific proof (A. *Daubert* Dec. 29), it was an abuse of discretion for the court to preclude the expert opinion of Dr. Kadane to analyze the dearth of empirical and statistical data upon which the validity of PMRB analysis derived. The refusal to allow Dr. Kadane to testify was prejudicial error.

<u>POINT V</u>

VOLPE WAS DEPRIVED OF A FAIR TRIAL DUE TO AN ACTUAL CONFLICT OF INTEREST CAUSED BY DEFENSE COUNSEL'S MULTIPLE REPRESENTATION OF ALL DEFENDANTS[35]

Det. Volpe was deprived of a fair trial due to an actual conflict of interest in that counsel who represented him also represented Det. Fraas, his sole co-defendant in the second trial, and failed to shift blame to Fraas as could have been done based on the record evidence.

The law firm of Freeman Nooter & Ginsberg (hereafter "Freeman") represented all defendants, including the Estate of Joseph Volpe. Since no one was sitting at the defense table to object to the possible conflict on behalf of the late Det. Volpe, there could be no effective conflict waiver (and none appears anywhere in the record).

Rule 1.7(a)(1) of the New York Rules of Professional Conduct prohibits a lawyer from representing a client "if a reasonable lawyer would conclude that . . . the representation will involve the lawyer in representing differing interests." In other words, "[a] lawyer may not place himself in a position where a conflicting interest may, even if inadvertently, affect, or give the appearance of affecting the obligation

---

[35] The standard of review is *de novo. See Dunton v. Suffolk County,* 729 F.2d 903, 909 (2nd Cir. 1984) (opinion amended 748 F.2d 69).

of the professional relationship." *Cinema Five, Ltd. v. Cinerama, Inc.,* 528 F.2d 1384, 1386 (2nd Cir. 1976).

This Court's decision in *Dunton v. County of Suffolk County, supra,* is controlling. *Dunton* held that defense counsel cannot adequately represent a client if to do so would require counsel to refrain from zealously advocating for his client to avoid disadvantaging another client. Specifically, the *Dunton* Court held that a new trial must be ordered where, as here, defense counsel fails to present a viable defense that required shifting blame to another client. In *Dunton*, defendant Pfeiffer was a police officer employed by Suffolk County. Pfeiffer's attorney was hired by Suffolk County to represent him in defense of a § 1983 civil rights action. Pfeiffer had a colorable qualified immunity defense that was not raised by his attorney because doing so would have shifted liability back onto Suffolk County. This Court held that, absent adequate warnings on the dangers of conflict of interest, Pfeiffer could not waive the conflict of interest because as a layperson he would not comprehend the need to pursue the qualified immunity defense.

This Court also rejected the claim that the conflict was not prejudicial because the county had agreed to indemnify Pfeiffer for

compensatory damages, but not punitive damages: "We believe that because the jury never had a chance to consider Pfeiffer's good faith immunity defense, Pfeiffer did not receive a fair trial to which he was entitled." *Id.* 909-10. Accordingly, this Court vacated the judgment and remanded the matter a new trial. *Dunton* remains the governing law in the Second Circuit.

In the case at bar, Halstead and Restivo claimed that Det. Volpe acted in concert with Det. Fraas, and others, to plant the Q-8 hairs that were found in Restivo's van. Although the record showed that it was Det. Fraas who had complete custody and control of the hairs and participated in the search of the van on March 26, 1985, when the hairs were found, Freeman failed to argue that if anyone were responsible it was Det. Fraas and not Det. Volpe.

By simultaneously representing Det. Volpe and Det. Fraas, defense counsel could not argue an alternative theory of liability (vis-à-vis planting hairs) that could have exonerated Det. Volpe. Arguing that only Det. Fraas had access to the hairs was reasonable based on the fact that Det. Volpe did not have access to the hairs, and was not present during the search of the van. Furthermore, according to Det. Volpe, it

was Det. Fraas who told Det. Volpe that he believed that hairs consistent with Fusco's were present in Restivo's van. The failure of defense counsel to even attempt to shift the blame onto Det. Fraas resulted in the jury (incredibly) finding Det. Volpe liable while, incongruously, finding Det. Fraas *not* liable.

A conflict-free lawyer would have argued that if the hairs were planted, Det. Fraas must have done it, either alone or with others – but not with Det. Volpe. However, since the Freeman firm was simultaneously representing Det. Volpe, Det. Fraas, and Nassau County, any attempt to shift blame from Volpe onto Fraas would have been detrimental to Fraas as well as Nassau County, since the county had to indemnify the plaintiffs if *any* of the defendants were found liable.

In essence, the Freeman firm was operating under multiple conflicts of interest by representing not only all of the alleged malfeasors, but also the indemnifying party, Nassau County. Nor was the conflict vitiated because Nassau County had agreed to indemnify the Volpe estate. The children, family and friends of the late Det. Volpe have a vested interest in clearing his good name. *Cf. United States v.*

*Schwartz*, 283 F.3d 76 (2nd Cir. 2002) (new trial ordered due to conflict of interest where counsel for the criminal defendant was hired by the PBA, simultaneously represented the PBA in a civil suit involving the same underlying facts, and possibly failed to raise a plausible defense on behalf of the criminal defendant to protect the financial interests of the PBA). *Accord, Ricciuti v. NYC Transit Auth.,* 796 F. Supp. 84, 88 (S.D.N.Y. 1992) (ordering separate counsel because a colorable defense that could be raised "is a defense that may be good for the officer but bad for the City. That represents a potential conflict"); *accord, Bernstein v. Piermont*, 2013 WL 571840 (S.D.N.Y Oct. 21, 2013) (ordering separate counsel because the "potential for liability-shifting has been found to create a 'genuine and serious' possibility that a conflict of interest will emerge" [citing *Baker v. Gerould,* 2005 WL 2406003, at *2 (W.D.N.Y. 2005) (ordering separate counsel because, "while each defendant may defend himself by denying or challenging the government's proof of the existence of the alleged conspiracy, some of them may also argue alternatively that, even if an alleged conspiracy is proved, they were not part of it")]); *Mercado v. City of New York*, 2010 WL 3910594 (S.D.N.Y Sept. 30. 2010) (ordering separate counsel

because "if any degree of wrongdoing occurred here, Goldbourne and Jones each point the finger at each other. While it may be true that their primary, unified defense may prevail, the aforementioned defenses remain as secondary ones which Goldbourne and Jones cannot assert if they are jointly represented").

The fact that Nassau County has reluctantly agreed to indemnify Volpe's estate (they previously said they would not but then said they would) does not vitiate the prejudice. First, the county can once again turn around and deny indemnification. As Assistant County Attorney Van Der Waag stated at the Conflict Hearing, in the context of mentioning that Nassau County does not permit indemnification of the criminal acts of its employees:

> Now, right now the indemnification is in place. But it could go back to the Indemnification Board for a review if it continues and the Second Circuit in particular affirms, th[at] Mr. Volpe act[ed] improperly. I don't know whether it's going to happen, but that's a potential (Dist Ct. ECF # 269-1, p. 16).

(In this regard, note that Nassau County has gone back-and-forth on this issue at least three times – to date. *Id.* at 22-23, 25-26.)

Second, there is more to a judgment involving moral turpitude than dollars and cents. The late Det. Joseph Volpe has a family who

believes he did nothing wrong and wants his good name (and their legacy) restored. He – and they – had a right to zealous representation in defending against the scurrilous *malum in se* civil rights violations plaintiffs claim he committed.

In conclusion, the foregoing demonstrates that attorney Freeman "actively represented conflicting interests and that an actual conflict of interest adversely affected [the defense] lawyer's performance" during the trial. *Gordon v. Norman,* 788 F.2d 1194, 1198 (6th Cir. 1986) (quoted in *Patterson v. Balsacorp.* 440 F.3d 104, 115 (2nd Cir. 2006). While "Blame the dead guy" might have appeased the living defendants, it was a stab in the heart to the Volpe family. Accordingly, a new trial should be ordered.

## PLAINTIFFS' POLICE PRACTICES EXPERT MISLED THE JURY REGARDING THE APPLICABILITY OF *BRADY* AND USURPED THE JURY'S ROLE AS THE EXCLUSIVE FINDER OF FACTS[36]

Russell Fischer testified as an expert for plaintiffs on best police practices. However, his testimony far exceeded the role of expert witness and usurped the jury role as fact-finder.

First, Fischer's testimony regarding *Brady* obligations was not relevant because in 1985-86, during the time of the criminal investigation, and Restivo and Halstead's subsequent trial, it was not "clearly established" that police officers had disclosure obligations under *Brady.* It was not until 1995, in *Kyles v. Whitley,* 514 U.S. 419 (1995), that the Supreme Court held that prosecutors have "a duty to *learn* of any favorable evidence known to the others acting on the government's behalf in the case, including the police" (emphasis supplied). Prior to *Kyles,* "[b]y its terms, *Brady* applied only to prosecutors" and whatever information they had in their *possession. Haley v. City of Boston,* 657 F.3d 39, 48 (1st Cir. 2011). Nevertheless, at Trial II, Fischer was permitted to misinform the jury that in 1984-85,

---

[36] The standard of review on this issue is abuse of discretion. *See Amorigianos v. Ntl. R.R. Passenger Corp.,* 303 F.3d 256 (2nd Cir. 2002).

Det. Volpe and his fellow police officers had a duty to bring to the prosecutors' attention information that the *police* knew or should have known had to be disclosed to the defense under *Brady*. In other words, Fischer not only contravened the prohibition against an expert giving testimony about the law (*United States v. Bilzerian*, 926 F.2d 1285, 1294 (2nd Cir. 1991), he also misinformed the jury about the state of the law in 1984-1985.

Second, Fischer was permitted, over Volpe's objection, to define for the jury the "materiality" element of a *Brady* violation; and then to opine that *Brady's* obligation to disclose required (1) Det. Volpe to alert the prosecutor to the rope and the jeans found in John French's car, and (2) for the prosecutor to disclose that information to the defense (T-II 1790-92). That opinion was both wrong and usurped the jury's obligation to decide that ultimate issue of fact.

The law is clear that the "mere possibility that an item of undisclosed information might have helped the defense or might have affected the outcome of the trial, does not establish materiality in the constitutional sense." *United States v. Agurs,* 427 U.S. 97 (1974). The government only need disclose putative evidence "that, if suppressed,

would deprive the defendant of a fair trial." *United States v. Coppa*, 267 F.3d 132, (2d Cir. 2001) (quoting *United States v. Bagley*, 473 U.S. 667 (1985). In short the prosecution has no duty to disclose "speculative information" *Giles v. Maryland*, 386 U.S. 66 (1967).

Furthermore, that the jeans were inadvertently destroyed by the Lynbrook Police Department did not alter the status of the jeans. Inadvertently lost or destroyed evidence "must both possess exculpatory value that was apparent before the evidence was destroyed, and be of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means." *California v. Trombetta*, 476 U.S. 479 (1984); *Illinois v. Fisher*, 540 U.S. 544 (2003). The destruction of the evidence must have been in bad faith to be sanctionable. *Id.* Again: that the jeans and rope were inadvertently lost or destroyed by members of the Lynbrook Police Department – not acting jointly with Nassau Police Department – did not make that information material. *See also, People v. LaBounty*, 127 A.D.2d 989 (4th Dept. 1987) ("the exculpatory potential of this evidence being purely speculative, its destruction by police does not violate the *Brady* rule"); *People v. Pacheco*, 38 A.D.3d 686 (2nd Dept. 2007) (defendant's claim

that the prosecution's failure to disclose potential witnesses' home addresses "may have led to potentially exculpatory materials is entirely speculative and, therefore, is not a basis for reversal"); *Smith v. Artus*, 2009 U.S. Dist. Lexis 50264 (W.D.N.Y. June 16, 2009) (rejecting *Brady* claim that police destruction of a black coat and hat undermined an "O.J. Simpson defense" - "If it doesn't fit, you must acquit" – because it was speculative whether the destroyed coat would have fit the defendant); *Barnes v. Graham*, 2009 WL 1424116 (S.D.N.Y. May 20, 2009) (rejecting *Brady* claim where it was not established that undisclosed knife found near a crime scene was the murder weapon); *United States v. Hunley*, 2010 U.S. Dist. Lexis 92746; 2010 WL 3527542 (W.D.N.Y. Sept. 7, 2010) (police destruction of revolver before defendant could test it was not a *Brady* violation, because there was no proof that the gun destroyed was the same gun defendant allegedly possessed).

Third, it was clearly error for the district court to have allowed Fischer to usurp the jury's fact-finding function by allowing him to testify on an ultimate issue, namely, whether the jeans and the rope

constituted *Brady* material. As this Court observed in *United States v. Duncan*, 42 F.3d 97, 101 (2nd Cir. 1994):

> When an expert undertakes to tell the jury what result to reach, this does not aid the jury in making a decision, but rather attempts to substitute the expert's judgment for the jury's. When this occurs, the expert acts outside his limited role of providing the groundwork in the form of an opinion to enable the jury to make its own informed determination. In evaluating the admissibility of expert testimony, this Court requires the exclusion of testimony which states a legal conclusion.

In *United States v. Mejia*, 545 F.3d 179, 190 (2nd Cir. 2008), this Court said, "it is a little too convenient" when an expert witness purports to be an expert on "precisely those facts that a party must prove in order to win its case;" in that circumstance, the "expert transforms into the hub of the case and displaces the jury, connecting all and combining all of testimony and physical evidence into a coherent, discernible, internally consistent picture of the Plaintiff's case." *See also In re: Rezulin Products Liability Litigation,* 309 F. Supp.2d 531, 538 (S.D.N.Y. 2004) (criticizing the engagement of expert witnesses for the purposes of arguing the client's cause rather than to offer specialized knowledge or expertise that would be helpful in resolving complex issues of fact).

Unlike Lori French Gabberty – who testified that the jeans that were in the car were "stitched," *not* striped – Mr. Fischer never saw the jeans. Thus, his opinion that the jeans were *Brady* material was pure speculation. *See Zerega Ave. Realty Corp. v. Horbeck Offshore Transp., LLC,* 571 F.3d 206, 214 (2nd Cir. 2009) (improper to admit expert testimony that "is speculative or conjectural").

The same holds true regarding the rope. There was no testimony as to the thickness or composition of the rope. The medical examiner said that rope used to strangle Theresa was about 1-4" thick and less than six feet in length. However, Fischer did not opine as to the thickness or length of the rope in the photograph. The medical examiner also testified that the rope would have had blood on it. However, there was no testimony of any blood being on the rope; and no blood appears on the rope in the photograph in evidence (A. 375).

Fischer also exceeded the realm of expert testimony when he described, in a search warrant affidavit, the words "possibly human blood" and "hair is consistent with" Ms. Fusco as having specific meaning in the law enforcement community. That pseudo-scientific assertion was false. Those terms have no special meaning in the law

and in fact were used in their ordinary sense to prove to a neutral and objective magistrate probable cause to issue a warrant. Moreover, Judge McCarty, when he was an ADA, drafted Det. Volpe's March 29, 1985 (T-II 1471-72, 1480). Judge McCarty could not recall if the words "possible human blood" were his or Volpe's words (T-II 1485-87). In any event, Judge McCarty said that he had the final say on what words were used in the affidavit; and he did not intend the phrase "possible human blood" to be definitive; any red stain at a crime scene would be viewed as "possible human blood" (T-II 1485-86).

Finally, although the district court had excluded testimony from another proffered expert (Dr. Kadane) about false confessions, Fischer was permitted to testify, over defense objection, that the lengthy police interrogations of Michael Cockerel may have adversely affected his reliability and the credibility of his testimony (T-II 1835-36). This testimony was a veiled attack on the credibility of Michael Cockerel. However, the weight and credibility of witness testimony is the exclusive right of the jury "who are presumed to be fitted for it by their natural intelligence and their practical knowledge of men and the ways of men." *Nimely v. City of New York,* 414 F.3d 381, 397-98 (2nd Cir.

2005). Consequently, "expert opinions that constitute evaluations of witness credibility, even when such evaluations are rooted in scientific or technical expertise, are inadmissible under Rule 702." *Nimely,* 414 F.3d at 398.

Accordingly a new trial should be granted.

---

POINT VII

THE DISTRICT COURT ERRONEOUSLY DENIED A SETOFF BASED ON A NONEXISTENT CONFLICT BETWEEN N.Y. GEN. OBLIG. LAW § 15-108 AND 42 U.S.C. § 1983 AND IGNORED THE GENERAL PROHIBITION AGAINST DOUBLE RECOVERY[37]

The district court erred in concluding that Volpe was not entitled to a setoff reflecting the $2.2 million dollars in compensation Restivo and Halstead each had obtained in settlement from the State of New York, and by failing to instruct the jury on "double recovery."

First of all, contrary to the district court opinion, N.Y. Gen. Oblig. Law § 15-108 ("G.O.L.") and 42 U.S.C. § 1983 are cognate in their authorization of compensatory damages. Even the "deterrence" that § 1983 seeks to achieve is "through the mechanism of damages that are

---

[37] The standard of review on district court's interpretation and application of state law is *de novo. See Phansalkar v. Anderson Weinroth & Co.,* 344 F.3d 184, 199 (2nd Cir. 2003).

compensatory – i.e., damages grounded in determinations of plaintiff's actual losses." *Hoffman v. McNamara,* 688 F. Supp. 830, 834 (D. Conn. 1998) (quoting *Memphis Community School Dist. V. Stachura,* 477 U.S. 299, 307 (1987). "If a federal claim and a state claim arise from the same operative facts, and seek identical relief, an award of damages under both theories will constitute double recovery." *Mason v. Oklahoma Turnpike Auth.*, 115 F.3d 1442, 1459 (10th Cir. 1997). Hence, there is no conflict in bases for recovery among the state and federal statutes with respect to wrongful conviction. *Compare, Banks ex rel. Banks v. Yokemick,* 177 F. Supp.2d 239, 250 (S.D.N.Y. 2001) (finding policy differences between § 1983 and New York "wrongful death" statute, because "life is perhaps the most profoundly personal and vital of civil rights. Its unlawful deprivation by public officials, or under color of state law, goes to the very core of the rule of law").

In *Mason v. City of New York,* 949 F. Supp. 1068, 1076 (S.D.N.Y. 1996), Judge Kaplan held that a reduction of a jury award in the § 1983 action by the amount paid by New York City for the same tort would not violate federal policies as long as the plaintiff remains whole after the setoff. *Id.* 1078. Similarly, in the case at bar, reducing the $18

million dollar jury awards by the $2.2 million each plaintiff obtained from the state would not "diminish" the federal award because the federal jury was not told of the $2.2 million each plaintiff had received from the state. Since the total awards included both compensatory and punitive considerations by the jury, it would not diminish plaintiffs' award by reducing those awards by the amounts plaintiffs received by the state for compensatory damages. Indeed, given the sordid lives the plaintiffs had led up until the time of their arrests and convictions, the astronomically large jury's award had to be based in large part on pain and suffering and punitive damages.

Furthermore, the district court's conclusion that G.O.L. § 15-108 applies only where the settling party and non-settling party are joint tortfeasors was incorrect. G.O.L. § 15-108 applies equally to "theories of liability other than tort." *Carter v. State of New York*, 139 Misc.2d 423, 427 (Ct. of Claims 1988).

In the case at bar, the district court's conclusion that a setoff was unwarranted because the state had done nothing wrong was also erroneous. Court of Claims Act § 8-b imposes vicarious liability on New

York for torts committed by municipal employees. *See Baba Ali v. State of New York,* 24 Misc.3d 591 (Ct. of Claims 2009).

Even if G.O.L. § 15-108 did not apply, general equitable principles preclude claimants from obtaining double recovery for the same injuries and damages. *Indu Craft, Inc. v. Bank of Baroda,* 47 F.3d 490, 497 (2nd Cir. 1995) ("A plaintiff seeking compensation for the same injury under different legal theories is only entitled to one recovery"); *accord, Bender v. City of New York,* 78 F.3d 787, 793 (2nd Cir. 1996); *Mason,* 115 F.3d at 1459 ("If a federal claim and a state claim arise from the same operative facts, and seek identical relief, an award of damages under both theories will constitute double recovery"); *cf. Carter v. State, supra,* 139 Misc.2d at 428 (eschewing double recovery for same tort); *Gonzalez v. New York,* 2009 N.Y. Misc. LEXIS 6570 (Ct. of Claims 2009) (denying recovery for nonpecuniary damages against for which claimant had already been compensated by settlement with City of New York); *Zarcone v. Perry,* 78 A.D.2d 70, 79 (2nd Dep't 1980) (dismissing state lawsuit based on rule against duplicative recovery where plaintiff had already recovered in federal lawsuit damages "on the same facts

constituting the injury, and according to a charge which submitted the same elements of damages").

The two cases relied upon by the district court are not to the contrary. *Halpern v. Rosenbloom,* 459 F. Supp. 1346, 1352 (S.D.N.Y. 1978), held that Section 15-108 applied to rights to contribution contractually created by joint tortfeasors. And *Barkley v. United Homes, LLC,* 848 F. Supp.2d 248, 264-65 (E.D.N.Y. 2012), held only that Section 15-108 does not apply to defendants sued as necessary parties pursuant to Fed. R. Civ. Pro. 19.

In sum, because plaintiffs were not entitled to "double recovery," it was error for the district court not to allow Volpe to introduce evidence that plaintiffs had each received $2.2 million from New York State, and not to instruct the jury that they may choose to consider that money in determining how much more to award plaintiffs. The state monetary settlements were relevant and probative of what would constitute an adequate and proper amount of compensation for plaintiffs' injuries. Accordingly, a new trial on damages should be ordered.

<u>POINT VIII</u>
<u>THE DAMAGES AWARDED WERE EXCESSIVE</u>[38]

The $18 million dollar damages awarded to each plaintiff was far in excess of what was reasonable compensation under the circumstances.

"Compensatory damages 'are intended to redress the concrete loss that a plaintiff has suffered by reason of the defendant's wrongful conduct.'" *State Farm Mut. Ins. Co. v. Campbell,* 538 U.S. 408, 416 (2003). A court may not sustain an award that is "so excessive as to suggest that it was motivated by 'passion or prejudice' rather than a reasoned assessment of the evidence of injury presented at trial." *Ramierez v. New York City OTB,* 112 F.3d 38, 40 (2nd Cir. 1997).

To determine whether the awards in this case deviated materially from what would be reasonable compensation, the district court looked

---

[38] The standard of review on excessiveness of damages is *de novo. See Dagnello v. Long Island R.R. Co.,* 289 F.2d 797 (2nd Cir. 1961); *Stampf v. Long Island R.R.,* 761 F.3d 192, 204-05 (2nd Cir. 2014).
   *But see Zarcone v. Perry,* 572 F.2d 52, 56 (2nd Cir. 1978) (holding that the standard for appellate review of compensatory awards, where the trial judge has denied a motion to set aside the verdict as excessive, is whether the award was so high as to shock the judicial conscience and constitute a denial of justice." *Zarcone v. Perry,* 572 F.2d 52, 56 (2nd Cir. 1978).

to New York's C.P.L.R. § 5501(c). *See also, Johnson v. City of New York,* 2011 WL 2693234 * 5 (S.D.N.Y. 2011) (applying CPLR § 5501(c) to assess reasonableness of compensatory damages awarded plaintiff on state law malicious prosecution claim); *Peterson v. County of Nassau,* 995 F. Supp. 305, 320 (E.D.N.Y. 1998) (applying CPLR § 5501(c) to assess reasonableness of compensatory damages awarded plaintiff on state law false arrest claim).

CPLR § 5501(c) requires a court to find that "an award is excessive or inadequate if it deviates materially from what would be reasonable compensation." Although phrased as a direction to New York's intermediate appellate courts, § 5501(c)'s "deviates materially" standard applies to both trial and appellate judges. *See Lightfoot v. Union Carbide Corp.,* 901 F. Supp. 166, 169 (S.D.N.Y. 1995).

We submit that the district court failed to make any meaningful comparison between the damages awarded plaintiffs in the case at bar and the damages awarded in comparable state cases.

The district court cited *Haynes v. City of New York,* 29 A.D.3d 521 (2nd Dep't 2006) (reducing award to $1 million for 10 months wrongful incarceration); and *Sital v. City of New York,* 60 A.D.3d 465 (1st Dep't

2009) (claimant spent 20 hours in jail; award for false arrest reduced to $150,000 and new trial ordered on malicious prosecution claim), which other than noting the period of time for which the plaintiffs were incarcerated and the amounts they were awarded, gave no other details regarding the bases for the damage awards. Plaintiffs in those cases may have been compensated for lost wages or other pecuniary damages that plaintiffs did not seek.

A case more factually analogous to the case at bar is *Gristwood v. State,* 119 A.D.3d 1414 (4th Dep't 2014) (claimant wrongfully incarcerated for nine years awarded of $4.62 million, $2.7 million for loss of liberty, mental anguish and loss of family relationships while incarcerated; and $1.92 million for continuing pain and suffering); *see also, Gonzalez v. State,* 26 Misc.3d 1212(a) (Ct. Claims 2009) (19 year-old claimant who served five years was awarded $ 1.5 million for pecuniary and non-pecuniary injuries for wrongful conviction); *Ortiz v. State,* No. 96390 (Ct. Claims 2000) (award $ 530,000.00, non pecuniary, for serving ten years for rape and sodomy).

The Damages Awarded "Shocks the Conscience"

Plaintiffs were adult men at the time of Theresa Fusco's brutal rape and murder. They were poly-substance abusers and manual laborers. Their convictions were the result of their confessions and admissions of guilt to so many people. Even assuming, without for an instant conceding, that Restivo and Halstead were actually innocent, their pecuniary losses (given their individual lifetime earnings up until the time of their convictions) would most likely have been approximately $50,000 to $75,000 per year. The extreme disparity between the $18 million dollar awarded each to Restivo and Halstead, as compared to the non-pecuniary damages awarded in the cases discussed above, suggest not only that the $18 million dollars awarded to each of them far exceeded what was reasonably needed to compensate them, but also that the non-pecuniary damages awarded were so wildly excessive as to "shock the conscience." *See, generally, Ismail v. Cohen,* 899 F.2d 183, 186 (2nd Cir. 1990) (holding district court erred in limiting its frame of reference to federal § 1983 cases and not consider state court awards in calculating damages).

For all the foregoing reasons, we submit the damages awarded should be vacated and the matter remitted for a new trial on damages, or the damages awarded should be substantially reduced.

---

## CONCLUSION

FOR ALL THE FOREGOING REASONS, THE JURY VERDICT AT TRIAL II SHOULD BE VACATED AND THE JURY VERDICT AT TRIAL I SHOULD BE REINSTATED (POINT I); AT THE LEAST, A NEW TRIAL SHOULD BE ORDERED (POINT II-VI); THE DAMAGES AWARD SHOULD BE SUBSTANTIALLY REDUCED (POINT VII-VIII)

Respectfully submitted by

PETER J. TOMAO and
RICHARD M. LANGONE,
Attorneys for the Estate of
Joseph Volpe
600 Old Country Road, Suite 328
Garden City, NY 11530

### Certificate of Compliance with Type-Volume Limitation, Typeface Requirements, and Type-Style Requirements

This Court granted appellant permission to file an oversized- brief not greater than 24,000 words. *See* 2nd Cir. ECF # 117.

1. This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because the brief contains 20,552 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(A)(7)(B)(iii).

2. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionate space typeface using Micro-Soft Word 2007 in 14 point Century font.

Dated:      Garden City, N.Y.
            September 28, 2015

                                /s/ Richard M. Langone

**SPECIAL APPENDIX**

# Table of Contents

**Page**

Memorandum and Order of the Honorable Joanna Seybert,
dated March 8, 2010 ....................................................................... SPA1

Memorandum and Order of the Honorable Joanna Seybert,
dated August 15, 2012 .................................................................... SPA6

Memorandum and Order of the Honorable Joanna Seybert,
dated September 4, 2012 ................................................................ SPA42

Memorandum and Order of the Honorable Joanna Seybert,
dated July 22, 2013 ........................................................................ SPA48

Judgment of the United States District Court, Eastern District of
New York, entered November 17, 2014, Appealed From ............ SPA95

# SPA1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------X
JOHN KOGUT,

                    Plaintiff,

                                        MEMORANDUM AND ORDER
          -against-                      06-CV-6695 (JS)(WDW)
                                         (LEAD CASE)

THE COUNTY OF NASSAU, POLICE
COMMISSIONER DONALD KANE, POLICE
COMMISSIONER WILLIAM J. WILLETT (2005),
POLICE COMMISSIONER JAMES LAWRENCE,
DETECTIVE SEAN SPILLANE (HEAD OF HOMICIDE
1985), DETECTIVE DENNIS FARRELL (HEAD OF
HOMICIDE 2005), DETECTIVE JOSEPH VOLPE,
DETECTIVE ROBERT DEMPSEY, DETECTIVE ALBERT
MARTINO, DETECTIVE WAYNE BIRDSALL,
DETECTIVE MILTON G. GRUBER, DETECTIVE
CHARLES FRAAS, DETECTIVE FRANK SIRIANNI,
DETECTIVE HARRY WALTMAN, P.O. MICHAEL
CONNAUGHTON, P.O. WILLIAM DIEHL, and
JOHN DOES 1-5,

                    Defendants.
----------------------------------------X
JOHN RESTIVO, DENNIS HALSTEAD,
MELISSA LULLO, JASON HALSTEAD,
HEATHER HALSTEAD and TAYLOR
HALSTEAD,

                                         06-CV-6720(JS)(WDW)
                    Plaintiffs,          (MEMBER CASE)

          - against -

NASSAU COUNTY, JOSEPH VOLPE, in his
individual capacity, ROBERT DEMPSEY,
in his individual capacity, FRANK SIRIANNI,
in his individual capacity, MILTON GRUBER,
in his individual capacity, HARRY WALTMAN
in his individual capacity, ALBERT MARTINO,
in his individual capacity, CHARLIE FRAAS,
in his individual capacity, THOMAS ALLEN
in his individual capacity, RICHARD BRUSA,
in his individual capacity, VINCENT DONNELLY,
in his individual capacity, MICHAEL
CONNAUGHTON, in his individual capacity,
WAYNE BIRDSALL, in his individual capacity,
WILLIAM DIEHL, in his individual capacity,
JACK SHARKEY, in his individual capacity,
DANIEL PERRINO, in his individual capacity,
ANTHONY KOZIER, in his individual capacity,

Detective Sergeant CAMPBELL, (Shield #48),
in his individual capacity, SEAN SPILLANE,
in his individual capacity, RICHARD ROE
SUPERVISORS #1-10, in their individual
capacities,

                        Defendants.
----------------------------------------X

APPEARANCES:
For Plaintiffs:
John Kogut          Anthony M. Grandinette, Esq.
                    Grandinette & Serio, LLP
                    114 Old Country Road, Suite 420
                    Mineola, NY 11501

                    Paul Casteleiro, Esq.
                    200 Washington Street, Suite 500
                    Hoboken, NJ 07030

John Restivo,       Barry C. Scheck, Esq.
Dennis Halstead,    Deborah L. Cornwall, Esq.
Melissa Lullo,      Monica R. Shah, Esq.
Jason Halstead, Nick Joel Brustin, Esq.
Heather Halstead,   Anna Benvenutti Hoffman, Esq.
and Taylor          Cochran, Neufeld & Scheck, LLP
Halstead            99 Hudson Street, 8th Floor
                    New York, New York 10013

For Defendants:     Liora M. Ben-Sorek, Esq.
                    Sondra Meryl Toscano, Esq.
                    Office of the Nassau County Attorney
                    One West Street
                    Mineola, NY 11501

SEYBERT, District Judge:

      Plaintiffs commenced these actions 06-CV-6695 and 06-CV-6720

on December 19, 2006, and December 21, 2006, respectively.

Subsequently, the Court consolidated both cases into the earlier-filed

action.  Kogut, Restivo, and Halstead base the majority of their claims

against Nassau County ("County") and various Nassau County Police

Department ("NCPD") officers and supervisors (collectively

"Defendants") on 42 U.S.C. § 1983, alleging, <u>inter alia</u>, malicious

prosecution, false arrest, and false imprisonment.  Additionally,

2

Kogut, Restivo, and Halstead assert 14th Amendment due process violations, and a variety of state claims stemming from their prior interrogations, arrests, and subsequent state prosecutions.

On August 27 and 28, 2008, Defendants moved to dismiss both actions. In an Order dated August 3, 2009 ("August 2009 Order"), the Court granted in part and denied in part Defendants' motions. In an Order dated December 11, 2009 ("December 2009 Order"), the Court granted in part and denied in part Plaintiffs' motions for reconsideration. Approximately two months later, on February 4, 2010, Defendants filed a letter motion seeking certification of interlocutory appeal pursuant to 28 U.S.C. § 1292.

Section 1292 of Title 28 of the United States Code permits federal district courts to certify controlling issues of law for immediate appeal. It provides:

> (b) When a district judge, in making in a civil action an order not otherwise appealable under this section, shall be of the opinion that such order involves a controlling question of law as to which there is substantial ground for difference of opinion and that an immediate appeal from the order may materially advance the ultimate termination of the litigation, he shall so state in writing in such order. The Court of Appeals which would have jurisdiction of an appeal of such action may thereupon, in its discretion, permit an appeal to be taken from such order, if application is made to it within ten days after the entry of the order: <u>Provided</u>, <u>however</u>, that application for an appeal hereunder shall not stay proceedings in the district court unless the district judge or the Court of Appeals or a judge thereof shall so order.

28 U.S.C. § 1292(b) (emphasis in original). The court should not freely certify orders involving the sufficiency of pleadings, <u>see</u> <u>Gottesman v. General Motors Corp.</u>, 268 F.2d 194, 196 (2d Cir. 1959), in part because

3

"[i]nherent in the requirements of section 1292(b) [certification] is that the issue certified be ripe for judicial determination." Oneida Indian Nation of New York State v. County of Oneida, 622 F.2d 624, 628 (2d Cir. 1980). "Where the record has not yet developed far enough to permit considered appellate disposition of the claim presented, the case may not be 'ripe' for interlocutory review." Able v. United States, 870 F. Supp. 468, 471 (E.D.N.Y. 1994) (citing Paschall v. Kansas City Star Co., 605 F.2d 403, 406 (8th Cir. 1979) ("Consideration of the factual basis must be such that a sound premise exists upon which the legal issues can be determined with precision").

In this case, putting aside the fact that Defendants' motion is likely untimely,[1] Defendants have provided the Court with an insufficient basis to demonstrate that there is a substantial ground for difference of opinion surrounding the controlling issues of law decided in the December 2009 Order. In short, Defendants' current motion is just another rehash of its prior papers, arguing over and over the

---

[1] Section 1292(b) provides that a motion for leave to appeal must be filed with the court of appeals within ten days after the district court issues an order approving the interlocutory appeal. Thus, the statute itself does not provide a time limit for when the moving party must file its motion with the district court. Nevertheless, courts have found that the party seeking interlocutory appeal cannot unreasonably delay in its application. See Green v. City of New York, No. 05-CV-0429, 2006 WL 3335051, at *2 (E.D.N.Y. Oct. 23, 2006) (stating that § 1292(b) certification motion made two months after order was untimely); Ferraro v. Sec'y of U.S. Dept. of Health and Human Servs, 780 F. Supp. 978, 979 (E.D.N.Y. 1992) (denying § 1292(b) certification where "there was no justification for plaintiff's [two-and-a-half-month] delay in requesting certification[,]" and noting the delay "[was] an indication that the saving of time [was] of little concern in this case"); see also Weir v. Propst, 915 F.2d 283, 287 (7th Cir. 1990) (finding district court abused its discretion in granting § 1292(b) certification requested three months after the order appealed with no justification for the delay).

Plaintiffs argue that Defendants' application is untimely and state that the Defendants have failed to give an excuse for their delay. In reply, Defendants give the court a litany of excuses, none of which are availing, as to why they delayed. Most shockingly, the Defendants state that, because of personnel changes, they "needed time to get up to speed" on the case. Defendants have had close to four years since the beginning of this case, and arguably since 1985, to get up to speed.

same points.  Defendants state:

> We believe that this and other court decisions
> conflating invalidity and favorable termination
> have misapplied Heck and that the most coherent
> reading of that precedent is that it creates a
> threshold invalidity requirement different from
> and in addition to the favorable termination
> element.

(Defs' Letter in Supp. 3.)  Yet, Defendants provide the Court with <u>no</u>

<u>cases</u> demonstrating the alleged misapplication or correct application,

for that matter, of the <u>Heck</u> standard in a case similar to the one before

the Court.  Defendants' "belief" is not grounds for certification under

Section 1292.

Moreover, this case is approaching the four-year mark, and

has barely progressed through discovery, because of Defendants' repeated

dilatory conduct.  Section 1292 certification of this case would only

serve to impede the advancement of this case further, which is directly

opposite the statute's intentions.

<u>CONCLUSION</u>

For the reasons discussed above, Defendants' motion is DENIED.

SO ORDERED.

/s/ JOANNA SEYBERT
Joanna Seybert, U.S.D.J.

Dated:    March __8__, 2010
          Central Islip, New York

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------X
JOHN KOGUT,

                Plaintiff,

                                 MEMORANDUM & ORDER
      -against-                06-CV-6695(JS)(WDW)
                                 (LEAD CASE)

THE COUNTY OF NASSAU, POLICE
COMMISSIONER DONALD KANE, POLICE
COMMISSIONER WILLIAM J. WILLETT (2005),
POLICE COMMISSIONER JAMES LAWRENCE,
DETECTIVE SEAN SPILLANE (HEAD OF HOMICIDE
1985), DETECTIVE DENNIS FARRELL (HEAD OF
HOMICIDE 2005), CAROLANN HESSEMAN, AS
EXECUTRIX FOR THE ESTATE OF JOSEPH VOLPE,
DETECTIVE ROBERT DEMPSEY, DETECTIVE ALBERT
MARTINO, DETECTIVE WAYNE BIRDSALL,
DETECTIVE MILTON G. GRUBER, DETECTIVE
CHARLES FRAAS, DETECTIVE FRANK SIRIANNI,
DETECTIVE HARRY WALTMAN, P.O. MICHAEL
CONNAUGHTON, P.O. WILLIAM DIEHL, and
JOHN DOES 1-5,

                Defendants.
-----------------------------------------X
JOHN RESTIVO, DENNIS HALSTEAD,
MELISSA LULLO, JASON HALSTEAD,
HEATHER HALSTEAD, and TAYLOR
HALSTEAD,

                                 06-CV-6720(JS)(WDW)
             Plaintiffs,       (MEMBER CASE)

      - against -

NASSAU COUNTY, CAROLANN HESSMAN, AS
EXECUTRIX FOR THE ESTATE OF JOSEPH VOLPE,
in his individual capacity, ROBERT DEMPSEY,
in his individual capacity, FRANK SIRIANNI,
in his individual capacity, MILTON GRUBER,
in his individual capacity, HARRY WALTMAN
in his individual capacity, ALBERT MARTINO,
in his individual capacity, CHARLIE FRAAS,
in his individual capacity, THOMAS ALLEN
in his individual capacity, RICHARD BRUSA,
in his individual capacity, VINCENT DONNELLY,

Case 2:06-cv-06695-JS-WDW   Document 350   Filed 08/15/12   Page 2 of 36 PageID #: 13690

in his individual capacity, MICHAEL
CONNAUGHTON, in his individual capacity,
WAYNE BIRDSALL, in his individual capacity,
WILLIAM DIEHL, in his individual capacity,
JACK SHARKEY, in his individual capacity,
DANIEL PERRINO, in his individual capacity,
ANTHONY KOZIER, in his individual capacity,
Detective Sergeant CAMPBELL, (Shield #48),
in his individual capacity, SEAN SPILLANE,
in his individual capacity, RICHARD ROE
SUPERVISORS #1-10, in their individual
capacities,

                    Defendants.
----------------------------------------X
APPEARANCES
For Plaintiffs:
John Kogut          Anthony M. Grandinette, Esq.
                    John T. Serio, Esq.
                    Grandinette & Serio, LLP
                    114 Old Country Road, Suite 420
                    Mineola, New York 11501

                    Paul Casteleiro, Esq.
                    86 Hudson Street
                    Hoboken, New Jersey 07030

John Restivo,       Barry C. Scheck, Esq.
Dennis Halstead,    Deborah L. Cornwall, Esq.
Melissa Lullo,      Monica R. Shah, Esq.
Jason Halstead,     Nick Joel Brustin, Esq.
Heather Halstead,   Anna Benvenutti Hoffman, Esq.
and Taylor          Sonam A. H. Henderson, Esq.
Halstead            Cochran, Neufeld & Scheck, LLP
                    99 Hudson Street, 8th Floor
                    New York, New York 10013

For Defendants:     Louis M. Freeman, Esq.
                    Lee Ginsberg, Esq.
                    Freeman, Nooter & Ginsberg
                    75 Maiden Lane, Suite 503
                    New York, New York 10038

David L. Lewis, Esq.
Lewis & Fiore, Esq.
225 Broadway, Suite 3300
New York, New York 10007

Liora M. Ben-Sorek, Esq.
Sondra Meryl Toscano, Esq.
Christine Ann Lobasso, Esq.
Dennis J. Saffran, Esq.
Sondra Meryl Toscano, Esq.
Office of the Nassau County Attorney[1]
One West Street
Mineola, New York 11501

SEYBERT, District Judge:

   This Memorandum and Order addresses only Defendants' motion to exclude Plaintiffs' hair experts and Plaintiffs' motion to exclude Defendants' statistician.  For the reasons that follow, Defendants' motion (Docket Entry 205) is DENIED except to the extent discussed below, and Plaintiffs' motion (Docket Entry 204) is GRANTED.

<u>BACKGROUND</u>

   These <u>Daubert</u> motions principally concern the phenomenon that the Court will refer to as "post-mortem root banding" ("PMRB").  The Court will discuss PMRB and its

---

[1] Michael Ferguson, Esq. of the Nassau County Attorney's Office has participated in various proceedings in connection with this case.  Mr. Ferguson is directed to file a notice of appearance forthwith.

relevance in detail, but it first turns to the crime and prosecution underlying this wrongful conviction case.

I. <u>The Fusco Homicide</u>

On November 10, 1984, Theresa Fusco disappeared after leaving work at approximately 9:50 p.m. Her nude body was discovered five weeks later in a wooded area on Long Island, New York. In 1986, Plaintiffs John Restivo, Dennis Halstead, and John Kogut were tried and convicted of Fusco's rape and murder. (<u>See</u> <u>generally</u> Pls. Opp. 2.)[2]

The only forensic evidence linking Restivo, Halstead, or Kogut to the Fusco Homicide at their 1986 criminal trials were two "questioned" hairs (the "Q8 hairs") that Nassau County Police Department ("NCPD") investigators purportedly recovered during a search of Restivo's blue van on March 26, 1985, almost five months after the murder. An NCPD analyst, Detective Charles Fraas, testified that the Q8 hairs were consistent with "known" hairs that were collected during Fusco's autopsy. (<u>See</u>

---

[2] There are two sets of motion papers under consideration here. Citations to "Defs. Br. __;" "Pls. Opp. __;" and "Defs. Reply __" refer to Defendants' motion to exclude Plaintiffs' experts, Plaintiffs' opposition to that motion, and Defendants' reply, respectively. Citations to "Pls. Br. __;" "Defs. Opp. __;" and "Pls. Reply __" refer to Plaintiffs' motion to exclude Defendants' expert, Defendants' opposition to that motion, and Plaintiffs' reply, respectively.

# SPA10

generally Pls. Opp. 2.)   At Restivo and Halstead's 1986 trial, prosecutors argued that the presence of the Q8 hairs in Restivo's van proved that Restivo, Halstead, and Kogut used the van to abduct Fusco, rape her, and then, after strangling her in a cemetery, dump her body in the woods near the railroad tracks in Lynbrook--all within a span of a few hours.   All three hair experts at that trial--Fraas and hair microscopist Nicholas Petraco for the prosecution and Peter De Forest for the defense--testified that they observed PMRB in the Q8 hairs.

DNA testing eventually excluded Restivo, Halstead, and Kogut as the source of the semen that was collected from Fusco's body, and all three men had their 1986 convictions vacated. Plaintiff Kogut was re-tried in 2005.   At the re-trial, prosecutors offered DNA evidence matching the Q8 hairs and a third hair also ostensibly collected from Restivo's van (the "Q4 hair" and, together with the Q8 hairs, the "Q hairs") with known hairs collected during the autopsy.   After considering evidence related to PMRB, Judge Victor M. Ort was persuaded that the Q hairs were not actually left in Restivo's van on the night that Fusco disappeared.   (See generally Pls. Opp. 3.)   Judge Ort acquitted Kogut, and the indictments against Restivo and Halstead were soon dismissed.   Plaintiffs brought this wrongful

5

conviction case shortly thereafter.   (See generally Pls. Opp. 3-4.)

II. Post-Mortem Root Banding

Plaintiffs contend that PMRB evidence demonstrates that the Q hairs were in fact autopsy hairs that were planted among, or mistakenly mixed with, trace evidence collected from Restivo's van.   Plaintiffs' PMRB experts--Max Houck, Nicholas Petraco (who testified for the prosecution at Halstead and Restivo's 1986 trial), and Peter De Forest--propose to testify that PMRB is the emergence of opaque, ellipsoidal bands at the roots of hairs that have been removed from bodies that have been decomposing for at least several days.   In Plaintiffs' Experts'[3] opinion, PMRB only develops while hairs are still attached to a decomposing body, and the banding takes several days after death to appear.   This means, then, that if the Q hairs show PMRB, then they could not have come from Ms. Fusco during the short time she was alleged to have been in the van on the night she died.   A more likely explanation, from Plaintiffs' perspective,

---

[3] Because this decision addresses both Plaintiffs' three PMRB experts and Defendants' statistics expert, and because it is sometimes helpful to describe Plaintiffs' views on PMRB in generalities, the Court will occasionally refer to all three of Plaintiffs' PMRB experts as "Plaintiffs' Experts."

is that the Q hairs were taken from the autopsy table and placed with the trace evidence collected from the van.

In June, the Court held a <u>Daubert</u> hearing to determine whether and to what extent Plaintiffs' Experts and Defendants' statistician, Joseph Kadane, will be permitted to testify at trial.  <u>See</u> <u>generally</u> <u>Daubert v. Merrell Dow Pharms., Inc.</u>, 509 U.S. 579, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993).  The following is a summary of the proposed experts' qualifications and opinions.  Other relevant evidence, either adduced at the hearing or submitted with the parties' motions, is addressed as appropriate in the discussion section.

A. <u>Max Houck</u>

Houck is a forensic anthropologist and trace evidence analyst.  (Pls. Ex. 1, Houck Expert Report ("Houck Rpt.") at 1[4].)  Among Houck's professional and educational achievements are Bachelor's and Master's degrees in anthropology and a Ph.D. in applied chemistry.  (<u>Id.</u>)  From 1992 to 2001, he was a physical scientist in the FBI's Laboratory Division, where he was assigned to the trace evidence unit.  Later, he became the

---

[4] Many of the exhibits received in evidence at the <u>Daubert</u> hearing were duplicative of evidence attached to the parties' motions.  Except as otherwise noted, the Court will refer to evidence using the designation each exhibit received at the hearing.

7

director of the Forensic Science Initiative (Research) at the University of West Virginia.  He held this post until 2011. (Id.)  At one point during his career, Houck chaired the Scientific Working Group on Materials Analysis ("SWGMAT"), which is a professional organization whose mission is to develop consensus guidelines for best practices in the forensic sciences field.  (Daubert Hearing Transcript ("Hrg. Tr.") 24-25.)  SWGMAT has a sub-committee dedicated to hair and fiber analysis.  (Id.)

In his expert report, Houck explains that PMRB is an artifact of decomposition:

> In decomposition, hairs that were actively growing . . . until the time of death go through changes in their root ends related to the decomposition of the surrounding skin and follicle.  One of the phenomena observed in these former anagen or early catagen hairs [i.e., hairs in the active growing stage] is called "putrid root" or "post-mortem root banding."

(Houck Rpt. 6.)  He defines PMRB as "an opaque ellipsoidal band which appears to be composed of a collection of parallel elongated air spaces near the root of a hair, appearing as a dark or blackened band in the hair shaft."  (Id. (internal quotations omitted).)  This definition is derived from the seminal article on PMRB, "The Morphology and Evidential Significance of Human Hair Roots," which was authored by

8

Plaintiffs' other two PMRB witnesses, Nicholas Petraco and Peter De Forest, as well as Charles Fraas (the detective at the Halstead/Restivo 1986 criminal trial) and another researcher. N. Petraco, C. Fraas, F.X. Callery, and P.R. De Forest, "The Morphology and Evidential Significance of Human Hair Roots," J. FORENSIC SCI. 33(1):68-76, 73 (1988).

According to Houck, "[t]he transformation of the putrid root <u>only</u> occurs in roots that remain in the scalp of a decomposing body; the changes do not occur if the hair is plucked (or shed) prior to death and allowed to deteriorate." (Houck Rpt. 7.)  He asserts that, according to the literature on the topic, for a hair to exhibit PMRB three conditions must be met: the hair must have been (1) in the active growing phase prior to an individual's death; (2) in the skin while the body was decomposing; and (3) "in the decomposing skin for a minimum of 7 days."  (<u>Id.</u>)  Based on Houck's understanding of the prosecution's theory of the Fusco Homicide, according to which Fusco was in Restivo's van for "perhaps less than an hour," the Q hairs could not have come from Fusco on the night she disappeared. (See <u>id.</u> at 7-8.)  Houck concludes: "Based on the known and documented scientific clinical studies on postmortem root banding relating to its timing, description, appearance,

and conditions for existence, there is no known mechanism or reasonable explanation for [PMRB] to appear in Ms. Fusco's hairs that were allegedly left in the blue van . . . ." (Id. at 8.)

B. Nicholas Petraco

Nicholas Petraco has a Bachelor's degree in analytical chemistry and a Master's degree in forensic science. Among other things, Petraco was a trace evidence analyst with the New York Police Department ("NYPD") from 1974 until 1990. In this role, he analyzed hair evidence in thousands of cases. (Pls. Ex. 15, Petraco Expert Report ("Petraco Rpt.") 2.) Since 1990, he has consulted for the NYPD's Forensic Investigation Division, where he is responsible for performing casework, training new analysts, and establishing standard operating procedures for the Department's criminalistics unit. (Id.) Among his professional and educational accomplishments, Petraco chaired SWGMAT's hair committee and, as mentioned above, co-wrote "The Morphology and Forensic Significance of Human Hair Roots," a landmark article on PMRB. (Id. at 3.)

Like Houck, Petraco believes that the Q8 hairs purportedly collected from Restivo's van could not have come from Fusco either before she died or during the brief span between her death and when her body was left in the woods.

(Petraco Rpt. 3).  As to the PMRB, Petraco opined that PMRB only develops in hairs while they are attached to a decomposing body and that the banding takes at least 8 hours after death to appear.  (Id. at 4-5.)   On the latter point, Petraco cites two instances in which PMRB was observed in hairs 8-10 and 10-12 hours after death, respectively.  According to Petraco, these are the shortest reported intervals before which PMRB has been observed.  (Id. at 5.)   Petraco has never seen, read, or heard about a case in which PMRB appeared less than eight hours after death.  (Id.)   Petraco also states that hairs do not continue to develop post-mortem banding patterns once they've been removed from a dead scalp.  (Id. at 5.)

Petraco  makes  two  other  points  relevant  to  the following discussion.  First, he observed that the Q8 hairs exhibited banding patterns that are consistent with the patterns on "known" hairs collected during Fusco's autopsy.  (Id. at 6.) And, because hairs do not continue to develop PMRB once they are removed from the scalp (id. at 5), it is "extremely unlikely, and probably impossible" that the Q8 hairs--if they really came from Fusco either before or shortly after she died--would exhibit PMRB consistent with degree of banding seen on the autopsy hairs taken weeks after Fusco was murdered (id. at 6).

11

Second, Petraco observed that the Q8 hairs were in "pristine condition" and did not exhibit any debris, mechanical damage, or breakage that one would expect from hairs that had been on the floor of a van for four months. (Id. at 6.) In contrast, other hairs collected from Restivo's van did display these types of damage. (Id.)

Petraco also concludes that the Q4 hair could not have come from Fusco while she was alive or shortly after she died. (Id. at 6-7.) He formed this opinion for reasons similar to the rationale underpinning his conclusions as to the Q8 hairs.

### C. Peter De Forest

De Forest has a Bachelor's degree and a Doctorate in criminalistics. (Pls. Ex. 25, De Forest Expert Report ("De Forest Rpt.") Ex. A.) He taught criminalistics at the John Jay College of Criminal Justice for nearly forty years. (Id.) A list of his scholarly books, chapters, articles, and presentations spans sixteen pages. (Id.) Among his many other professional memberships, De Forest is an Academic Affiliate of the American Society of Crime Laboratory Directors and a charter member of the New York Society of Forensic Sciences. At one time he was the chairman of the Council on Forensic Science Education. (Id.)

In his report, De Forest explains that although scientists do not yet fully understand how and why PMRB works (De Forest Rpt. 6), "[e]xperience and research have shown that classical post-mortem root banding in scalp hairs is only observed in hairs that have been taken from anagen follicles in partially decomposed scalp tissue." (De Forest Rpt. 6.) He observes that PMRB "is a recognized phenomenon in the scientific community of forensic hair examiners," and he states that he has kept current on develops concerning PMRB since he became involved in the case in 1986. (Id. at 7.)

Like Houck and Petraco, De Forest doesn't think that the Q8 hairs were left behind by Fusco on the night she was abducted. (Id. at 8.) The Q8 hairs exhibited PMRB, which mean that the hairs "had come from a decomposing body and had not been in the van interior environment for any period of time even approaching that of the other hairs" that had been collected from the van. (Id. at 8.) On the timing point, De Forest suggests that microbial activity may be to blame for PMRB and that the most vulnerable sections of hair (the least keratinized) enjoy the greatest protection from microbial attack (because they are under the scalp surface). (Id. at 7.) At the hearing, he elaborated on this idea, explaining that the

juxtaposition between increased vulnerability (less keratinization) and decreased microbial access as one moves along the shaft of the hair toward the root may explain PMRB's spindle or ellipsoidal shape. (Hrg. Tr. 518, 542.)

De Forest also examined "known" hairs from Fusco's autopsy and reached the following conclusion:

> What is very clear is that the degree of [PMRB] observed and documented in the Q8 hairs is similar to the greatest degree of [PMRB] observed among the known hairs taken at autopsy. It is my opinion to a reasonable degree of scientific certainty that the Q8 hairs exhibiting [PMRB] came from the sample of known hairs taken at the autopsy of the homicide victim, Theresa Fusco.

(De Forest Rpt. 8.) He also concluded that the Q4 hair "exhibited post-mortem root banding beyond a reasonable scientific certainty." (Id.)

D. Joseph Kadane

The only defense expert at issue in this motion is Joseph Kadane, a statistician. He has a Ph.D. in statistics and he is a professor emeritus of statistics at Carnegie Mellon University. (Defs. Ex. L, Kadane Expert Report ("Kadane Rpt.") 1.) Although he has never studied human hair, he has previously offered expert statistics testimony. (Id.)

14

Defendants engaged Kadane to opine on two related questions: first, the extent to which PMRB can be reliably distinguished from pre-mortem root banding and whether the Q hairs exhibited pre- or post-mortem banding; and second, whether science can reliably ascertain the length of time since a banded hair was removed from a body. (Id. at 3.) On the first question, he refers to a study by a graduate student named Alison Domzalski that tested whether hairs from living subjects would develop root banding if they were exposed to various environmental conditions including, for example, being buried in soil. (Alison Clare Domzalski, "The Effects of Environmental Exposure on Human Scalp Hair Root Morphology" (February 2004) (the "Domzalski Paper").) Domzalski found that certain hairs did develop a type of root banding after being exposed to the elements, and she cautioned that this banding "could be confused" with PMRB. (Id. at 49) She noted, however, that the environmental banding appeared nearer to the hair root than PMRB does. (See id.) The parties dispute whether PMRB can be reliably distinguished from environmental root banding, but in Kadane's opinion, Domzalski's study shows that with respect to the evidence in this case:

> [I]t is not unreasonable to suppose that the
> Q-hairs were also exposed to dirt in the van

> in which they were found. Since the
> mechanism(s) that lead to root banding is
> unknown, we are not in a position to
> determine whether the Q-hairs are pre- or
> post-mortem. Neither of these can be
> excluded.

(Kadane Rpt. 11.)

On the second question, whether an examiner can tell the amount of time since a banded hair was removed from a scalp, Kadane suggests the issue is not nearly as clear-cut as Plaintiffs' Experts make it seem. Referring to Petraco's assertion that, in the hundreds of cases he has reviewed, he has not seen or read about banding appearing earlier than a day or two after death (other than the two cases where banding apparently developed within 12 hours), Kadane opines that this claim fails to account for crime scene and autopsy delays. (Kadane Rpt. 12.) In other words, an examiner can't observe whether PMRB appears shortly after death because the body won't be autopsied until significantly after death. (See id.)

Kadane's report concludes:

> I find that to a high degree of scientific
> certainty, Dr. DeForest [sic] believes that
> he can distinguish reliably between
> postmortem hair banding and premortem (or
> environmental) hair banding. However, there
> are no validation studies confirming that he
> or anyone else can do this, and no published

16

> experiments on the subject.  We have only
> subjective belief and unsupported
> speculation.

(Kadane Rpt. 14.)

Kadane supplemented his report after he had reviewed Plaintiffs' Experts' findings.  He concluded that report as follows:

> The claim that root banding of human hairs
> must be postmortem is such an example [of a
> probabilistic claim made without statistical
> evidence].  Msrs. DeForest [sic], Houck and
> Petraco are saying with probability one that
> root banding must be postmortem.  They have
> no statistical foundation for that opinion.

(Docket Entry 209-3 at 5.)

<u>DISCUSSION</u>

Upon careful consideration of the evidence at the <u>Daubert</u> hearing and the parties' arguments, the Court concludes that Plaintiffs' Experts may offer their opinions on PMRB consistent with the limitation discussed in Section II, below. Defendants' expert, Dr. Kadane, may not testify.

In the discussion that follows, the Court discusses the standard for admitting expert evidence and then applies it first to Plaintiffs' Experts and then to Dr. Kadane.

I. <u>Legal Standard</u>

Federal Rule of Evidence 702 is the starting point for assessing whether scientific or technical experts may testify at trial.  Rule 702 provides that:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.  District courts are the "gate-keepers" of expert evidence, and they must make an initial determination whether experts are qualified and whether their testimony is both relevant and reliable.  <u>See</u> <u>Amorgianos v. Nat'l R.R. Passenger Corp.</u>, 303 F.3d 256, 264 (2d Cir. 2002).  Expert evidence is relevant if it tends to make any fact of consequence to the litigation more or less probable.  <u>Id.</u> at 265; <u>see also</u> Fed. R. Evid. 401.  Whether an expert's testimony is sufficiently reliable may be a more nuanced question.  In answering it,

courts undertake "a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue." Daubert, 509 U.S. at 592-93.  Reliability is treated in depth in Section II, below.

The proponent of an expert's testimony has the burden of satisfying the admissibility requirements by a preponderance of the evidence.  E.g., United States v. Williams, 506 F.3d 151, 160 (2d Cir. 2007).  The decision whether to admit or exclude a proposed expert's testimony is committed to the Court's broad discretion.  E.g., Amorgianos, 303 F.3d at 264.  District courts should generally exclude expert testimony "if it is speculative or conjectural or based on assumptions that are 'so unrealistic and contradictory as to suggest bad faith' or to be in essence 'an apples and oranges comparison.'"  Zerega Ave. Realty Corp. v. Hornbeck Offshore Transp., L.L.C., 571 F.3d 206, 214 (2d Cir. 2009) (citing Boucher v. U.S. Suzuki Motor Corp., 73 F.3d 18, 21 (2d Cir. 1996)).  "[O]ther contentions that the assumptions are unfounded go to the weight, not the admissibility, of the testimony."  Id. (quoting Boucher, 73 F.3d at 212) (alteration in Boucher).

II. <u>Plaintiffs' Experts</u>

As discussed in this section, Plaintiffs' Experts may testify provided that their opinions on timing and on the ultimate issue of whether the Q hairs were left in Restivo's van on the night of the crime are not offered with any degree of "scientific certainty."  At the outset, the Court has no trouble finding that Plaintiffs' Experts are qualified to testify about their experience in the field of forensic science.  They each have a wealth of educational and professional experience and, judging by their professional associations, among other things, they are well-regarded in their field.  See, e.g., <u>Derienzo v. Trek Bicycle Corp.</u>, 376 F. Supp. 2d 537, 557 (S.D.N.Y. 2005). Whether their testimony is helpful is a similarly easy question: Plaintiffs' Experts' opinions are relevant to whether police found the Q hairs in Restivo's van or planted them there--a critical question in this case.  See, e.g., <u>Amorgianos</u>, 303 F.3d at 265.  Whether Plaintiffs' Experts' opinions are reliable and "fit" with the facts of this case merits a deeper discussion. See <u>Katt v. City of N.Y.</u>, 151 F. Supp. 2d 313, 356 (S.D.N.Y. 2001) ("Daubert requires, more, however, than a sterling resume to permit opinion testimony by a professed expert.").

A. <u>Are Plaintiffs' Experts' Opinions Scientifically Valid?</u>

As mentioned already, to be admissible under Rule 702, expert testimony must be "based on sufficient facts or data" and the "product of reliable principles and methods," and the expert has to have had "reliably applied the principles and methods to the facts of the case." FED. R. EVID. 702. In <u>Daubert</u>, the Supreme Court set forth criteria to help courts gauge the reliability of purported scientific evidence. <u>See</u> 509 U.S. at 590. These are: whether a theory or technique (1) "can be (and has been) tested;" (2) "has been subjected to peer review and publication;" (3) has an acceptable rate of error; (4) is guided by accepted professional standards; and (5) is generally accepted within the relevant professional community. <u>Id.</u> at 593-94. Although these factors are not a definitive checklist, <u>id.</u> at 592, they are useful in evaluating whether an expert's scientific testimony is valid, <u>see id.</u> at 590.

Plaintiffs argue that their experts' testimony is admissible under either <u>Daubert</u> or the Supreme Court's holding in <u>Kumho Tire Co. v. Carmichael</u>, which extended district courts' gate-keeping function beyond "scientific" evidence to "technical, or other specialized knowledge." <u>See</u> 526 U.S. 137, 147, 119 S. Ct. 1167, 1174, 143 L. Ed. 2d 238 (1999). The Court

rejects this argument to the extent that it means the Court should evaluate Plaintiffs' Experts' opinions without considering the criteria the Supreme Court has identified for assessing whether an opinion meets scientific muster. Daubert teaches that "in order to qualify as 'scientific knowledge,' an inference or assertion must be derived by the scientific method." 509 U.S. at 590. Houck's and De Forest's opinions are grounded in the language of scientific certainty (see Houck Rpt. 8 (Based on the known and documented scientific . . . ."); De Forest Rpt. 8 ("It is my opinion to a reasonable degree of scientific certainty . . . ."), and it would be inappropriate to let their testimony through the gate wholesale without testing whether their opinions are scientifically valid. See United States v. Glynn, 578 F. Supp. 2d 567, 570 (S.D.N.Y. 2008); In re Ephedra Prods. Liab. Litig., 393 F. Supp. 2d 181, 187 (S.D.N.Y. 2005).

The idea that PMRB takes several days to develop (and thus that it could not have developed in the short time Ms. Fusco was alleged to be in Restivo's van) has not yet been established by scientific standards of proof. See In re Ephedra, 393 F. Supp. 2d at 186. The Court reaches this conclusion for several related reasons. First, although the

theory can be tested, it hasn't been.  See, e.g., Williams, 506 F.3d at 160 (citing Daubert, 509 U.S. at 593-94).  Houck highlighted some of the ethical and logistical problems associated with testing the theory on human subjects (see Hrg. Tr. 110), but a valid study does not necessarily depend on human cadavers (see Kadane Rpt. 5).  The Court recognizes that this cuts both ways; if a proposition is falsifiable, then a party challenging the proposition is free to design an experiment disproving it.  If this was the only shortcoming in Plaintiffs' timing theory, the Court may have been inclined to let it through.  But the Court has additional concerns.

Second, while Houck, Petraco, and De Forest agree that PMRB takes days, not hours, to develop, this hypothesis is not firmly grounded in the little academic literature or studies that exist on the topic.  Houck believes PMRB develops within "days" (Hrg. Tr. 173) and that if PMRB was observed in hairs from someone who had been dead less than a day it would be a "significant finding" (id. at 143).  Petraco thinks PMRB typically needs two or three days to appear.  (Id. at 428-29.) And De Forest says that three days is the "reasonable lower limit" of time needed for PMRB to appear.  (Id. at 646.)  The written work on the topic is not nearly as uniform, however, and

the value of the few studies that have been done is limited by small sample sizes or other issues. See Kelley v. Am. Heyer-Schulte Corp., 957 F. Supp. 873, 880 n.8 (W.D. Tex. 1997) ("Adequacy of a sample size is an important consideration in assessing the validity of a study . . . ."); see also Mastercard Int'l, Inc. v. First Nat. Bank of Omaha, Inc., No. 02-CV-3691, 2004 WL 326708, at *10 (S.D.N.Y. Feb. 23, 2004) (excluding a confusion survey due to an inadequate survey size). A non-exhaustive discussion of the hearing evidence follows.

One study, by Charles A. Linch and Joseph A. Prahlow, suggests that PMRB may take between two days and a week to develop. (See Pls. Ex. 10, Charles A. Linch & Joseph A. Prahlow, "Postmortem Microscopic Changes Observed at the Human Head Hair Proximal End," J. FORENSIC SCIENCE 2001:46(1), 15-20 [the "Linch & Prahlow Study"].) Linch and Prahlow only looked at twenty-two cases, though, a very small sample. (See Hrg. Tr. 520.)

Plaintiffs also point to a study in which researchers looked at hairs plucked from three gorilla corpses that had been found in the wild. (Pls. Ex. 11, Kathryn J. Jeffery, Kate A. Abernethy, Caroline E. G. Tutin & Michael W. Bruford, "Biological and Environmental Degradation of Gorilla Hair and

Microsatellite Amplification Success," BIOLOGICAL J. OF THE LINNEAN SOCIETY, 2007, 91, 281-294.)  The researchers found that hair from a gorilla that had been dead for eighteen hours did not exhibit PMRB, hair from a gorilla that had been dead for three days exhibited some PMRB, and hair from a gorilla that had been dead for six days exhibited advanced decomposition.  (Id. at 289-290.)  Gorilla hair is similar to human hair (id. at 286), and therefore this study might suggest that PMRB takes longer than eighteen hours to develop.  The problems with this study is, again, that no one knows how or why PMRB happens in humans and thus no one knows whether or how the process might work differently in gorillas.  And, the sample size problem with this study is acute: the researchers only were able to study a single gorilla that had been dead for less than two days.  (See id. at 283.)

Jamie Collier, a graduate student, also conducted research on the timing of PMRB.  (See Pls. Ex. 14, Jamie Hughes Collier, "Estimating the Postmortem Interval in Forensic Cases through the Analysis of Postmortem Deterioration of the Human Head Hair," Master's Thesis, May 2005 [the "Collier Paper"].)  She studied hairs from nine cadavers--plus one living subject as a control--and found that the earliest onset of PMRB was eighty-

nine days after death. (Id. at 23.) Dr. Houck could not reconcile these findings with his opinion that PMRB appears within one day to seven days after death. (Hrg. Tr. 186.) As with the other literature, this paper only considered a relative handful of cases. Also, all of the hairs were from middle-aged and older Caucasians, three of whom suffered from cancer. (Collier Paper at 29.) It's unclear whether or how PMRB acts differently across age and race, and because certain cancer treatments can affect hair follicles, it's possible that regimens that include chemotherapy or radiation might impact PMRB. (See Hrg. Tr. 186.)

There is also a graduate thesis by Barbara Wagner Collins, one of Dr. De Forest's graduate students. (Def. Ex. E, Barbara Wagner Collins, "The Effect of Temperature on Post Mortem Morphology of Human Hair Roots," Master's Thesis, June 1996 [the "Collins Paper"].) Collins' research employed two methods for determining the timing of PMRB. In the first, she took hair and scalp samples from autopsies and, keeping a part of each sample as a control, placed part of the sample in different test environments: soil, sand, or no medium at either four or twenty degrees Celsius (room temperature). (Id. at 12.) She observed that the scalp hair samples at room temperature

began to develop PMRB after twenty-four hours.  (Id. at 15.)
More pronounced banding developed by forty-eight hours, and the
frequency of banding increased and then stabilized after about
seventy-two hours.  (Id.)  The scalp hair specimens stored at
four degrees Celsius never attained the degree of PMRB as the
specimens stored at room temperature (id. at 16), which suggests
that, like decomposition generally, PMRB development is
correlated with temperature (see id. at 9 (explaining that
decomposition rates depend in part on temperature)).  In the
second approach, Collins obtained post-mortem hairs from
autopsies that had been conducted by the New York City Medical
Examiner's office.  (Id. at 13.)  The lapse between a subject's
death and the autopsy ranged from between twelve to eighty-seven
hours.  (Id. at 13-14.)  Collins did not observe PMRB in any of
these hairs, which, given the short interval between death and
autopsy, she felt was consistent with the findings in her first
study.  (Id. at 16.)  Collins' findings support Plaintiffs'
position but her second approach only studied twelve samples
(id. at 14), and it's unclear how many samples she studied under
the first approach (although she apparently eliminated hairs
from people being treated with chemotherapy and radiotherapy,
(id., Abstract)).

27

# SPA33

The  third  reason  that  the  Court  cannot  accept
Plaintiffs' Experts' opinions as scientific certainty is that
there have been at least two cases where PMRB has reportedly
been observed much earlier than the experts would think
possible.  As Petraco explained in his report, in two instances
in the mid-1980s, PMRB was observed between 8-12 and 10-12 hours
after death, respectively.  (Petraco Rpt. 5.)  Obviously, if
these incidents really happened, they would give lie to the idea
that PMRB invariably takes days to develop.  Plaintiffs attempt
to cast doubt on these early sightings by suggesting that the
times of death in those cases were imprecise, meaning that the
bodies could have been dead longer than 12 hours.  (See id. at
5.)  Plaintiffs may be correct, but the point is that we just
don't know.  Plaintiffs fall back on the idea that these are
outliers and that their experts have never seen or heard of a
similar case.  (See, e.g., id. ("In the 26 years I have been
actively following this issue since the trial, I have never
seen, read, or heard about a case of postmortem root banding
occurring within less than 8 hours after death.").)  On this
point, though, Kadane's concerns about autopsy bias are well-
taken; if forensic scientists are not in a position to find PMRB
within a short time of someone's death, they will never do so.

28

In sum, the idea that PMRB needs multiple days to develop cannot withstand the rigors of scientific proof, and it goes too far for Plaintiffs' Experts to testify that their conclusions are sound to a "reasonable degree of scientific certainty." See Glynn, 578 F. Supp. 2d at 574 ("[T]o allow Detective Valenti, or any other ballistics examiner, to testify that he had matched a bullet or casing to a particular gun 'to a reasonable degree of ballistic certainty' would seriously mislead the jury as to the nature of the expertise involved."). That is not to say, however, that Plaintiffs' Experts' testimony is completely excluded.

B. Are Plaintiffs' Experts' Opinions Otherwise Reliable?

Under Evidence Rule 702, witnesses with "technical or other specialized knowledge" may offer their "opinions on matters where the data falls short of proving the witness's conclusion." In re Ephredra, 393 F. Supp. 2d at 188. As Judge Rakoff explained, "an art appraiser testifying about a painting's authenticity might state an opinion based in part on scientific analysis, but the ultimate conclusion would come from the witness's specialized knowledge, training and experience." Id. "Scientists, too, form professional opinions that are reasonably based on 'good science' but where the data is

insufficient for definitive scientific proof." Id.  In the Court's view, at least, this is what we have here: much of what Plaintiffs' Experts have to say is grounded in sound science, and the last leap--the timing--is justified by their training and experience.

Aside from the timing issue, Plaintiffs' Experts' testimony on PMRB is supported by many of Daubert's indicia of reliability.  One, there is evidence that PMRB can be distinguished from environmental banding within an acceptable rate of error.  A group of FBI analysts, led by Stephen Shaw, conducted a study for which they collected 600 hairs and subjected them to a range of environmental conditions.  Although these hairs exhibited signs of decomposition, they did not present PMRB.  These hairs were then mixed with hairs known to have come from deceased subjects.  According to the abstract of the study (whose publication is forthcoming), two hair examiners were able to distinguish post-mortem root-banded hairs from environmentally-banded hairs with 99.5% accuracy. When the two examiners double-checked each other's work, their accuracy increased to 100%.  (See generally Pls. Ex. 12.)  Suffice it to say, this is a tolerable error rate.  See, e.g., United States v. Crisp, 324 F.3d 261, 271 (4th Cir. 2003).  Further, the Shaw

study is generally in line with Alison Domzalski's results, which showed that although environmental insults produce changes to scalp hair roots, these changes should not be confused with PMRB. (See Domzalski Paper at 49 (noting that although environmental banding "could be confused" with PMRB, the environmental banding that Domzalski encountered was "very proximal to the anagen root end. This is not an accepted criterion for postmortem root banding"); Hrg. Tr. 673 (Shaw study validates Domzalski's research), 372 (environmental banding can be distinguished from PMRB).)

Two, Plaintiffs' Experts' opinions are consistent with the academic literature on the topic. (See, e.g., Pls. Ex. 10 at 19 ("Postmortem head hair proximal end microscopic changes are sufficiently specific for the experienced examiner to offer an opinion that an evidence hair may have originated from decomposing scalp tissue."); see also Pls. Ex. 6, S. Seta, H. Sato, M. Yoshino and S. Miyasaka, "Morphological Changes of Hair Root with the Time Lapsed After Death," J. OF THE FORENSIC SCI. SOC. 24:4 (July/August 1984).)

Relatedly, three, PMRB as Plaintiffs' Experts' describe it is a generally accepted phenomenon within the forensic science community. (See, e.g., Pls. Ex. 12 ("Based on

the experience of hair examiners, postmortem banding is generally accepted throughout the forensic hair community as a reliable indication of hair removal during the postmortem process."); Petraco Rpt. at 4-5 (identifying basic principles of PMRB that are "established in the forensic scientific community"); see also Hrg. Tr. 36-37 ("Q. Would it be fair to say that since the Petraco De Forest publication in 1988, that the way they defined and described [PMRB] was generally accepted in the community of hair microscopists and forensic anthropologists as the definition of [PMRB]? A. Yes." (Houck Testim.)).)[5]

---

[5] Moreover, the Court notes that Houck and Petraco have examined hairs both from living and dead subjects, and they have never observed PMRB in hairs from a living person. (See Hrg. Tr. 81 (Houck); id. at 346, 358 (Petraco).) Just as significant, they have never seen, heard, or read about a case where PMRB was observed in hair from a living person. (Id. at 81 (Houck); id. at 358 (Petraco).) Given their deep ties to the hair microscopy community (see, e.g., id. at 24 (Houck), id. at 302-03 (Petraco)), this suggests that such a case has never been observed. See also id. at 83-84 (Houck would expect to learn through his professional network if another microscopist were to observe PMRB in a hair plucked from a living person). Defendants' position--that Plaintiffs' view is logically flawed because Plaintiffs' Experts look at hairs only from dead people (during autopsies, for example)--is factually incorrect. Houck and Petraco have examined hairs from both living and dead people over their long and distinguished careers. (Id. at 167 (Houck); id. at 346 (Petraco).)

32

The issue, then, in light of their testimony on PMRB generally, is whether Plaintiffs' Experts may offer their professional opinions on the timing of PMRB.  The Court concludes that they may, consistent with the limitation described above.  Without repeating much of the evidence already discussed in Section II.A, the Court is convinced that although these facts do not add up to <u>scientific</u> proof, they supply a reasonable basis for forensic experts to conclude that PMRB is an artifact of decomposition and that, consistent with the speed at which other effects of decomposition appear on a corpse, it does not appear immediately after death.  The Collins Paper, the gorilla study, the Linch & Prahlow Study (<u>see</u> <u>supra</u> 23-26), and De Forest's juxtaposition hypothesis (<u>supra</u> 13-14) all suggest that PMRB takes more than a few hours to develop in the scalp hairs of a dead body and thus it may be more likely than not that the Q hairs in Restivo's van did not come from Fusco on the night she died.  <u>See</u> <u>In re Ephedra</u>, 393 F. Supp. 2d at 190 (applying a "more-probable-than-not" standard to scientific issues).  In sum, this is not a case where the Court "finds the gap too great between the science and [Plaintiffs' Experts'] conclusions."  <u>Id.</u> at 189; <u>see also</u> <u>Kumho Tire</u>, 526 U.S. at 156 ("[N]o one denies that an expert might draw a conclusion from a

set of observations based on extensive and specialized experience.").

Defendants' remaining objections go to the weight of Plaintiffs' Experts' testimony, not its admissibility. Plaintiffs' Experts may offer their opinions as to PMRB except that they may not testify that their views on the timing of PMRB (or any ultimate opinion that the Q hairs did not come from Fusco on the night she died) are matters of "scientific certainty." See id. at 190 (precluding expert from testifying that causality was established "to a reasonable degree of scientific certainty" but permitting testimony that a particular causality was plausible or "more-probable-than-not").

III. Defendants' Expert

Plaintiffs move to exclude Kadane's testimony, arguing that he is not qualified to opine on matters related to hair microscopy, has not reliably applied any worthwhile methodology to the facts of the case, and offers legal conclusions under the guise of scientific expertise. (See generally Pls. Br. 9-17.) The Court agrees that Kadane does not have the relevant expertise to offer a helpful opinion at trial. For expert testimony to be admissible, it must have "a reliable basis in the knowledge and experience of the relevant discipline." Kumho

<u>Tire</u>, 526 U.S. at 149 (alterations and quotation marks omitted).
Although there is no dispute that Kadane is an accomplished
statistician, it is equally beyond debate that he lacks more
than a passing familiarity with hair microscopy and forensic
science.   His expertise is simply not useful in attempting to
refute Plaintiffs' Experts' opinions about PMRB.   <u>Malletier v.
Dooney & Bourke, Inc.</u>, 525 F. Supp. 2d 558, 642 (S.D.N.Y. 2007)
("An expert qualified in one subject matter does not thereby
become an expert for all purposes.   Testimony on subject matters
unrelated to the witness's area of expertise is prohibited by
Rule 702."). As Plaintiffs note, Kadane was free to conduct his
own statistical analysis of PMRB but did not do so.   (Pls. Br.
2).

# SPA41

CONCLUSION

For the foregoing reasons, Defendants' motion to exclude Plaintiffs' experts is DENIED except to the extent that the discussion above precludes Plaintiffs' Experts' from testifying to any degree of "scientific certainty." Plaintiffs' motion to exclude Defendant's statistics expert is GRANTED. Defendants' request to re-open the Daubert record (Docket Entry 289) is DENIED because the evidence to which they call the Court's attention is irrelevant. Defendants' motion to file excess pages (Docket 229) is retroactively GRANTED.

SO ORDERED.

/s/ JOANNA SEYBERT
Joanna Seybert, U.S.D.J.

Dated:    August __15__, 2012
          Central Islip, New York

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------X
JOHN KOGUT,

                Plaintiff,

                                  MEMORANDUM & ORDER
      -against-                   06-CV-6695(JS)(WDW)
                                  (LEAD CASE)

THE COUNTY OF NASSAU, POLICE
COMMISSIONER DONALD KANE, POLICE
COMMISSIONER WILLIAM J. WILLETT (2005),
POLICE COMMISSIONER JAMES LAWRENCE,
DETECTIVE SEAN SPILLANE (HEAD OF HOMICIDE
1985), DETECTIVE DENNIS FARRELL (HEAD OF
HOMICIDE 2005), CAROLANN HESSEMAN, AS
EXECUTRIX FOR THE ESTATE OF JOSEPH VOLPE,
DETECTIVE ROBERT DEMPSEY, DETECTIVE ALBERT
MARTINO, DETECTIVE WAYNE BIRDSALL,
DETECTIVE MILTON G. GRUBER, DETECTIVE
CHARLES FRAAS, DETECTIVE FRANK SIRIANNI,
DETECTIVE HARRY WALTMAN, P.O. MICHAEL
CONNAUGHTON, P.O. WILLIAM DIEHL, and
JOHN DOES 1-5,

                Defendants.
----------------------------------------X
JOHN RESTIVO, DENNIS HALSTEAD,
MELISSA LULLO, JASON HALSTEAD,
HEATHER HALSTEAD, and TAYLOR
HALSTEAD,

                                  06-CV-6720(JS)(WDW)
              Plaintiffs,      (MEMBER CASE)

      - against -

NASSAU COUNTY, CAROLANN HESSMAN, AS
EXECUTRIX FOR THE ESTATE OF JOSEPH VOLPE,
in his individual capacity, ROBERT DEMPSEY,
in his individual capacity, FRANK SIRIANNI,
in his individual capacity, MILTON GRUBER,
in his individual capacity, HARRY WALTMAN
in his individual capacity, ALBERT MARTINO,
in his individual capacity, CHARLIE FRAAS,
in his individual capacity, THOMAS ALLEN
in his individual capacity, RICHARD BRUSA,
in his individual capacity, VINCENT DONNELLY,

in his individual capacity, MICHAEL
CONNAUGHTON, in his individual capacity,
WAYNE BIRDSALL, in his individual capacity,
WILLIAM DIEHL, in his individual capacity,
JACK SHARKEY, in his individual capacity,
DANIEL PERRINO, in his individual capacity,
ANTHONY KOZIER, in his individual capacity,
Detective Sergeant CAMPBELL, (Shield #48),
in his individual capacity, SEAN SPILLANE,
in his individual capacity, RICHARD ROE
SUPERVISORS #1-10, in their individual
capacities,

                        Defendants.
----------------------------------------X
APPEARANCES
For Plaintiffs:
John Kogut              Anthony M. Grandinette, Esq.
                        John T. Serio, Esq.
                        Grandinette & Serio, LLP
                        114 Old Country Road, Suite 420
                        Mineola, New York 11501

                        Paul Casteleiro, Esq.
                        86 Hudson Street
                        Hoboken, New Jersey 07030

John Restivo,           Barry C. Scheck, Esq.
Dennis Halstead,        Deborah L. Cornwall, Esq.
Melissa Lullo,          Monica R. Shah, Esq.
Jason Halstead,         Nick Joel Brustin, Esq.
Heather Halstead,       Anna Benvenutti Hoffman, Esq.
and Taylor              Sonam A. H. Henderson, Esq.
Halstead                Cochran, Neufeld & Scheck, LLP
                        99 Hudson Street, 8th Floor
                        New York, New York 10013

For Defendants:         Louis M. Freeman, Esq.
                        Lee Ginsberg, Esq.
                        Freeman, Nooter & Ginsberg
                        75 Maiden Lane, Suite 503
                        New York, New York 10038

# SPA44

David L. Lewis, Esq.
Lewis & Fiore, Esq.
225 Broadway, Suite 3300
New York, New York 10007

Liora M. Ben-Sorek, Esq.
Sondra Meryl Toscano, Esq.
Christine Ann Lobasso, Esq.
Dennis J. Saffran, Esq.
Sondra Meryl Toscano, Esq.
Office of the Nassau County Attorney
One West Street
Mineola, New York 11501

SEYBERT, District Judge:

This Memorandum and Order addresses Restivo and Halstead's motion to exclude evidence of Plaintiffs' prior bad acts. (Docket Entry 300.) Restivo and Halstead move to exclude: (1) Halstead's <u>nolo contendere</u> pleas to various Florida crimes; (2) evidence of illegal drug use; (3) evidence that Restivo or Halstead used racist language; (4) allegations of domestic violence and statutory rape; (5) a non-party's domestic violence convictions; and (6) Restivo's brother's convictions for witness intimidation or tampering. (Docket Entry 300.) For the following reasons, this motion is GRANTED IN PART and DENIED IN PART, and the Court RESERVES JUDGMENT IN PART.

I. <u>The Nolo Contendere Pleas</u>

Evidence of Halstead's <u>nolo contendere</u> pleas is not admissible. <u>Nolo contendere</u> pleas are generally inadmissible.

3

Fᴇᴅ. R. Eᴠɪᴅ. 410.   The Court need not reach whether these pleas
can be used for impeachment because Defendants have not shown
how Halstead's crimes fall within the rubric outlined in Federal
Rule of Evidence 609.

II. <u>Prior Drug Use</u>

The Court reserves judgment on Restivo and Halstead's
request to exclude evidence of prior drug use.   It will
entertain objections to this evidence as the trial progresses.

III. <u>Racist Language</u>

Similarly, the Court reserves judgment on whether
evidence that Restivo used a racist slur during an exchange with
one of Plaintiffs' alibi witnesses.   Defendants would use the
exchange to help explain why the witness eventually repudiated a
statement that he had provided to Plaintiffs' investigator.
Defendants argue that the exchange, which shocked and angered
the witness, helps rebut Plaintiffs' suggestion that the witness
changed his story simply to curry favor with prosecutors.
Unsurprisingly, Plaintiffs argue that this evidence is severely
prejudicial.   The Court will rule on this evidence as the trial
develops.   See <u>Irizarry v. Corknard</u>, No. 10-CV-1022, 2012 WL
2990021, at *1 (N.D.N.Y. July 20, 2012) ("Courts considering a
motion <u>in limine</u> may reserve decision until trial so that the

4

motion is placed in the appropriate factual context."). The Court will incorporate appropriate questions into its jury voir dire.

IV. Domestic Violence and Statutory Rape

Except as follows, the Court reserves judgment on Restivo and Halstead's request to exclude evidence (1) of their acquaintance with local teenagers and (2) that they committed acts of domestic violence. Defendants may not elicit testimony that any of the Plaintiffs had sexual relationships with underage girls. Fed. R. Evid. 403.

V. David Rapp's Criminal History

Evidence of David Rapp's criminal history is inadmissible except as follows. Defendants may elicit evidence that Rapp was facing unspecified criminal charges at the time he told detectives about his conversation with Restivo in order to rebut Plaintiffs' position that Rapp's statement was coerced. (See Defs. Opp. 11.)

VI. Witness Tampering

Restivo and Halstead's request to bar evidence of Charlie Restivo's witness tampering is denied. This evidence may be used to impeach Charlie Restivo because the convictions

involve dishonest acts and their impeachment value substantially
outweighs their prejudicial effect.   FED. R. EVID. 609(b).


                              SO ORDERED.

                              /s/ JOANNA SEYBERT
                              Joanna Seybert, U.S.D.J.

Dated:      September 4, 2012
            Central Islip, New York

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------X
JOHN KOGUT,

                  Plaintiff,

          -against-

THE COUNTY OF NASSAU, POLICE
COMMISSIONER DONALD KANE, POLICE
COMMISSIONER WILLIAM J. WILLETT (2005),
POLICE COMMISSIONER JAMES LAWRENCE,
DETECTIVE SEAN SPILLANE (HEAD OF HOMICIDE
1985), DETECTIVE DENNIS FARRELL (HEAD OF
HOMICIDE 2005), CAROLANN HESSEMAN, AS
EXECUTRIX FOR THE ESTATE OF JOSEPH VOLPE,
DETECTIVE ROBERT DEMPSEY, DETECTIVE ALBERT
MARTINO, DETECTIVE WAYNE BIRDSALL,
DETECTIVE MILTON G. GRUBER, DETECTIVE
CHARLES FRAAS, DETECTIVE FRANK SIRIANNI,
DETECTIVE HARRY WALTMAN, P.O. MICHAEL
CONNAUGHTON, P.O. WILLIAM DIEHL, and
JOHN DOES 1-5,

                 Defendants.
----------------------------------------X
JOHN RESTIVO, DENNIS HALSTEAD,
MELISSA LULLO, JASON HALSTEAD,
HEATHER HALSTEAD, and TAYLOR
HALSTEAD,

                 Plaintiffs,

        - against -

NASSAU COUNTY, CAROLANN HESSMAN, AS
EXECUTRIX FOR THE ESTATE OF JOSEPH VOLPE,
in his individual capacity, ROBERT DEMPSEY,
in his individual capacity, FRANK SIRIANNI,
in his individual capacity, MILTON GRUBER,
in his individual capacity, HARRY WALTMAN
in his individual capacity, ALBERT MARTINO,
in his individual capacity, CHARLIE FRAAS,
in his individual capacity, THOMAS ALLEN
in his individual capacity, RICHARD BRUSA,
in his individual capacity, VINCENT DONNELLY,

MEMORANDUM & ORDER
06-CV-6695(JS)(WDW)
(LEAD CASE)

06-CV-6720(JS)(WDW)
(MEMBER CASE)

1

```
in his individual capacity, MICHAEL
CONNAUGHTON, in his individual capacity,
WAYNE BIRDSALL, in his individual capacity,
WILLIAM DIEHL, in his individual capacity,
JACK SHARKEY, in his individual capacity,
DANIEL PERRINO, in his individual capacity,
ANTHONY KOZIER, in his individual capacity,
Detective Sergeant CAMPBELL, (Shield #48),
in his individual capacity, SEAN SPILLANE,
in his individual capacity, RICHARD ROE
SUPERVISORS #1-10, in their individual
capacities,

                    Defendants.
--------------------------------------X
```

APPEARANCES
For Plaintiffs:

| John Kogut | Anthony M. Grandinette, Esq.<br>John T. Serio, Esq.<br>Grandinette & Serio, LLP<br>114 Old Country Road, Suite 420<br>Mineola, New York 11501 |
| --- | --- |
| | Paul Casteleiro, Esq.<br>86 Hudson Street<br>Hoboken, New Jersey 07030 |
| John Restivo and<br>Dennis Halstead | Barry C. Scheck, Esq.<br>Monica R. Shah, Esq.<br>Nick Joel Brustin, Esq.<br>Anna Benvenutti Hoffman, Esq.<br>Cochran, Neufeld & Scheck, LLP<br>99 Hudson Street, 8th Floor<br>New York, New York 10013 |
| For Defendants: | Louis M. Freeman, Esq.<br>Lee Ginsberg, Esq.<br>Freeman, Nooter & Ginsberg<br>75 Maiden Lane, Suite 503<br>New York, New York 10038 |
| | David L. Lewis, Esq.<br>Lewis & Fiore, Esq.<br>225 Broadway, Suite 3300<br>New York, New York 10007 |

Liora M. Ben-Sorek, Esq.
Sondra Meryl Toscano, Esq.
Christine Ann Lobasso, Esq.
Dennis J. Saffran, Esq.
Sondra Meryl Toscano, Esq.
Office of the Nassau County Attorney
One West Street
Mineola, New York 11501

SEYBERT, District Judge:

The following motions are currently pending before the Court: (1) Defendants' letter motion for judgment as a matter of law regarding Plaintiffs' Monell claims (Docket Entry 447); (2) Plaintiff John Kogut's ("Kogut") motion for a new trial[1] (Docket Entry 456); (3) Plaintiffs Dennis Halstead ("Halstead") and John Restivo's ("Restivo" and together with Halstead and Kogut, "Plaintiffs") motion for a new trial (Docket Entry 457); and (4) Halstead and Restivo's motion to amend/correct/settle the record (Docket Entry 474), in which Kogut joined.  For the following reasons, Defendants' letter motion regarding Monell is DENIED AS MOOT, Kogut's motion for a new trial is DENIED, Halstead and Restivo's motion for a new trial is GRANTED IN PART and DENIED IN PART, and the motion to amend/correct/settle the record is GRANTED.

---

[1] The Court notes that Kogut has also joined in Halstead and Restivo's motion for a new trial and incorporated their arguments by reference.  At times, however, the Court distinguishes the arguments as specific to particular plaintiffs.

BACKGROUND

The Court assumes familiarity with the facts and procedural history of this case. Briefly, Kogut initially commenced an action on December 19, 2006 pursuant to 42 U.S.C. § 1983 ("Section 1983") against, inter alia, the County of Nassau (the "County"), Detective Sean Spillane ("Spillane"), Detective Joseph Volpe ("Volpe"), Detective Robert Dempsey ("Dempsey"), Detective Wayne Birdsall, Detective Charles Fraas, and Detective Frank Siranni (collectively "Defendants"). Two days later, Halstead and Restivo commenced an action of their own, also pursuant to Section 1983, against Defendants. By Order dated March 31, 2009, this Court consolidated the actions.

The facts of this case begin with the 1984 rape and murder of sixteen-year-old Theresa Fusco. In connection with that investigation, Plaintiff Kogut was twice brought to the Nassau County Police Department ("NCPD") headquarters for questioning. On March 26, 1985, after an overnight interrogation, Kogut provided a written and videotaped confession in which he implicated himself as well as Plaintiffs Halstead and Restivo. Ultimately, all three Plaintiffs were arrested and tried. On June 27, 1986, Kogut was convicted on all counts in the Indictment. On December 3, 1986, after a trial separate from Kogut's, Halstead and Restivo were convicted of rape and second-degree murder.

4

Beginning in 1993, samples of semen obtained from Fusco's body were subjected to DNA testing. After initial tests excluded Halstead, Restivo, and Kogut as the source of the semen, Plaintiffs moved to vacate their convictions, but their motions were denied. Later DNA tests again excluded Plaintiffs, and on June 11, 2003, Plaintiffs' convictions were vacated. In 2005, however, the Nassau County District Attorney retried Kogut; and in December 2005, Kogut was acquitted. Shortly thereafter, the Nassau County Supreme Court formally dismissed the charges against Halstead and Restivo.

Plaintiffs thus commenced Section 1983 actions before this Court for Defendants' alleged constitutional violations in connection with the investigation of Theresa Fusco's rape and murder and Plaintiffs' prosecutions. After a lengthy procedural history, this Court ultimately held a consolidated jury trial on Plaintiffs' claims. The jury was presented with the following issues: (1) whether Defendants denied Kogut of his constitutional rights to due process and right to a fair trial; (2) whether Defendants denied Restivo of his constitutional rights to due process and right to a fair trial; (3) whether Defendants denied Halstead of his constitutional rights to due process and right to a fair trial; (4) whether Defendants maliciously prosecuted Kogut during the 1985 to 1986 time period; (5) whether Defendants maliciously prosecuted Kogut

# SPA53

during the 2005 time period; (6) whether Defendants maliciously prosecuted John Restivo; (7) whether Defendants maliciously prosecuted Dennis Halstead; (8) whether Defendant Spillane failed to supervise Volpe, Dempsey, and the other police officers and, if so, whether Spillane is entitled to qualified immunity; and finally (9) whether the County was responsible for the acts of Spillane in failing to supervise, and, if so, whether this failure caused an injury to Plaintiff Kogut. Following a nearly three-month trial and six days of deliberation, the jury returned a defense verdict.

<u>DISCUSSION</u>

Currently pending before the Court are Plaintiffs' motions for a new trial as well as Plaintiffs' motion to amend/correct/supplement the record and Defendants' letter motion, made just before the jury's verdict, regarding Plaintiffs' <u>Monell</u> claims. The bulk of the following Memorandum and Order will pertain to Plaintiffs' respective motions for a new trial. Accordingly, the Court will first address the applicable legal standard.

I.  <u>Legal Standard</u>

"A motion for a new trial, pursuant to [Federal Rule of Civil Procedure] 59, may be granted when the district court is 'convinced that the jury has reached a seriously erroneous result or that the verdict is a miscarriage of justice.'"

6

Tesser v. Bd. of Educ. of City Sch. Dist. of City of N.Y., 190
F. Supp. 2d 430, 440 (E.D.N.Y. 2002) (quoting Smith v. Lightning
Bolt Prods., Inc., 861 F.2d 363, 370 (2d Cir. 1988)).  In making
this determination, the Court "is free to weigh the evidence
[itself] and need not view it in the light most favorable to the
verdict winner."  Health Alliance Network, Inc. v. Cont'l Cas.
Co., 245 F.R.D. 121, 127 (S.D.N.Y. 2007) (alteration in
original) (quoting Song v. Ives Labs., Inc., 957 F.2d 1041, 1047
(2d Cir. 1992)).  In addition, the Court may grant a new trial
"even if there is substantial evidence to support the verdict."
Datskow v. Teledyne Cont'l Motors Aircraft Prods., a Div. of
Teledyne Indus., Inc., 826 F. Supp. 677, 683 (W.D.N.Y. 1993)
(internal quotation marks and citation omitted).  Despite this
liberality, however, "[a] court should only grant a new trial
when a jury's verdict is egregious."  Health Alliance Network,
Inc., 245 F.R.D. at 127.  Furthermore, "Rule 59 is not a vehicle
for relitigating old issues, presenting the case under new
theories, securing a rehearing on the merits, or otherwise
taking a 'second bite at the apple[.]'"  O'Connell v. Onondaga
Cnty., No. 09-CV-0364, 2013 WL 998598, at *1 (N.D.N.Y. Mar. 13,
2013) (alteration in original) (quoting Sequa Corp. v. GBJ
Corp., 156 F.3d 136, 144 (2d Cir. 1998)).

　　　　Where a party seeks a new trial based upon evidentiary
errors, such as the majority--though not all--of Plaintiffs'

arguments here, the Court looks to the standard of Federal Rule of Civil Procedure 61.  Rule 61 provides that

> [u]nless justice requires otherwise, no error in admitting or excluding evidence--or any other error by the court or a party--is ground for granting a new trial, for setting aside a verdict, or for vacating, modifying, or otherwise disturbing a judgment or order. At every stage of the proceeding, the court must disregard all errors and defects that do not affect any party's substantial rights.

FED. R. CIV. P. 61.  In other words, "[e]ven if . . . evidence was admitted in error, this is not a ground for granting a new trial unless it affected [plaintiffs'] 'substantial rights.'"  Stowe v. Nat'l R.R. Passenger Corp., 793 F. Supp. 2d 549, 568 (E.D.N.Y. 2011).  "The Second Circuit has clarified that a substantial right has been affected only where a jury's judgment was likely to have been 'swayed by the error.'"  Parrish v. Sollecito, 280 F. Supp. 2d 145, 165 (S.D.N.Y. 2003) (quoting Perry v. Ethan Allen, Inc., 115 F.3d 143, 150 (2d Cir. 1997)). Relevant to this inquiry is "whether or not the evidence bears on an issue that is plainly critical to the jury's decision" and "whether or not the evidence was emphasized in arguments to the jury." Hynes v. Coughlin, 79 F.3d 285, 291 (2d Cir. 1996).

II.  Separate Trials

Halstead, Restivo, and Kogut contend that the Court's decision to conduct a consolidated trial prejudiced all of them.

On July 31, 2012, Halstead and Restivo moved to bifurcate, requesting that their claims be tried separately from those of Kogut. (<u>See</u> Docket Entry 312.) Kogut subsequently joined in that motion. (<u>See</u> Docket Entry 349.) The Court, however, denied those motions on the record during an August 16, 2012 conference. (<u>See</u> Aug. 16, 2012 Minute Entry, Docket Entry 353.)

Although Plaintiffs assert various arguments as to why a consolidated trial now mandates new, separate, trials, their primary contention is that the Court allowed the jury to hear prejudicial material that would not have otherwise been admitted had there been one trial for Plaintiff Kogut and a separate trial for Plaintiffs Halstead and Restivo. Specifically, they raise error with respect to the admission of the Kogut confession and certain polygraph evidence. The Court will address the arguments pertaining to the Kogut confession first before turning to the polygraph evidence.

A. <u>Kogut Confession</u>

Halstead and Restivo maintain that severance was necessary because the jury adjudicating their claims never should have been informed of Kogut's confession. In their prior motion for bifurcation, Halstead and Restivo primarily argued that Kogut's confession is irrelevant and inadmissible on their individual liability claims. (<u>See</u> Docket Entry 312 at 9-10.) At the August 16, 2012 hearing, the Court rejected this

9

argument, holding that Kogut's confession was admissible in Halstead and Restivo's case to show Defendants' malice, or the absence thereof, in connection with Halstead and Restivo's malicious prosecution claim.  (Aug. 16, 2012 Tr. 7.)

Currently, Halstead and Restivo reiterate their assertion that the jury deciding their claims never should have heard evidence regarding Kogut's confession.  Specifically, Halstead and Restivo assert that 1) the Kogut confession was inadmissible hearsay for which there was no permissible "non-truth" purpose, 2) the Court's jury charge erroneously instructed the jurors that they could consider the Kogut confession in determining whether there was probable cause to commence the 2005 proceedings against Halstead and Restivo, and 3) the Kogut confession is irrelevant to the malice element of their malicious prosecution claims and to their fair trial claims.  The Court will address each of these arguments in turn.

### 1. Hearsay

Hearsay is an out of court statement offered for the truth of the matter asserted.  See FED. R. EVID. 801(c).  As the Court's holding during the August 16, 2012 conference makes clear, the Kogut confession was not being offered for the truth of the matter asserted, but rather for the "non-truth" purpose of demonstrating whether Defendants maliciously prosecuted Halstead and Restivo, based upon their subjective belief in

guilt.   (Aug. 16, 2012 Tr. 9 ("In this context malice and
probable cause are closely related, and the defendants should be
able to use the evidence that they subjectively believed Restivo
and Halstead were guilty [i.e., the Kogut confession] to negate
plaintiffs' evidence that the defendants acted [with]
malice.").)   Accordingly, Halstead and Restivo's motion for a
new trial on this ground is DENIED.

> ## 2. Jury Instructions

Halstead and Restivo also contend that the Court
erroneously instructed the jury as to probable cause, misleading
the jury into thinking that it could consider the Kogut
confession as part of its analysis.

Plaintiffs refer to the malicious prosecution section
of the charge, in which the Court properly instructed the jury
that, to establish a claim for malicious prosecution, Plaintiffs
must prove that: "One, the Defendants caused them to be
criminally prosecuted.   Two, that there was no probable cause
for the criminal proceeding, and Three, that the Defendants did
so maliciously, that is, for a bad purpose, and Four, that the
prosecution was eventually terminated in Plaintiffs' favor, in a
manner indicating that the Plaintiffs were not guilty of the
charge."   (Trial Tr. 6038.)   With respect to the probable cause
element specifically, the Court instructed the jury that "you
must determine whether a reasonably prudent person, based upon

11

all of the facts and circumstances known to him when the prosecution was commenced, would have believed that the plaintiffs were guilty of the crimes charged." (Trial Tr. 6040.)

Halstead and Restivo maintain that this explanation of probable cause suggests to the jury that they could consider "defendants' belief in guilt," including in that analysis whether Kogut's confession contributed to that belief. (H&R Br. for New Trial, Docket Entry 457-1 at 13.) They assert that the Court instead should have instructed the jury that probable cause means the belief that the prosecution would succeed based on admissible evidence. (Docket Entry 457-1 at 13.) This assertion is based upon the Second Circuit's discussion of probable cause in Boyd v. City of New York, 336 F.3d 72 (2d Cir. 2003). There, the Second Circuit proffered two ways of thinking about the probable cause analysis. Initially, the Court noted that "[t]o succeed on a claim for malicious prosecution, the plaintiff must show that a prosecution was initiated against him, that it was brought with malice but without probable cause to believe that it could succeed and that the prosecution terminated in favor of the accused plaintiff." Id. at 76. In the very next sentence, the Circuit went on to explain that "[p]robable cause, in the context of malicious prosecution, has also been described as such facts and circumstances as would

# SPA60

lead a reasonably prudent person to believe the plaintiff guilty." Id. Later in its discussion, the Circuit noted that, if the plaintiff's statements regarding his knowledge of stolen property were made after arrest but before he was given Miranda warnings, that this statement would be inadmissible, and therefore there would have been no probable cause to believe that the prosecution for possession of stolen goods would succeed. Id. at 77. As such, Halstead and Restivo read Boyd to assert that probable cause to commence proceedings means the belief that the prosecution would succeed based on admissible evidence. (See Docket Entry 457-1 at 13.) Thus, Halstead and Restivo maintain that the Court's charge, as given, was erroneous because it essentially did not make explicit that the probable cause analysis included only admissible evidence.

While the Court's instruction was legally correct, the Court agrees with Halstead and Restivo that the charge, as worded, may have misled the jury and that the jury may have improperly considered the Kogut confession in connection with Halstead and Restivo's malicious prosecution claim. See O'Connell v. Onondaga Cnty., No. 09-CV-0364, 2013 WL 998598, at *5 (N.D.N.Y. Mar. 13, 2013) ("A jury instruction is erroneous if it misleads the jury as to the correct legal standard or does not adequately inform the jury on the law." (quoting Anderson v. Branen, 17 F.3d 552, 556 (2d Cir. 1994)). Moreover, this

13

confusion pertains directly to an element of Halstead and Restivo's malicious prosecution claim, and therefore cannot be said to be harmless.

To begin, and as previously noted, the Court clearly held during the August 16, 2012 conference that, in attempting to show probable cause, Defendants were limited to evidence that was both included in their interrogatory responses and admissible in Halstead and Restivo's criminal proceedings. (Aug. 16, 2012 Tr. 11.)   Kogut's confession, however, was not admissible in Halstead and Restivo's criminal proceedings. Accordingly, the jury never should have considered the Kogut confession in determining whether Defendants had probable cause in connection with Halstead and Restivo's case.

Although nuanced, and in most cases likely synonymous, the difference between the two ways of describing probable cause carry very different connotations in the setting of this particular case.   That is to say, defining probable cause as whether the prosecution could succeed puts the standard within the context of court proceedings, in which, of course, the prosecution must rely upon admissible evidence in order to be successful.   In contrast, defining probable cause as "whether a reasonably prudent person, based upon all of the facts and circumstances known to him when the prosecution was commenced," see Trial Tr. 6040, as many courts have, suggests a wider range

of evidence.   <u>See</u>, <u>e.g.</u>, <u>Colon v. City of N.Y.</u>, 60 N.Y.2d 78, 82, 468 N.Y.S.2d 453, 455 N.E.2d 1248 (1983) (defining probable cause as described).   Here, one of the facts and circumstances known to Defendants was that Kogut had provided a confession, but this "evidence" would not have any bearing on whether the prosecution against Halstead and Restivo would or could succeed.

Additionally, the Kogut confession was arguably one of the central pieces of evidence in this case and the Court finds that the absence of a more direct instruction with respect to probable cause affected Halstead and Restivo's substantial rights.   In particular, the Court notes that approximately two hours after it relieved a particular juror from service upon learning of his outside research on "false confessions," the jury returned a defense verdict.

Accordingly, Halstead and Restivo's motion for a new trial on this ground is GRANTED.   In the interest of completion, however, the Court's analysis continues.

3.   <u>Confession was Irrelevant to Malice</u>

Restivo and Halstead also maintain that they are entitled to a new trial because Kogut's confession is irrelevant to malice, and thus in adjudicating a consolidated trial, the jury improperly considered the Kogut confession on this element of Halstead and Restivo's malicious prosecution claim as well. The Court disagrees.

15

# SPA63

Halstead and Restivo argue that, contrary to the Court's pretrial ruling, the Kogut confession was irrelevant to malice because "plaintiffs' theory was that defendants framed them through the intentional creation of false evidence and withholding of exculpatory evidence, which is malicious whether or not defendants believed that plaintiffs had in fact committed the crime." (Docket Entry 457-1 at 13.)

Halstead and Restivo are correct in their general assertion that if "defendants framed [Plaintiffs] through the intentional creation of false evidence and withholding of exculpatory evidence," that this would be "malicious whether or not defendants believed that plaintiffs had in fact committed the crime." (Docket Entry 457-1 at 13-14 (citing <u>Ricciuti v. N.Y.C. Transit Auth.</u>, 124 F.3d 123, 130 (2d Cir. 1997).) However, as their brief acknowledges, Plaintiffs attempted to show malice based upon three separate theories: that Defendants (1) pursued a lawful end by intentionally unlawful means, such as by taking an illegal action in order to obtain a conviction of a person they believed to be guilty; (2) acted with reckless disregard of the rights of the plaintiff; (3) acted pursuant to a wrong or improper motive, in other words for some reason other than a desire to see the ends of justice served. (Docket Entry 457-1 at 14; Pls.' Proposed Jury Instructions, Docket Entry 382, at 13.)

16

Thus, while subjective intent may not necessarily be relevant to the element of malice where the theory is that Defendants pursued a lawful end by intentionally unlawful means, such as through the fabrication of evidence, this was not Halstead and Restivo's only theory of malice.  Here, as in their proposed jury instructions, Halstead and Restivo acknowledge that another theory of malice was that Defendants acted pursuant to a wrong or improper motive, and they cite to Lowth v. Town of Cheektowaga, 82 F.3d 563 (2d Cir. 1996) for that purpose. (Docket Entry 457-1 at 14; Docket Entry 382 at 13.)  In Lowth, the Second Circuit stated the general premise that where there is a lack of probable cause, malice may be inferred.  Id. at 573.  In so noting, the Second Circuit also implied that the subjective intent of the officer was relevant to the malice inquiry.  Id. (discussing whether the "accuser" believed "in the guilt of the accused" (internal quotation marks and citation omitted)).

Halstead and Restivo attempt to distinguish Lowth and similar cases because, in the instant case, there was no inference of malice flowing from the lack of probable cause. That is to say, here, there was an indictment, and therefore an inference of probable cause.  The Court, however, finds that this is not a particularly viable distinction.  The relevant inquiry is not whether there is an inference of malice flowing

17

from the lack of probable cause, or whether there is an inference of probable cause that can be overcome, but rather the relevant inquiry is the meaning of "malice" and whether or not a defendant exhibited it.  Where malice is defined as a "wrong or improper motive, something other than a desire to see the ends of justice served," this implicates an analysis into subjective belief.  See, e.g., Pinsky v. Duncan, 79 F.3d 306, 313 (2d Cir. 1996) (noting that, while malice may include particular theories, malice "implicates an evil or unlawful purpose" (emphasis added)); Smith v. City of N.Y., 388 F. Supp. 2d 179, 187 (S.D.N.Y. 2005) (after holding that there was probable cause, the Court also found that there was no malice because the Assistant District Attorney "believed D.G.'s allegations and found her to be a credible witness").  Thus, this theory looks to the defendant's state of mind, his "desire."  In contrast, other theories may look to the defendant's actions, or "means." As such, and while actions may necessitate a finding of malice under certain factual scenarios regardless of subjective belief, it is not always the case that subjective belief is irrelevant under any theory of malice.  Accordingly, Halstead and Restivo's motion for a new trial on this ground is DENIED.

    4.  Confession Irrelevant to Fair Trial Claims

Halstead and Restivo also argue that Kogut's confession was irrelevant to their due process/fair trial claims. Again, the Court disagrees.

Halstead and Restivo's fair trial claim turned on three kinds of evidence: (1) suppressed Brady material; (2) fabrication and planting of evidence; and (3) creating false witness statements by coercion. (Trial Tr. 5806.) As the third theory suggests, the Kogut confession was relevant to whether Defendants created false witness statements by coercion. And, in fact, Halstead and Restivo used the confession to argue that, even assuming that the Kogut confession was true, Fusco could not have been in the van for more than 15 or 20 minutes, which was not a long enough period of time to show post mortem root hair banding. (See Trial Tr. 5853)

Accordingly, Halstead and Restivo's motion for a new trial on this ground is also DENIED.

### 5. Exclusion of Expert Testimony of Saul Kassin

Furthermore, Halstead and Restivo argue that "[t]he error of introducing the Kogut confession . . . was compounded by the Court's improper exclusion of social psychologist Dr. Saul Kassin's testimony" regarding false confessions. (Docket Entry 457-1 at 16.)   Similarly, Kogut maintains that he is entitled to a new trial due to the Court's exclusion of Dr. Kassin's testimony.   Essentially, Plaintiffs assert that Dr.

Kassin's testimony was necessary to help the jury evaluate the evidence and put the Kogut confession into perspective.    The Court disagrees.

During a conference on September 6, 2012, the Court issued its ruling excluding Dr. Kassin's testimony.    The Court held:

> While Professor Kassin has some special training in psychology and police techniques regarding false confessions, his knowledge, background and proffered testimony do not meet the criteria under Rule 702.    His qualifications are impressive but the facts and data that he relied upon are weak.    The principles and methods are difficult to relate to the issues we have here. Essentially, this is an area that the jurors can decide for themselves.    The jury can determine if Kogut was exhausted, high, or submitted to constant clues given to him by Detectives Volpe, Sirianni, and Dempsey, or that Kogut believed he failed the test, was terrified of the detectives and finally that he was worn down by refusals to allow him to call a lawyer or his girlfriend.

(Sept. 6, 2012 Tr. 6.)

The Court stands by this conclusion and does not believe that there was an error in excluding Dr. Kassin's testimony such as to warrant a new trial on this basis. Certainly the issue of false confessions is conceptually somewhat counterintuitive.    However, this Court, of course, must perform a gatekeeping function with respect to expert testimony, <u>Daubert v. Merrell Dow Pharma., Inc.</u>, 509 U.S. 579, 113 S. Ct.

2786, 125 L. Ed. 2d 469 (1993), and precedent simply does not support the admission of this type of testimony. Federal courts, including within this Circuit, have consistently considered, and excluded, expert testimony on the topic of false confessions. See United States v. Deputee, 349 F. App'x 227, 229 (9th Cir. 2009); United States v. Mamah, 332 F.3d 475, 475 (7th Cir. 2003); United States v. Mazzeo, 205 F.3d 1326, 2000 WL 323032, at *2 (2d Cir. 2000); Yang Feng Zhao v. City of N.Y., No. 07-CV-3636, 2008 WL 3928238, at *2 (S.D.N.Y. Aug. 20, 2008). In fact, this case is not the first in which a court has excluded Dr. Kassin's testimony under Daubert. See Bell v. Ercole, No. 05-CV-4532, 2011 WL 5040436, at *13 (E.D.N.Y. Oct. 21, 2011); see also Commonwealth v. Robinson, 449 Mass. 1, 5-6, 864 N.E.2d 1186, 1189-90 (2007). Furthermore, a review of Dr. Kassin's report, once again, supports the Court's conclusion that his testimony is not the product of reliable principles and methods. (See, e.g., Kassin Report, Docket Entry 316-1, at 6 ("While it is not possible to determine with precision the statistical prevalence of the problem, it is clear that false confessions occur . . . .").)

Accordingly, Plaintiffs' motion for a new trial on this ground is DENIED.

B.  Polygraph Evidence

# SPA69

Both of the pending motions for a new trial also raise various issues with respect to the polygraph evidence in this case. To the extent that Plaintiffs' arguments overlap, the Court will provide a singular discussion on the matter. To the extent that Plaintiffs proffer arguments specific to their unique status in the case, the Court will structure its analysis accordingly.

1. Prejudice to Restivo and Halstead by Admission of Kogut's Polygraph

Restivo and Halstead argue that they were prejudiced by the introduction of evidence that Kogut took a polygraph and was told that he failed. They argue that "the jury could have improperly relied on the fact of Kogut's polygraph in determining that Kogut (and, by implication, Restivo and Halstead) were guilty of the Fusco rape/murder, that defendants had probable cause to prosecute them, that defendants had a subjective belief in Restivo and Halstead's guilt, or all of the above." (Docket Entry 457-1 at 20).

With respect to the jury considering polygraph evidence to determine Plaintiffs' guilt or Defendants' subjective belief in guilt, the jury very clearly understood that they could not consider the polygraph results. The Court instructed the jury on multiple occasions that the results of any polygraphs were not in evidence and that the jury was not to

infer the results.  For example, during opening statements the Court instructed the jury as follows: "At certain times, counsel [may] make statements regarding a polygraphist.  The one thing you will not hear in this case is the result of a polygraph, one way or the other.  You are just here for the facts."  (Trial Tr. 223.)

There is nothing to suggest that the jury was in any way confused by these instructions or did not understand them. See Aristocrat Leisure Ltd v. Deutsche Bank Trust Co. Americas, 727 F. Supp. 2d 256, 275 (S.D.N.Y. 2010) ("There was no indication that the jurors either failed to comprehend the special instruction or were swayed by the stricken testimony."). In fact, one juror even interrupted closing arguments to note that they could not consider the results of the lie detector test.  (Trial Tr. 5777-78.)

In further support of their argument that they were prejudiced by the introduction of polygraph evidence, Halstead and Restivo also point to the trial testimony of Dempsey and Walsh.  Upon cross-examination, Detective Dempsey "gratuitously" testified that Restivo took and failed a polygraph.  (See Docket Entry 457-1 at 20-21 (citing Trial Tr. 3019).)  In addition, during his direct examination, Walsh testified that Restivo agreed to take a polygraph.  (Trial Tr. 5492.)  During Dempsey's testimony, the Court instructed the jury as follows: "Ladies and

gentlemen, you heard the term polygraph, lie detector test, et cetera. I want you to understand that polygraph or lie detector tests, the results, are never admissible, never admissible. These terms have nothing to do with respect to this case and you are to disregard them." (Trial Tr. 3616.) Similarly, during Walsh's testimony, the Court stated: "I, on [a] prior occasion, told you that polygraph evidence is not part of the case. You have not forgotten that, and it certainly has nothing to do with this case and Mr. Restivo. Strike from your memory anything with regard to the polygraph evidence." (Trial Tr. 5502.)

Halstead and Restivo maintain, however, that the Court's curative instructions were inadequate. In support, they cite to various texts and other sources discussing the practical ability of jurors to follow such instructions. Despite their academic approach to this issue, and the logical conundrum that curative instructions present in the abstract, this argument is not novel. "[J]uries are presumed to follow the instructions they are given." Stowe, 793 F. Supp. 2d at 567 (citing Bingham v. Zolt, 66 F.3d 553, 563 (2d Cir. 1995)). Although there are "particularly egregious circumstances" in which a curative instruction may be insufficient, see id. (citing United States v. Reyes, 18 F.3d 65, 71-72 (2d Cir. 1994), this is not such a case. In initially ruling on this matter, the Court took into consideration the very same arguments regarding prejudice that

Plaintiffs now raise.  The Court, properly, put its faith in the jury system.  See CSX Transp, Inc. v. Hensley, 556 U.S. 838, 841, 129 S. Ct. 2139, 173 L. Ed. 2d 1184 (2009) ("The jury system is premised on the idea that rationality and careful regard for the court's instructions will confine and exclude jurors' raw emotions.").

Accordingly, Plaintiffs' motion for a new trial in this regard is DENIED.

With respect to probable cause, Halstead and Restivo themselves used the Kogut polygraph in their probable cause analysis of malicious prosecution.  In attempting to rebut the presumption of probable cause, Halstead and Restivo, similar to their fair trial claim, offered evidence that Defendants created false witness statements through coercion tactics such as submitting witnesses to polygraphs and then telling them that they failed.  (Trial Tr. 5873-74, 5878-79.)  In fact, in his closing, counsel for Halstead and Restivo used the example that Restivo was taken in, given a polygraph, told he failed, and pressured into making a statement.  (Trial Tr. 5877.)  The scenario of Kogut's polygraph only bolsters this theory.

Accordingly, Halstead and Restivo's motion for a new trial on this ground is DENIED.

   2. Deliberating Jury Inadvertently Provided with
      Polygraph Results (and prior arrests)

   Kogut, Halstead, and Restivo also maintain that they
are entitled to a new trial because the jury was inadvertently
provided evidence regarding Kogut's polygraph examination and
results. Specifically, six days into deliberations, the jury
requested to see the Kogut polygraph and highlighted polygraph
question sheet of Kogut, which had been admitted into evidence
in a redacted form. (See Ct. Ex. 17.) Unfortunately, counsel
for Halstead and Restivo mistakenly pulled the unredacted
exhibit, which went unnoticed by defense counsel, and the jury
erroneously received evidence that the examiner determined that
Kogut had been lying during the polygraph examination and
evidence regarding Kogut's prior criminal history. Counsel
noticed the error within minutes, and Court personnel retrieved
the documents. Upon retrieval, however, one juror stated "I
think you want this back," referring to the polygraph exhibits.
(Trial Tr. 6196.)

   The parties and the Court recognized the significance
of this event, and the Court acted promptly. In fact, at no
time during discussion of the matter did Plaintiffs' counsel
request a mistrial. Rather, Plaintiffs' counsel drafted a
curative instruction, which the Court adopted almost verbatim.
The Court informed the jury that they had been mistakenly

provided a portion of Exhibit 8 that was not in evidence and instructed them that "[t]here is no evidence of any polygraph test result before you in this case. As I previously instructed you, polygraph results are not admissible, they are inadmissible, and should not be used by you for any purpose." (Trial Tr. 6199). In addition to providing the proposed curative instruction, the Court further accommodated Kogut's counsel and questioned each individual juror as to whether they could follow the Court's directive. (Trial Tr. 6199-6200.) See Bennett v. Poole, No. 04-CV-0014, 2008 WL 3200242, at *15 (W.D.N.Y. Aug. 5, 2008) (noting that, on appeal, the Appellate Division found that curative instruction, which was proposed by defense counsel, negated any prejudice).

Plaintiffs were essentially content with the Court's actions and made no further objections. See Health Alliance Network, Inc., 245 F.R.D. at 128 (denying new trial where Court provided curative instruction and the defendants did not ask for any further instruction or relief); see also Isaac v. City of N.Y., 271 F. App'x 60, 65 (2d Cir. 2008) ("[G]iven the District Court's willingness to adopt the remedial measures suggested by Isaac and Isaac's failure to object at that point, we conclude that the District Court did not exceed its allowable discretion in denying Isaac's motion to set aside the jury's verdict on this ground.").

27

As such, the Court finds that any error in this regard does not merit a new trial and Plaintiffs' motion in this respect is DENIED.

C. Additional Evidentiary Issues

Kogut raises several other evidentiary errors which he maintains merit a new trial. First, he raises error with respect to evidence of prior arrests. As noted previously, along with the polygraph results, the jury was also inadvertently provided with a background questionnaire form during deliberations. The questionnaire form contains information regarding Kogut's prior criminal history, including that Kogut had been arrested "7-8" times before, that Kogut had received a prior "charge" for "burg/tresp," and that Kogut may have been on probation at the time of his polygraph examination. (Ct. Ex. 18.) Second, Kogut maintains that, as a result of the consolidated trial with Halstead and Restivo, Kogut was prejudiced by the admission of testimony regarding Halstead's interactions with young girls and by the admission of statements allegedly made by Restivo.

Evidentiary errors, however, assuming there were any, do not merit a new trial unless a party's substantial rights were affected. See supra at 7-8. Here, even if there were such errors, they do not require a new trial. To begin, the jury heard some argument and testimony about Kogut's background,

28

albeit in a general sense.   For example, during opening statements, Kogut's counsel argued that Kogut's rough upbringing and difficult past may have made him more vulnerable to coercion tactics.   (See Trial Tr. 154-55, 210-11; see also id. 1285-87.) Thus, the fact that Kogut had a less than stellar past most likely came as little surprise to the jury.   Moreover, the questionnaire form was one page, containing a relatively large amount of information, within a several page document.   (Ct. Ex. 18.)   The jury received this document at the same time that it received several others and had the exhibits for a brief period of time.   In any event, this evidence certainly was not emphasized to the jury in any way, and there is nothing to suggest that they improperly considered it.   See Dominguez v. Samataro, 257 F.R.D. 624, 625-26 (D. Conn. 2009) (evidence regarding prior convictions did not warrant new trial).

Likewise, neither was testimony regarding Halstead's interactions with young girls or Restivo's supposed admissions prejudicial to Kogut such that a new trial is warranted.   Kim Beyer ("Beyer") and Regina Fuhrmann testified that, as teenagers, they frequented Halstead's apartment, where they at times drank alcohol and used marijuana.   Although this may have some implications about the much older Halstead, such testimony says very little about Kogut, who was a teenager himself at the time.   Furthermore, Beyer testified that, on the occasion she

met Kogut, Kogut was polite.   (Trial Tr. 4973.)   In addition, Michael and Kenneth Cockerel testified regarding statements allegedly made by Restivo, statements which said nothing of Kogut nor necessarily implicated him in any way.

The Court fails to see how any such evidence was prejudicial against Kogut, nevermind how it can be said to have affected his substantial rights.   Accordingly, Kogut's motion for a new trial in this respect is DENIED.

III.  Restivo and Halstead's Claims Regarding Presentation of Evidence Relevant to Crimes

In addition to the aforementioned arguments, Restivo and Halstead also assert that they were barred from presenting evidence directly relevant to their crimes, and therefore this Court should grant them a new trial.   Specifically, they argue that the Court barred or limited evidence pertaining to David Rapp, Fred Klein, Peter Weinstein, and prior cases involving Volpe and Dempsey.   Moreover, they assert that the cumulative effect of these errors further supports their position for a new trial.   The Court will address each of these arguments in turn.

A.  David Rapp

Halstead and Restivo claim that the Court improperly excluded approximately forty pages of deposition testimony from David Rapp.   (Docket Entry 457-1 at 24.)   Mr. Rapp was a former friend of Restivo's who testified during his deposition that he

was questioned by Nassau County Police Department officers, that officers told him that Carl Pozzini overheard him having a conversation with Restivo in which Restivo made admissions to Rapp, and that Rapp ultimately provided a false statement to police vaguely incriminating Restivo. (Docket Entry 457-1 at 24 (quoting Rule 32 designation of Rapp deposition excerpts).) The Court excluded this testimony because it is hearsay and because it is irrelevant.

Halstead and Restivo assert that this evidence is not hearsay and that it is relevant because Rapp not only denies that he ever had a conversation with Pozzini about Restivo's admissions, but that he told NCPD officers before the grand jury that Restivo had never made any admissions to him. Therefore, they say, it is relevant to rebut the presumption of probable cause.

The Court finds no error in its initial ruling. Defendants did not attempt to use the statements of Carl Pozzini or David Rapp in its showing of probable cause. (Trial Tr. 2200 (Defendants "are not coming in and saying we relied on it, the statement of David Rapp or the statement of Carl Pozzini, that was part of our reliance in arresting and prosecuting them.").) Thus, that Rapp later recanted his statement regarding Restivo's admissions is not relevant, and does not show that Defendants did not make a full and fair statement of the facts.

31

Nor is this "critical circumstantial evidence corroborating Restivo's testimony that defendants treated him the same way during the same investigation." (Docket Entry 457-1 at 26.)   Plaintiffs presented ample testimony regarding Defendants' treatment of witnesses and suspects during the investigation, including evidence regarding the treatment of Kogut and Michael Cockrel.   The Court may, in its discretion, exclude cumulative evidence.   See United States v. Stewart, 433 F.3d 273, 313 (2d Cir. 2006); Zomber v. Stolz, No. 09-CV-4637, 2012 WL 252844, at *8 (E.D.N.Y. Jan. 26, 2012).

Having found no evidentiary error, Halstead and Restivo's motion for a new trial in this regard is DENIED.

B.   Fred Klein Evidence

Halstead and Restivo further assert that the Court erred in excluding a particular document in connection with the testimony of Fred Klein. As Plaintiffs correctly state, "[t]he critical subject of Klein's testimony was whether Volpe ever disclosed the Brady material about the French car/striped jeans/rope lead to him." (Docket Entry 457-1 at 26.)   Klein could not recall whether he ever had knowledge of such evidence, but Volpe had testified during his deposition that he turned over the entire police file to Klein.   To counter Volpe's testimony, Halstead and Restivo sought to introduce the prior inconsistent statement of prosecution witness Brian O'Hanlon.

Klein's deposition testimony revealed that he had not seen the O'Hanlon statement but that he would have disclosed it to the defense if he had.  (See Docket Entry 457 Ex. D (O'Hanlon Stmt.).)  Thus, Plaintiffs sought to use the O'Hanlon statement as circumstantial evidence that Volpe had not, in fact, turned over the entire police file.  The Court concluded that, "[w]ithout O'Hanlon being here, I think it's an improper use of the document and I'm going to exclude it."  (Trial Tr. 4136.)

Even assuming arguendo that there was an evidentiary error in this respect, any error was harmless.  Mr. Klein directly testified regarding the French car/striped jeans/rope lead, and the jury heard extensive testimony and argument on this particular topic.  (See, e.g., Trial Tr. 4098-4125.) Although Mr. Klein did not have a specific recollection as to whether that evidence was contained in the file, his testimony alone provided circumstantial evidence to support Plaintiffs' argument that Volpe did not turn over the entire file. Specifically, Klein testified that he couldn't remember receiving those documents, but that if he had, it would have been important, and he would have followed up on it and/or brought that information to the attention of his colleagues. (See Trial Tr. 4123-24.)  That Klein did not do so, and even that Klein did not recall such potentially pertinent evidence, supported Plaintiffs' theory.  Accordingly, exclusion of the

# SPA81

O'Hanlon statement, even if erroneous, did not affect
Plaintiffs' substantial rights, and the motion for a new trial
in this regard is DENIED.

C. <u>Peter Weinstein</u>

In addition, Restivo and Halstead maintain that the
Court erred in excluding the March 10, 1995 memorandum from
former Appeals Bureau Chief Peter Weinstein in which Mr.
Weinstein recommends vacating Restivo and Halstead's
convictions. (Docket Entry 457-1 at 27.) Halstead and Restivo
claim that the Weinstein memorandum was critical to their
continuing prosecution case. The Court made the following
ruling: "Well, [the Weinstein memorandum] is subjective legal
opinion. It's not coming in . . . You can ascertain from Mr.
Weinstein all the things they didn't know and you can also
ascertain that in 1995 they were aware of the DNA testing and
what if any significance that had. I think you should be able
to elicit that information." (Trial Tr. 3858.)

Thus, once again, even if there was an error, which
the Court does not believe that there was, any error was
harmless as Plaintiffs were not prevented from presenting
evidence on this topic and were free to elicit this testimony
directly. Moreover, Halstead and Restivo assert that exclusion
of the Peter Weinstein evidence also hampered their proof
regarding the French car/striped jeans/rope material. (Docket

34

Entry 457-1 at 28.)   However, rather than calling Mr. Weinstein, the parties ultimately entered into a stipulation which stated that, "[t]o the best of Mr. Weinstein's knowledge, this information about the French car/striped jeans lead was never disclosed by the police to the prosecutors." (Ct. Ex. 4.)

Accordingly, the motion for a new trial based on the Court's exclusion of the Peter Weinstein evidence is DENIED.

D.  <u>Moore and Lee cases</u>

Halstead and Restivo further assert that the Court erred in excluding evidence regarding the cases of <u>Shonnard Lee v. Dempsey</u>, No. 00-CV-0881 (E.D.N.Y.), and <u>Robert Moore v. Incorporated Village of Hempstead</u>, No. 96-CV-5987 (E.D.N.Y.). Specifically, they maintain that they should have been able to use <u>Lee</u>, in which the jury found that Dempsey affirmatively misled and tricked the plaintiff, to impeach Dempsey's trial testimony that he never used trickery or deception to obtain a statement from a suspect. (Docket Entry 457-1 at 29.).   In addition, they say, they should have been able to introduce evidence that Dempsey and Volpe took other false confessions, such as in the <u>Lee</u> and <u>Moore</u> cases.  (Docket Entry 457-1 at 31.)

With respect to the preclusion of the <u>Lee</u> and <u>Moore</u> cases generally, the Court previously addressed these issues and ruled appropriately.  During the September 6, 2012 conference, the Court held:

> The evidence that the plaintiff seeks to introduce on 404(b) evidence as to the Shonnard Lee and Robert Moore prosecutions as they deal with Detectives Volpe and Dempsey will not be admissible in the first phase. They will be admissible in the second phase. Under 404(b), evidence of crimes, wrongs, or acts are not admissible to show action in conformity with. The evidence that plaintiffs seek to admit, this particular evidence, is to show a modus operandi, and that is not one of the permitted purposes in this particular case . . . .

(Sept. 6, 2012 Tr. 4-5.)  Plaintiffs cite no reason as to why the Court's prior ruling was erroneous, and in fact refer back to prior briefing on this issue.  "[A] Rule 59 motion may not be employed to relitigate already-decided matters," Ullman v. Starbucks Corp., 152 F. Supp. 2d 322, 326 (S.D.N.Y. 2001) (internal quotation marks and citation omitted), however, and the Court finds nothing erroneous in its initial ruling.

With respect to limitations on the impeachment of Dempsey, the Court properly concluded that the prejudicial effect of such impeachment evidence outweighed any probative value.  See Fed. R. Evid. 403 ("The court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence.").  As the Court expressed in its September 6, 2012 ruling, the jury very

likely would have been confused, by, and considered evidence regarding, Dempsey's prior conduct in other cases to conclude that Dempsey acted in conformity therewith and used coercive tactics to obtain false witness statements in this case. The prejudicial impact of such testimony cannot be understated. In the context of this particular trial, in which Plaintiffs presented various evidence regarding Defendants' alleged coercion tactics, the Court finds that the limitation of impeachment evidence was not error and, even if it was, any such error was harmless.

Accordingly, Halstead and Restivo's new trial motion on this ground is DENIED.

Finally, and as the Court finds that it did not err with respect to the aforementioned evidence, the Court also rejects Halstead and Restivo's claim regarding the cumulative effect of these errors. Accordingly, their motion for a new trial on the grounds that they were barred from presenting evidence directly relevant to their crimes is DENIED.

IV.  Qualified Immunity of Spillane

Halstead and Restivo further aver that the question of qualified immunity as to Defendant Spillane never should have been presented to the jury. The Court agrees.

Here, the jury was instructed, in relevant part:

37

    I will now instruct you about what is called qualified immunity. This instruction relates only to the claim that defendant Spillane created a policy or custom under which unconstitutional practices occurred. It does not relate to the claim that defendant Spillane directly participated in a constitutional violation, nor does it apply to any of the other claims any of the plaintiffs have asserted.

    At the time of the incidents giving rise to this lawsuit, it was clearly established law that supervisors were required to investigate all complaints regarding an officer's wrongdoing with respect to a violation of constitutional rights. However, even if you find that the defendant Spillane violated the law requiring him to investigate all complaints regarding an officer's wrongdoing with respect to a violation of constitutional rights, he may still not be liable to Restivo and Halstead. This is because the defendant may be entitled to what is called qualified immunity. If you find that he is entitled to such immunity, you must find him not liable.

(Trial Tr. 6043-44.)

    The Court determined that there were pending questions of fact on which qualified immunity as to Defendant Spillane turned. For example, the Court explained, during a somewhat lengthy discussion on this particular portion of the jury charges and verdict sheet, that whether qualified immunity for Spillane was present here depended upon whether the jury credited Plaintiffs' version of events as to witness interrogations and the overall investigation. (See, e.g., Trial Tr. 5275 ("The jury may very well find that the defendants did

38

not use coercive tactics in questioning Kogut and/or Mr.
Restivo.  They may find that they got him coffee; they were nice
to him; he had some time to rest.  I don't know what they will
find."); Trial Tr. 5276 ("I think there is reasonable basis,
because the jury can find that the information Spillane had was
not as serious.  They may find that he had some information, but
it really wasn't clear that Kogut was being fed facts, that he
was forced, you know.")).

Certainly, these factual issues were properly
presented to the jury.  See Oliveira v. Mayer, 23 F.3d 642, 649-
50 (2d Cir. 1994) (finding that the District Court erred in not
presenting qualified immunity to the jury due to factual issues
involved); Wright v. Wilburn, 194 F.R.D. 54, 60 (N.D.N.Y. 2000)
("[I]f determining the objective reasonableness of the police
officer's conduct requires further fact finding, it is
appropriate to submit the issue of qualified immunity to the
jury.").

Furthermore, and although there is somewhat of a split
of authority, see Stephenson v. Doe, 332 F.3d 68, 81 n.18 (2d
Cir. 2003) ("Courts have disagreed about whether a jury that is
provided a proper legal basis should decide qualified
immunity."), the better course of action is for the Court to
decide qualified immunity as a matter of law after the jury has
resolved the factual issues in dispute, see Lore v. City of

Syracuse, 670 F.3d 127, 162 (2d Cir. 2012) ("We conclude that
although the district court properly put the fact questions to
the jury, it erred in having the jury decide the ultimate legal
question . . . ."); Warren v. Dwyer, 906 F.2d 70, 76 (2d Cir.
1990) ("The ultimate legal determination whether, on the facts
found, a reasonable police officer should have known he acted
unlawfully is a question of law better left for the court to
decide.").

The Court further notes that Halstead and Restivo, but
not Kogut, brought the claim of supervisory liability as to
Spillane. Accordingly, Halstead and Restivo's new trial motion
on this ground is meritorious, and GRANTED in this respect.

V.   The Verdict is Against the Weight of the Evidence

Finally, Plaintiffs seek a new trial because, they
say, the verdict was against the weight of the evidence.
Insofar as Halstead and Restivo have argued such, the Court has
already granted their motion for a new trial and need not
address this issue any further. Insofar as Kogut seeks a new
trial on this ground, his motion is DENIED.

Kogut outlines a list of evidence which, he believes,
"overwhelmingly demonstrates that the verdict in favor of the
defendants on each of the plaintiff's claims was against the
clear weight of the evidence." (Docket Entry 456 at 12.) In
the Court's view, such evidence falls into two primary

categories: (1) testimonial evidence; and (2) scientific and medical evidence.

By "testimonial" evidence, the Court means to refer to evidence that turns primarily, if not exclusively, on witness credibility, such as the testimony of retired F.B.I. Special Agent Frank Meyers, testimony regarding Plaintiffs' whereabouts on November 10, 1984, and evidence regarding Kogut's confession. Despite the relatively lenient standard on a Rule 59 motion, however, the jury's assessment of witness credibility is entitled to deference and "the court should only grant such a motion when the jury's verdict is egregious." Ricciuti, 70 F. Supp. 2d at 305; see also Ellis v. La Vecchia, 567 F. Supp. 2d 601, 610 (S.D.N.Y. 2008) ("The jury was entitled to credit Plaintiff's testimony and the Court should not disturb that assessment."). Here, a reasonable view of the evidence is that Plaintiffs were together on the night of November 10, 1984 and that, whether true or not, Kogut's confession was not the product of coercion. For example, Agent Meyers testified, during his videotaped deposition, that the blue van purportedly used during Fusco's rape and murder was up on blocks in Restivo's driveway and not in immediately operable condition. (Trial Tr. 3510-12.) The jury, though, which viewed portions of the deposition, was in the best position to determine Agent Meyer's credibility, and may have very well found that Meyers,

41

# SPA89

as a member of Restivo's family, was entitled to less
credibility or simply that Meyers may have been mistaken.
Moreover, the jury viewed the Kogut videotape confession on
multiple occasions, in addition to having heard an abundance of
testimony on this particular topic, and, in light of such
testimony, it was reasonable for them to credit Defendants'
version of events.

With respect to the scientific and medical evidence,
some of it, such as the DNA evidence, pertains more to the issue
of Plaintiffs' actual guilt or innocence in the underlying crime
than to the issues relevant to the particular case at hand.
Other evidence, such as the post mortem root hair banding
evidence and the medical evidence concerning the manner of
death, although scientific in nature, has a testimonial and
credibility component as well. See Giles v. Rhodes, 171 F.
Supp. 2d 220, 226 (S.D.N.Y. 2001) ("Even assuming arguendo the
medical evidence concerning Giles' injuries did not itself
implicate any credibility issues, a decision by this Court that
the verdict is against the weight of the evidence would require
me to credit the plaintiff's testimony over the defendants'."
(emphasis in original)); see also Lewis v. City of N.Y., 689 F.
Supp. 2d 417, 426 (E.D.N.Y. 2010) (jury was entitled to credit
one expert over the other). Even in the face of unrefuted
expert testimony, the jury need not necessarily adopt the

expert's opinion without scrutiny.  Giles, 171 F. Supp. 2d at 226 ("The fact that defendants did not rebut Dr. Mihalakis's opinion with a medical expert of their own did not immunize the Mihalakis testimony from the jury's evaluation of whether it was credible.").  In this case, Defendants demonstrated on cross-examination of Plaintiffs' expert on post mortem root hair banding that, as to the issue of timing, which was critical to Plaintiffs' case, additional research was required and the expert could not testify on that issue to a reasonable degree of scientific certainty.  (Trial Tr. 2111-16.)  Accordingly, the verdict as to Kogut was not so "seriously erroneous" as to merit a new trial.  See Campbell v. City of N.Y., No. 99-CV-5129, 2003 WL 660847, at *2 (S.D.N.Y. Feb. 27, 2003).

Kogut's motion for a new trial on the grounds that the verdict was against the clear weight of the evidence is DENIED.

VI.  Motion to Settle the Record

Also pending before the Court is a motion to settle the record filed by Plaintiffs Halstead and Restivo and joined by Plaintiff Kogut.  (See Docket Entries 474 & 476.)  According to Plaintiffs, the current trial record erroneously omits certain deposition excerpts that were played for the jury during trial.  Plaintiffs request that the Court enter an Order reflecting that these deposition excerpts were indeed presented

to the jury and are appropriately part of the record.  For the following reasons, Plaintiffs' motion is GRANTED.

A district court may, in certain circumstances, amend, correct, or clarify the record.  For example, Federal Rule of Appellate Procedure 10(e) provides that "[i]f any difference arises about whether the record truly discloses what occurred in the district court, the difference must be submitted to and settled by that court and the record conformed accordingly." FED. R. APP. P. 10(e)(1); see also Corbett v. Guardian Worldwide Moving Co., 164 F.R.D. 323, 329 (E.D.N.Y. 1995) ("Rule 10(e) provides a mechanism for ensuring that the record reflects accurately what transpired in the district court." (internal quotation marks and citation omitted)).  In addition, Federal Rule of Civil Procedure 60(a) states that "[t]he court may correct a clerical mistake or a mistake arising from oversight or omission whenever one is found in a judgment, order, or other part of the record." FED. R. CIV. P. 60(a).

In support of their motion, Plaintiffs provide sworn declarations from Ms. Deborah Cornwall, former counsel for Halstead and Restivo, and Mr. Anthony Grandinette, counsel for Kogut.  Both declarations affirm that Plaintiffs' counsel kept contemporaneous records of video deposition excerpts that were presented to the jury, taking into account changes made after Defendants' objections, the Court's rulings, and attempts to

reduce the overall length of particular clips.  (Cornwall Decl.
¶ 4; Grandinette Decl. ¶ 4.)   Defendants do not particularly
dispute that portions of the specified depositions were
presented to the jury.   Rather, they oppose Plaintiffs' motion
because there is no way of knowing for sure whether the portions
Plaintiffs identify are truly accurate and because Plaintiffs'
counsel should have identified on the record the portions being
played for the jury or moved the final versions into evidence.
(Defs.' Opp. to Mot. to Settle, Docket Entry 479, at 3.)

        Given the sworn declarations of such thorough counsel,
the Court's familiarity with the trial proceedings, and the
Defendants' somewhat general opposition to the motion, the Court
concludes that those portions of deposition excerpts specified
in the Cornwall and Grandinette declarations were presented to
the jury and are properly part of the record.   See Libaire v.
Kaplan, No. 06-CV-1500, 2010 WL 2301197, at *4 (E.D.N.Y. June 7,
2010) (concluding that particular exhibits were part of the
record because magistrate judge likely would have noticed
missing exhibits and it generally appeared that exhibits had
been before the Court at some point); United States v. DiPietro,
No. 02-CR-1237, 2007 WL 2164262, at *2 (S.D.N.Y. July 25, 2007)
("[T]he Court holds that it may consider both direct and
circumstantial evidence in ruling on a motion to correct the
record under Federal rule of Appellate Procedure 10(e).");

# SPA93

Benvenisti v. City of N.Y., No. 04-CV-3166, 2007 WL 1825853, at
*1 (S.D.N.Y. June 25, 2007) (denying motion to settle the record
without prejudice to plaintiff bringing an amended motion with a
sworn affidavit articulating reasons for belief that documents
were part of the summary judgment record).  Accordingly,
Plaintiffs' motion to settle the record is GRANTED and the
portions specified in the declarations are deemed part of the
record.

CONCLUSION

For the foregoing reasons, Kogut's motion for a new
trial is DENIED, Halstead and Restivo's motion for a new trial
is GRANTED IN PART and DENIED IN PART, and the motion to
amend/correct/supplement the record is GRANTED.

Finally, also pending before the Court is Defendants'
motion for judgment as a matter of law regarding Plaintiffs'
Monell claims (Docket Entry 447).  Defendants submitted this
motion to the Court on November 28, 2012.  In light of the
jury's verdict, rendered the following day on November 29, 2012,
Defendants' motion for judgment as a matter of law on the Monell
claims is DENIED AS MOOT.

[BOTTOM OF PAGE INTENTIONALLY LEFT BLANK]

46

Within thirty (30) days of the date of this Memorandum & Order, counsel for Halstead and Restivo and counsel for Defendants shall provide the Court with dates that they are available for a Court conference.

SO ORDERED

/s/ JOANNA SEYBERT
Joanna Seybert, U.S.D.J.

DATED:      July __22__, 2013
            Central Islip, New York

# UNITED STATES DISTRICT COURT

### EASTERN DISTRICT OF NEW YORK

FILED
CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y.

★  **NOV 17 2014**  ★

------------------------------X

JOHN RESTIVO & DENNIS HALSTEAD,

Plaintiffs

LONG ISLAND OFFICE

-V-

JUDGMENT IN A CIVIL CASE
CV 06-6720 (JS)

CAROLANN HESSEMAN AS EXECUTRIX
FOR THE ESTATE OF JOSEPH VOLPE
(in his individual capacity),

Defendant

------------------------------X

__X__ **Jury Verdict.**  This action came before the Court for a trial
by jury.  The issues have been tried, and the jury has ren-
dered its verdict.

____ **Decision by Court.**  This action came to trial or hearing be-
fore the Court.  The issues have been tried or heard, and a
decision has been rendered.

IT IS ORDERED AND ADJUDGED that the Plaintiff JOHN
RESTIVO recover of the Defendant CAROLANN HESSEMAN AS EXECUTRIX
FOR ESTATE OF JOSEPH VOLPE (in his individual capacity) the sum
of $18,000,000.00.

IT IS FURTHER ORDERED AND ADJUDGED that the Plaintiff
DENNIS HALSTEAD recover of the Defendant CAROLANN HESSEMAN AS
EXECUTRIX FOR ESTATE OF JOSEPH VOLPE (in his individual capacity)
the sum of $18,000,000.00.

With no other claims remaining, the case is CLOSED.

Dated: Central Islip  NY
       Nov. 17, 2014

DOUGLAS C. PALMER
Clerk of Court

By: Charles J. Baran
Deputy Clerk